# EXHIBIT 13

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

MARY ELLEN JOHNSON        §
                          §
VS.                       §    CIVIL ACTION NUMBER
                          §    5:15-CV-00297-FB-HJB
SOUTHWEST RESEARCH        §
INSTITUTE                 §


ORAL DEPOSITION OF KARL NOVA COOPER

San Antonio, Texas

January 20, 2017

10:07 a.m.


Reported by:

Micheal A. Johnson, RDR, CRR, CCR

Job No. 17938

1              ORAL DEPOSITION OF KARL NOVA

2     COOPER, produced at the instance of the

3     Plaintiff, in the above-styled and numbered

4     cause on the 20th day of January, 2017, at

5     10:07 a.m., before Micheal A. Johnson, RDR,

6     CRR, Notary Public in and for the State of

7     Texas, reported by realtime stenographic

8     means, at the offices of Norton Rose

9     Fulbright, 300 Convent Street, Suite 2100,

10    San Antonio, Texas, pursuant to Notice of

11    Oral Deposition, and in accordance with the

12    Federal Rules of Civil Procedure.

13

14

15

16

17

18

19

20

21

22

23

24

25

1            A P P E A R A N C E S

2    ON BEHALF OF THE PLAINTIFF
     MARY ELLEN JOHNSON:
3
          Colin W. Walsh, ESQ.
4         LAW OFFICE OF ROB WILEY, P.C.
          1011 San Jacinto Boulevard, Suite 401
5         Austin, Texas 78701
          (512) 271-5527
6         cwalsh@robwiley.com

7
     ON BEHALF OF THE DEFENDANT
8    SOUTHWEST RESEARCH INSTITUTE:

9         Mario A. Barrera, ESQ.
          NORTON ROSE FULBRIGHT, LLP
10        300 Convent Street, Suite 2100
          San Antonio, Texas 78205
11        (210) 270-7125
          mario.barrera@nortonrosefulbright.com
12

13   ALSO PRESENT:

14        Kelly Anderson, SwRI In-House Counsel

15

16

17

18

19

20

21

22

23

24

25

1           A.      I did.

2           Q.      And who was that?

3           A.      My immediate supervisor was

4      Nicholas Hawkins.

5           Q.      And did he oversee just your

6      division or -- I'm sorry, just your

7      department or more than one?

8           A.      He overseed -- or oversaw a --

9      what would be considered a section of that

10     department.

11          Q.      So how many employees did he

12     oversee, approximately?

13          A.      I'm not entirely sure.

14          Q.      Well, how many --

15          A.      If I were to guess, between 10

16     and 15.

17          Q.      So there were a lot of people

18     in Nicholas Hawkins' position, then, in

19     Division 11?

20          A.      Each department had

21     approximately two people in that position.

22     So realize that --

23          Q.      So about six people would have

24     Nicholas Hawkins' position, then?

25          A.      At the time -- yes.  When I was

1     A.    It is above.

2     Q.    So just to make sure that I

3 understand how it works, it goes technician,

4 principal technician, senior technician?

5     A.    Technician, senior technician,

6 principal technician.

7     Q.    You literally just said that.

8 All right.  I apparently was not listening.

9 What's above principal?

10    A.    Staff.

11    Q.    Staff.  Is there anything above

12 staff?

13    A.    Not in that ladder.

14    Q.    Is there something called

15 "engineering technologist"?

16    A.    There is an engineering

17 technologist.

18    Q.    What is that?

19    A.    That is an exempt position that

20 some staff technicians are available -- can

21 be promoted to.  I don't think it's on the --

22 yeah.  I can't picture the career ladder, but

23 a principal engineering -- I'm sorry, an

24 engineering technologist is an exempt

25 position --

1        Q.      And it would be --

2        A.      -- that you could take from

3    that technician path.

4        Q.      Okay.  And would it be a

5    promotion to go up to an engineering

6    technologist from --

7        A.      It certainly would.  It takes

8    you from the nonexempt staff role to an

9    exempt staff role.

10       Q.      Do you guys do internal midyear

11   performance reviews, or did you when you were

12   supervising Ms. Johnson?

13       A.      I don't recall.  Sometimes

14   midyears are performed.

15       Q.      When would they be performed?

16       A.      Midyear.  Usually springtime,

17   if we were to do them.

18       Q.      Okay.  So we talked a little

19   bit about how you wanted and expected

20   Ms. Johnson to go out and find other work and

21   to work better in teams.  What did you do to

22   work with her to make sure that happened?

23       A.      I tried to get her involved in

24   a couple of different efforts that I was

25   involved in on -- on the project side.

1      Q.      Did any other employees have

2   issues with communication or working on teams

3   at the same time that Mary Ellen Johnson was

4   working there?

5      A.      So on the people I was

6   supervising at the time, we've already

7   discussed one potential case, which is Marcus

8   Tyler, and we had a hard time integrating him

9   into a team.  Other than that, nobody in my

10  group.

11     Q.      What were the genders of the

12  five people that you supervised?

13     A.      So Darrel Short was male; Pablo

14  Terrazas was male; Mary Ellen Johnson was

15  female; Marcus Tyler, male; and I did have a

16  student I believe at the time who was also

17  male.

18     Q.      So Mary Ellen Johnson was the

19  only female working in that department -- or

20  in your department?

21     A.      In my group of those five

22  people; that is correct.

23     Q.      What is "timesheet Friday"?

24     A.      It is the final Friday in a pay

25  period.

1    activities that they are doing.

2        Q.    Who pays overhead charges --

3    charges to overhead?

4        A.    The institute, in the end.  Our

5    company pays for charges to overhead.

6             May I get up and get a drink?

7        Q.    Sure.

8        A.    Is this a -- thank you.

9        Q.    All right.  So I want to talk a

10   little bit about the e-mail that we entered

11   as Exhibit 1.  And we talked about how you

12   believe that this was an unprofessional

13   e-mail, correct?

14       A.    Yes.

15       Q.    And that's why you went to

16   Mr. Hawkins about it?

17       A.    Yes.

18       Q.    Why did you go to

19   Mr. Hawkins -- now, when did you go to

20   Mr. Hawkins about it?

21       A.    I went -- I contacted Nick soon

22   after I got this, and I believe we met the

23   following day.  We met over the weekend to

24   discuss this.

25       Q.    Why didn't you address this

1    with Ms. Johnson before going to Nick?

2         A.    Quite honestly, it took me by

3    surprise.  I didn't quite know how to handle

4    it, one.  Secondly, I was -- I was leaving on

5    a monthlong work-related trip that Sunday.

6    So I got this at the end of the day on Friday

7    and I was leaving Sunday to ship out for a

8    month.

9         Q.    Okay.  But why didn't you talk

10   to Ms. Johnson before that?

11        A.    I was -- certainly had a lot of

12   things to prep for and I was loaded.  I

13   simply didn't have the time.

14        Q.    So what was your main issue

15   with this e-mail when you contacted Nick

16   Hawkins?  Was it just that this was

17   unprofessional and you were surprised by it?

18        A.    It was the -- yes.  It was the

19   tone.  It was -- there was the profanity, the

20   hostility within the e-mail that was unusual

21   to me.

22        Q.    And what did Nick Hawkins do

23   once you talked to him about this?

24        A.    Yeah, we talked about it.  He

25   agreed that it was not professional, hostile,

1    everything I just said, and that -- and after

2    discussion, we talked about how I might

3    handle this when I get back.

4         Q.    And so you said you left for a

5    month.  Is that why the meeting didn't occur

6    until July 9th?

7         A.    That is correct.

8         Q.    So why didn't Mr. Hawkins just

9    address this himself?

10        A.    I don't know.

11        Q.    Do you think it warranted

12   immediate action from Mr. Hawkins?

13             MR. BARRERA:  Objection, calls

14        for speculation.

15        A.    I can't speculate as to what --

16   BY MR. WALSH:

17        Q.    In your opinion as a

18   supervisor, did this e-mail warrant immediate

19   action?

20        A.    It certainly required action.

21   I wish I had been there to take care of it

22   sooner.

23        Q.    Did it warrant immediate

24   action?

25        A.    As I said, I wish I was there

1    at the bottom, handwritten --

2         A.    Right.

3         Q.    -- that's Terry's --

4         A.    Yes.

5         Q.    -- that's a project that she

6    would be working on?

7         A.    Right.  She was doing sewing

8    for Terry.

9         Q.    And is there anything not

10   listed here that you discussed with her?

11        A.    No, not that I remember.  These

12   are my notes.

13        Q.    So tell me what you discussed

14   regarding your handwritten note 3, where it

15   says, "Waiting - being charged to project,"

16   if you remember.

17        A.    I don't remember the specifics

18   outside of what was sort of written here.  We

19   began talking about her sitting around idle.

20   Again, this ties back to that e-mail that she

21   sent.  So in the development of the

22   conversation, we realized that she was

23   charging project time for sitting around, not

24   actively -- not actually working on the

25   project, but rather waiting in her lab for

1    work, and she charged that time to the

2    project, which is not allowable.  So we

3    discussed what time that was.  There's the

4    note, the four hours waiting on July 7th and

5    two hours waiting on July 8th, and discussed

6    that that is a real problem.  We are not to

7    charge projects unless we work on them.  It

8    is a fraudulent charge otherwise.  And her

9    response was it's not common.  She said it

10   was not a common practice, and so that's what

11   that "not common" note is.

12        Q.    Here it says July 7th and

13   July 8th.  Is that really supposed to be

14   June?

15        A.    Oh, yes.  Yes, that's correct.

16        Q.    Okay.  So after you had this

17   discussion, did she change it?

18        A.    Yes.

19        Q.    Immediately?

20        A.    I don't recall.  I think it

21   took some time, but I don't remember the

22   timeline.

23        Q.    But you don't recall any other

24   incidents with her -- involving this time?

25        A.    Define "incidents."

1              mischaracterizes his testimony.

2        A.    I'm sorry, what was the

3   question?

4   BY MR. WALSH:

5        Q.    You withheld information on

6   Ms. Johnson's trustworthiness from HR?

7              MR. BARRERA:  Objection,

8         mischaracterizes his prior testimony.

9        A.    Sorry.  I'm not hearing the

10  question.

11  BY MR. WALSH:

12       Q.    Is it correct that you withheld

13  information on Ms. Johnson's trustworthiness

14  from HR?

15             MR. BARRERA:  Objection,

16        mischaracterizes his testimony.

17       A.    I didn't withhold.  I was

18  giving information relevant to a tuition

19  complaint.

20  BY MR. WALSH:

21       Q.    And unequal pay complaint,

22  correct?

23       A.    I was interviewed by Debbie

24  Lange.  She -- I gave answers to her

25  questions.  I don't know what the overall

1    picture was.  I'm a group leader at this

2    point.  I'm not involved in hiring and firing

3    and I don't know what salaries are even.

4    So --

5          Q.    Well, so part of this

6    complaint, though, had to do with whether or

7    not Ms. Johnson was promised a promotion,

8    right?

9          A.    That's correct, yes.

10         Q.    And so the issue comes down to

11   whether or not, you know, you believe that

12   somebody told her that she was promised a

13   promotion, right?

14         A.    That's where some of the line

15   of questioning was headed.

16         Q.    And so then, you know, when you

17   were asked whether or not she was promised a

18   promotion, don't you think your determination

19   of her trustworthiness would be relevant?

20         A.    I don't handle promotions.  I

21   push information up to my management that

22   handles things like promotions.  I conveyed

23   that information to my management.  I don't

24   know what she was promised or wasn't

25   promised.  I heard her side of the story,

1    asking you to do this affidavit?

2                MR. BARRERA:  Objection.

3          Again, instruct the witness not to

4          answer that question to the extent

5          that you have to disclose any

6          communications you had with the legal

7          department.

8    BY MR. WALSH:

9          Q.    Can you answer?

10               MR. BARRERA:  If what he's

11         asking you can only be answered

12         through disclosure of communications

13         you had with the legal department,

14         then I'm instructing you not to answer

15         the question.

16               THE WITNESS:  Okay.

17   BY MR. WALSH:

18         Q.    Let me ask it this way:  Was

19   this part of the EEOC investigation?

20         A.    I was not aware of that

21   investigation.

22         Q.    Were you aware of an EEOC

23   charge being filed?

24         A.    No.

25         Q.    Were you aware that she had

1    complained of discrimination before this

2    affidavit?

3         A.    No.

4         Q.    Why did you think you were

5    being asked to do this?

6         A.    I thought it was a function of

7    us dismissing Mary Ellen and something that

8    came out of that.

9         Q.    I want to go to the -- so can

10   you describe the incident that happened on

11   August 3rd?

12        A.    Yes, it's described in the

13   affidavit.  Mary Ellen came in late -- or had

14   called and notified Monica, one of our

15   admins, that she was going to be late.  I

16   contacted her, told her, you know, it was

17   timesheet Friday and she needed to complete

18   her timesheet so that we could then review,

19   approve and post those.  She showed up at

20   around 12:30 and said she had done her

21   timesheet, it was completed, she saved it,

22   she signed it.

23             So looking at her timesheet,

24   she had charged eight hours to overhead and

25   had filled out eight hours on her overhead

1      A.     Yes.

2      Q.     Why was she fired?

3      A.     Primarily for timesheet fraud.

4      Q.     Anything else?

5      A.     She had tardiness issues.

6      Q.     What?

7      A.     She had tardiness issues.

8      Q.     What kind of tardiness issues?

9      A.     She didn't -- she frequently

10   didn't report to work on time.

11     Q.     How do you know?

12     A.     We don't have any clock-in

13   system, so it's a matter of -- they're

14   supposed to call in at 8:00 if they're going

15   to arrive late.  I, you know, would go around

16   to various labs, people aren't there or I

17   needed to talk to various folks and if not --

18   if they're not there, then they're tardy.

19     Q.     How do you know they're not

20   just in the bathroom?

21     A.     Well, they could be.  We've got

22   pagers.  We can get ahold of people.

23     Q.     Did you go around every morning

24   to check to see if your employees were there?

25     A.     No.  We had a policy and

1  expected our people to follow policy.

2      Q.      So did you determine that

3  Ms. Johnson was tardy based on the times you

4  walked around and were looking for her at

5  8 a.m. and she wasn't there?

6      A.      No.

7      Q.      Then what did you base that

8  determination on?

9      A.      There were some instances where

10  she wasn't around and I hadn't gotten a call

11  from her, or the admin folks hadn't.  I did

12  run some door logs across my group at some

13  point because they very much are -- they have

14  work spaces.  And so there were certainly

15  many instances where -- there were instances

16  where you see people are tardy.  You can at

17  least have some guidance.

18      Q.      How does a door log tell you if

19  somebody's tardy or not?

20      A.      Because it records the time

21  when they walked through that door.

22      Q.      Well, could there ever be a

23  situation where she meets a project manager

24  in another building?

25      A.      There could be.

1  trying to get a sense.  Certain people have

2  certain reporting labs they go to.  Like I

3  know Dewey always goes to, you know, Lab X to

4  do his work because he's starting -- he is

5  working on a project and he's going to be

6  doing work over there.  Mary Ellen had a --

7  she would go to her lab generally in the

8  beginning of the day.  A lot of the board

9  work and stuff that she did was in her lab,

10  but then I knew if she was also working in

11  other labs.  Some of our engineers would walk

12  through a different area and I knew they

13  always reported to their office.  So it's a

14  guide.

15       Q.    So according to the

16  recommendation for termination of

17  Ms. Johnson, she was late to work 40 of her

18  last 69 days.  Does that sound right to you?

19       A.    Yeah, I mean -- yes, it's quite

20  plausible.

21       Q.    Why is that plausible?

22       A.    Backed up by the fact that if I

23  did go see her in the morning, you know, she

24  wasn't there and her -- the fact that she

25  didn't have a lot of project work, right,

1   meant she reported to her lab.  So running

2   the door logs for her was pretty accurate

3   because she didn't have project work and she

4   was going to her lab, so plausible.

5          Q.     How many times did you walk to

6   her lab looking for her and not find her

7   there?

8          A.     Honestly, I don't recall.

9          Q.     Was it a lot?

10         A.     Often enough to notice.

11         Q.     Did you write that down

12  anywhere?

13         A.     At the time?

14         Q.     Yeah.

15         A.     Is that what you're asking?

16         Q.     Yes.

17         A.     No.

18         Q.     I just want to hand you Exhibit

19  No. 10.

20                (Deposition Exhibit 10 marked

21         for identification.)

22  BY MR. WALSH:

23         Q.     If you could look through this,

24  is this the door log you ran for Mary Ellen

25  Johnson?

1      REPORTER'S CERTIFICATION

2           I, Micheal A. Johnson, Registered

3  Diplomate Reporter and Notary Public in and

4  for the State of Texas, certify that on the

5  20th day of January, 2017, I reported the

6  Oral Deposition of KARL NOVA COOPER, after

7  the witness had first been duly cautioned and

8  sworn to testify under oath; said deposition

9  was subsequently transcribed by me and under

10  my supervision and contains a full, true and

11  complete transcription of the proceedings had

12  at said time and place.

13           I further certify that I am

14  neither counsel for nor related to any party

15  in this cause and am not financially

16  interested in its outcome.

17           GIVEN UNDER MY HAND AND SEAL of

18  office on this 29th day of January, 2017.

19

20

21           _____

22  MICHEAL A. JOHNSON, RDR, CRR
    NCRA Registered Diplomate Reporter

23  NCRA Certified Realtime Reporter

    Notary Public in and for the
24  State of Texas
    My Commission Expires:  8/8/2020

25

# EXHIBIT 14

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

MARY ELLEN JOHNSON,           )
                              )
        Plaintiff(s),         )
                              )        CIVIL ACTION NO.
VS.                           )     5:15-CV-00297-FB-HJB
                              )
SOUTHWEST RESEARCH            )
INSTITUTE,                    )
                              )
        Defendant(s).         )


DEPOSITION OF

WILLIAM C. RYAN

DECEMBER 21, 2016

San Antonio, Texas


Reported by: Dicie Lee Eytcheson

Job NO.: 17762

1      ORAL DEPOSITION of WILLIAM C. RYAN, produced as a

2   witness at the instance of the Plaintiff(s), and duly

3   sworn, was taken in the above-styled and numbered

4   cause on the 21st day of December, 2016, from

5   9:32 a.m. to 3:56 p.m., before Dicie Lee Eytcheson,

6   CSR in and for the State of Texas, reported by machine

7   shorthand, at the law offices of NORTON ROSE

8   FULBRIGHT, Fulbright & Jaworski, LLP, 300 Convent

9   Street, Suite 2100, San Antonio, Texas 78205, pursuant

10   to the Federal Rules of Civil Procedure and the

11   provisions stated on the record or attached hereto.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                A P P E A R A N C E S

 2

    FOR THE PLAINTIFF(S):  MARY ELLEN JOHNSON
 3
          MR. COLIN WALSH, Esq.
 4        ROB WILEY, P.C.
          1011 San Jacinto Blvd., Suite 401
 5        Austin, Texas 78701
          PH: (512)271-5527
 6        cwalsh@robwiley.com

 7  FOR THE DEFENDANT(S): SOUTHWEST RESEARCH INSTITUTE

 8        MR. MARIO A. BARRERA, Esq.
          NORTON ROSE FULBRIGHT
 9        Fulbright & Jaworski, LLP
          300 Convent Street, Suite 2100
10        San Antonio, Texas 78205
          PH: (210)224-5575
11        mario.barrera@nortonrosefulbright.com

12  Also Present:

13        MARY ELLEN JOHNSON
          KELLY ANDERSON
14

15                    * * * * * *

16

17

18

19

20

21

22

23

24

25
```

1

2                    WILLIAM C. RYAN,

3   having been first duly sworn, testified as follows:

4                        EXAMINATION

5   BY MR. WALSH:

6       Q.   All right.  Well, thank you for being here this

7   morning.  Could you go ahead and state your name and

8   position.

9       A.   William Ryan, Director of the Electrical

10  Systems department of the Applied Power division,

11  Southwest Research Institute.

12      Q.   And how long have you had that position?

13      A.   Since 2016 to my best recollection.

14      Q.   Okay.  And where did you work -- Well, before I

15  start, let me say thank you for being here, if I didn't

16  already say that opening.

17               But I want you to know that this is not an

18  endurance contest.  If you ever need a break just let me

19  know.  I only ask that you answer any pending questions

20  before we take that break.  If I'm not clear in any of

21  my questions feel free to ask for clarification.  Your

22  attorney may object to some of them, but unless he

23  instructs you not to answer you can go ahead and answer

24  any of those questions.

25               Do you have any questions right now?

1    A.   No, sir.

2    Q.   Have you had your deposition taken before?

3    A.   No.

4    Q.   Have you ever been a party to a lawsuit before?

5    A.   No.

6    Q.   Have you ever testified in court before?

7    A.   No.

8    Q.   And, let's see, you said you had been the

9  director of the Applied Power division since 2006.

10    A.   The Electrical Systems department within the

11  Applied Power division.

12    Q.   Director -- And what did you do before that?

13    A.   I was a program manager, I believe, was my

14  title at Southwest Research.

15    Q.   What does the director of the Electrical

16  Systems department in the Applied Power division do?

17    A.   I am responsible for the operations of that

18  department.

19    Q.   Okay.  Could you explain what that means?

20    A.   I'm responsible for the financial performance,

21  the technical performance, the day-to-day operations.

22    Q.   What kind of day-to-day operations?

23    A.   I'm -- I'm not sure I understand what you're

24  looking -- what you're asking there.

25    Q.   Well, what did you mean when you said

1    day-to-day operations?

2        A.    The -- the -- the general oversight and

3    management of all of the staff within the department.

4    The decisions for procurements of overhead functions of

5    non-direct-billed items.  Things of that nature.

6        Q.    And what kind of training did you have to be

7    the director of the Electrical Systems department?

8        A.    I went through several of our corporate

9    training exercises, and as well as I received two

10   certificates from the University of Texas executive

11   education program.

12                    (Reporter clarification.)

13       Q.    (BY MR. WALSH)   What else?

14       A.    That is the only train -- that's the only

15   formal training that I've had.

16       Q.    Okay.  And who is your supervisor?

17       A.    Currently Mary Massey.

18       Q.    And what's her position?

19       A.    Vice president.

20       Q.    The vice president of what?

21       A.    The Applied Power division within the Southwest

22   Research Institute.

23       Q.    And how long has she been your supervisor?

24       A.    She's been my supervisor since Bob Keys retired

25   three or four years ago.

1     Q.    And Bob Keys was your supervisor before that?

2     A.    Correct.

3     Q.    And what years was he your supervisor?

4     A.    From 1999 through his retirement.

5     Q.    Which was when?  2013?

6     A.    I don't recall the exact year -- if it was 2012

7 or 2013.

8     Q.    Was it -- was he your supervisor while Mary

9 Ellen Johnson was working at Southwest?

10    A.    Yes.

11    Q.    So he was, at least, there in 2012 for some

12 portion of the year?

13    A.    Yes.

14    Q.    And was his position the vice president of

15 Applied Power?

16    A.    For the latter part of those years, yes.

17    Q.    Uh-huh.

18    A.    Specifically, from 2009 to 2012 he was the --

19 the vice president.

20    Q.    Now, there was some kind of reorganization that

21 happened within the Applied Power division; is that

22 correct?

23    A.    There has been multiple reorganizations, yes.

24    Q.    Was there one that happened while Mary Ellen

25 Johnson was working there?

 1    on this -- on this chart.

 2         Q.    Now, do you have more or less people reporting

 3    to you now?

 4         A.    More.

 5         Q.    And that's because you've absorbed departments?

 6         A.    Yes.

 7         Q.    Okay.  What is the next step in your career

 8    ladder?

 9         A.    In my -- The career ladder that I am currently

10    on executive director would be the next career step.

11         Q.    And that would be Mary Massey's job; is

12    that correct?

13         A.    In 2012 Mary Massey was the executive director.

14         Q.    Who currently holds that position?

15         A.    James Keys.

16         Q.    When did he get that position?

17         A.    When Bob Keys retired Mary Massey became vice

18    president and he took the position of executive

19    director.

20         Q.    Is there any relation between Bob Keys and Jim

21    Keys?

22         A.    Yes.

23         Q.    What's the relationship?

24         A.    Jim Keys is Bob Keys' son.

25         Q.    Did you apply for the position?

1  whole year.

2      Q.    What position did Mary Johnson perform?

3      A.    In 2012 Mary Ellen was a principal tech,

4  principal technician.

5      Q.    Is principal technician higher than senior

6  tech?

7      A.    Yes.

8      Q.    So it goes principal tech, senior tech, and

9  then what is below senior tech?

10     A.    Technician.

11     Q.    And Carmen Alvarado?

12     A.    Is an engineering technologist.

13     Q.    And where is that in the ladder?

14     A.    It is above principal tech.

15     Q.    So that would be Ms. Johnson's next step?

16     A.    That would be a potential next step for --

17     Q.    Well, what other next steps would there have

18  been?

19     A.    There's always opportunities to change career

20  ladders within the institute.

21     Q.    Okay.  Well, within the career ladder that she

22  was in engineering technologist was the next step?

23     A.    Staff tech would have been the next step.

24     Q.    And what is the staff tech?

25     A.    It's a -- it's an advancement within the

1    technician roles.

2        Q.   What's the difference between senior technician

3    and staff tech?

4        A.   Staff tech will have more independence.  They

5    will have -- make decisions independently and execute at

6    a higher level.  They'll also have a much higher

7    demonstration of -- and technical mastery of the skill

8    set.

9        Q.   How many staff techs are there in your

10   department in 2012?

11       A.   In 2012 there are two staff technicians.

12       Q.   And who are they?

13       A.   Dave King.  James -- James Shackelford.

14       Q.   And how many engineering technologists are

15   there?

16       A.   One engineering technologist.

17       Q.   Carmen Alvarado?

18       A.   Correct.  She is actually a senior engineering

19   technologist.

20       Q.   Is there a difference?

21       A.   There is a difference.

22       Q.   Well, what -- is senior better than just

23   engineering technologist?

24       A.   Yes.

25       Q.   Is -- So does that -- does that mean there is

1  an open in engineering technologist position in 2012 in

2  your department?

3       A.    No.

4       Q.    Why not?

5       A.    The positions are formed based upon technical

6  need of the department at -- at any given time as well

7  as technical merit of the staff.  They are not slots.

8  And let me clarify better.  It is higher on the --

9  senior engineering technologist is higher on the career

10 ladder than engineering technologist.

11      Q.    So which organizational chart are you looking

12 at to give me the last few answers?

13      A.    The organizational chart that is stated as

14 -5 -- item No. -528.

15      Q.    Can you tell me how are these -- how is this

16 chart organized in terms of why are the names listed in

17 the order they're listed?

18      A.    This particular chart is organized in two

19 different ways.  Specifically, I am referring to how

20 it's organized underneath department 3, Electrical

21 Systems department.  There are the direct reports --

22 technical direct reports, as well as acting managers,

23 that are reporting manager or -- or acting manager,

24 reporting directly to me.  Then depending on which

25 section, there is additional tech -- senior technical

1    A.   Correct.

2    Q.   Was she counseled about it before that?

3    A.   I don't recall any counseling on the

4  specific -- specifics of misrepresenting your time on a

5  time sheet prior to that.

6    Q.   Okay.  So she had one written counseling.  What

7  about any other times that she was counseled on that?

8    A.   She was again counseled verbally on the 3rd of

9  August when the second incident of misrepresenting time

10  on the time sheet was encountered.

11    Q.   Counseled in August.  When in August?

12    A.   On August 3rd.

13    Q.   Was she fired on August 3rd?

14    A.   She was not.

15    Q.   Okay.  So August 3rd about time keeping.  When

16  was she fired?

17    A.   Her employment was terminated on the 15th of

18  August.

19    Q.   So what happened between August 3rd and

20  August 15th that caused her termination?

21    A.   Can you elaborate or restate that question?

22    Q.   Did anything happen between August 3rd and

23  August 15th that caused her termination?

24    A.   As in a performance of Mary Ellen or the

25  process?

1    Q.   I'm talking about anything.

2    A.   So during that period I made the recommendation

3    for termination and the PARC committee met to consider

4    termination.

5    Q.   The PARC committee?

6    A.   Yes.  P-A-R-C.  Personnel Action Review

7    Committee.

8    Q.   Who's on that committee?

9    A.   The president, the vice president -- excuse

10   me -- the executive vice president, the head of

11   whichever technical division, which would be a vice

12   president, we'll sit on that, as well as legal counsel.

13   Q.   So why wasn't she fired on August 3rd?

14   A.   I can only make the suggestion to the council

15   that termination happen.  The council has to decide on

16   that and then take action from there.

17   Q.   Did you know on August 3rd that she was going

18   to be terminated, that you were going to recommend her

19   termination?

20   A.   I did not.

21   Q.   Why not?

22   A.   Because I -- I was only informed of the initial

23   incident that occurred, and I did not have time to

24   review the facts and consider the implication of exactly

25   what had occurred until the following week.

1    A.   Which instance would you --

2    Q.   I'd like all of them described for me.

3    A.   So the first case, in early June Mary Ellen was

4 working on multiple different projects.  She indicated

5 time on her time sheet against these projects that

6 were -- was not actually worked on the projects.  In

7 discussions with her immediate supervisor, it was

8 revealed that she had charged these hours against the

9 projects that she did not perform the work on; and she

10 acknowledged that and agreed that it shouldn't have been

11 done that way and took the act- -- and proceeded to file

12 a C16 form, which is a -- the form that we use for

13 changing hours on a time sheet, and removed those hours.

14    Q.   What work didn't she -- what work did she say

15 she performed but did not, in fact, perform?

16    A.   There were some tasking on -- on a couple of

17 projects -- I don't have the specifics on the exact

18 detail of that technical tasking -- that she did perform

19 the work; however, she billed for waiting for the work

20 as opposed to the work that she -- that performing work.

21 That is a --

22    Q.   Okay.

23    A.   Waiting for that tasking is not a billable

24 expense.  That's a -- that goes against our overhead

25 accounts in the system.

1     Q.   Okay.  So she did actually work, though, right;
2  it was billed to the wrong account?

3     A.   She performed a overhead task instead of a
4  project task and intentionally billed the project task
5  for the -- the work that was done on overhead.

6     Q.   So she billed it to the wrong account, correct?

7     A.   She intentionally billed it to the wrong
8  account.

9     Q.   You keep saying intentional.  How do you know?

10    A.   The -- When I was notified of the incident I,
11  of course, had questions and in my discussions with her
12  immediate supervisor the -- the representation was she
13  was trying to punish the project manager and the
14  engineer as she was unhappy with the way that they were
15  providing tasking to her.

16    Q.   Is there a rule about not billing time waiting
17  on a project?

18    A.   Yes.  Time waiting on a project is -- is not a
19  direct project expense, and that is very clearly defined
20  in our OPP that you --

21    Q.   Which OPP?

22    A.   I will have to ref- -- I can't -- I cannot
23  provide you the page number off the top of my head.

24    Q.   But it very clearly states that waiting on a
25  project is not billable to that project?

1     Q.   So anytime somebody puts in the wrong number

2  they're internally putting in the wrong number?

3     A.   They're intentionally typing on the keyboard.

4  If there are -- when they put the number in, if they put

5  a wrong number in, it is their belief at that current

6  time that they are using the proper number.

7     Q.   If we took --

8     A.   That is a -- that is not intentional.

9     Q.   Had Ms. Johnson ever been told not to do that?

10    A.   Told not to?

11    Q.   To bill the way she did.

12    A.   It is standing policy.  And, yes, it was

13  discussed at department meetings the proper way to bill

14  a time sheet.  She is -- Every employee receives

15  training on the time sheet system and the way to

16  properly input time.

17    Q.   Okay.  And that stuff is defined in the OPPs?

18    A.   It is defined there; it is separate training

19  that happens.

20    Q.   If we took a break, do you think you'd be able

21  to find the OPP that defines that stuff and the separate

22  training that defines that stuff?

23    A.   I'm not sure I could produce the separate

24  training.  I do believe that in the documents that were

25  disclosed there is the OPP that discussed the -- that

1   work.  You were informed this is not a valid charge.

2   You agreed.

3       Q.   So here, though, it sounds like Mr. Cooper is

4   telling Ms. Johnson that this is not a valid charge,

5   correct?

6       A.   Correct.

7       Q.   Not that she --

8       A.   It's not a valid charge.

9       Q.   -- knew this was an invalid charge?

10      A.   She -- If she did not know it was an invalid

11  charge she was unfamiliar with the training that was

12  provided to her previously.  She was informed at this

13  point in time that this was a violation.

14      Q.   Okay.  Does that change your assessment of

15  whether this was fraud?

16      A.   No.  She intentionally charged a project for

17  work that was not performed on the project.

18      Q.   Okay.  I'm going to hand you Exhibit 6.

19                      (Exhibit No. 6 marked.)

20      Q.   (BY MR. WALSH)  Have you seen this document

21  before?

22      A.   I have.

23      Q.   What is it?

24      A.   This is an e-mail from Mary Ellen Johnson to

25  Nova Cooper on June 8th of 2012 expressing frustration

1    Q.    And what happened on August 3rd?

2    A.    On August 3rd Mary Ellen misrepresented her

3    time by billing overhead accounts for time that she was

4    not in the office.

5    Q.    So did she fraudulently bill a client for time

6    on mark --

7    A.    She --

8    Q.    -- or work?

9    A.    On which instance?

10    Q.    August 3rd.

11    A.    She did not fraudulently bill a client

12    contract.

13    Q.    So she didn't do the thing that Nova Cooper

14    said she did in July, correct?

15    A.    In July she purposefully charged an

16    inappropriate number for her time.

17    Q.    Why do you think she purposefully charged an

18    inappropriate number?

19    A.    From the e-mail that she wrote discussing her

20    frustrations, which you have marked Exhibit 6, and

21    discussions with Nova Cooper, which I had after, I was

22    made aware of the meeting on July 9th.  It was -- The

23    statement that was used was she was trying to punish the

24    project manager and engineers for the lack of tasking.

25    Q.    Does it indicate that in this e-mail in

1    sheet system has closed out for that period.

2        Q.   Okay.  And so you said when you return to

3    work -- what? -- on Monday?

4        A.   That would be an appropriate time to do a C16

5    if the time sheet system had not -- had already closed

6    out when you discovered it.

7        Q.   Okay.  All right.  So you said that another

8    incident happened on August 3rd, 2012.  Can you describe

9    what that incident was?

10       A.   Mary Ellen Johnson called in for an unexpected

11   appointment and would not be in the office until during

12   the morning.  Act- -- actually, I believe there's an

13   e-mail associated with that.  Upon returning to work,

14   because it was a Time sheet Friday, and the time sheets

15   needed to be closed out, it was identified that Mary

16   Ellen Johnson was the only person who had not completed

17   their time sheet.

18             So immediately upon her return to the

19   office she completed her time sheet indicating that she

20   was working a full eight hours that day on an overhead

21   task, and proceeded to certify that time sheet as well

22   as document it on her overhead utilization

23   justification.  Her supervisor -- she notified her

24   supervisor that -- she apologized for not being able to

25   complete her time sheet in the morning.  Her supervisor

1  immediately went to approve the time sheet and noticed

2  that she had billed an overhead account that indicated

3  that she had been working in the office during the

4  morning and immediately notified her.

5          She did a -- completed a C16 to change

6  those charges and the time sheet was closed out.

7  Q.   So it was fixed?

8  A.   The account was not billed for the hours.

9  Q.   And what account was it?  Overhead?

10  A.   It was an overhead account.  I do not recall

11  which specific account it was.

12  Q.   Okay.  So she estimated her time -- is it

13  impossible for her to have worked eight hours that day?

14  A.   As she had no prior arrangements with her

15  supervisor for performing overhead tasks after hours,

16  yes.

17  Q.   So your testimony is it is impossible for her

18  to have worked eight hours on August 3rd, correct?

19  A.   Possible is a big word.  If there were urgent

20  overhead tasking that had been prearranged for her to

21  work an alternate schedule she could have worked eight

22  hours on that day.  She did not have such alternate

23  schedule arranged.

24  Q.   So what is a -- so can you describe to me what

25  the -- what the issue is with what she did?

1    A.    Under both accounts, under both the incident in

2  June and then on August 3rd, she intentionally charged

3  accounts for work that was either not performed or was

4  not performed on that account.

5    Q.    Talk to me about August 3rd.  What is the

6  significance of what happened?

7    A.    She billed four hours -- not estimated but

8  billed four hours for her time that was not worked.

9    Q.    Well, she estimated it, right, because you have

10  to estimate your total hours?

11    A.    No, sir.  She -- she only has to estimate her

12  time for time charged afternoon.

13    Q.    And she estimated eight hours.

14    A.    Which is beyond the work day and she did not

15  have any alternate schedule arranged.

16    Q.    Okay.  So the overhead account, who pays that?

17    A.    That is a -- In the accounting that goes

18  against a cost for operations of the institute.

19    Q.    Who pays for paid time off?

20    A.    A different account within the institute.

21    Q.    All right.  But no clients are billed for that,

22  right?

23    A.    No.

24    Q.    So the issue here was she put in -- again, it

25  was just a different number; she should have listed it

1    as vacation or sick time?

2         A.    The issue is that she, yes, intentionally

3    listed against a -- a charge number that would not

4    deduct from her personal accrual of leave time.

5         Q.    Has anybody else been fired for that?

6         A.    She was terminated for the loss -- loss of

7    trust out of a recurring event that is serious in

8    nature.

9         Q.    All right.  So we already discussed how that

10   was not the same event as June, correct?

11        A.    No.  I disagree.  It's falsification of time in

12   both cases.

13        Q.    And nobody else has been fired for that, right?

14        A.    I am not aware of all of the terminations at

15   the institute.  I have not fired anybody for a

16   falsification of time sheet.

17        Q.    Have you fired people for being not

18   trustworthy?

19        A.    I have not terminated anybody for being not

20   trustworthy.

21        Q.    Except Ms. Johnson?

22        A.    Except Ms. Johnson, correct.

23        Q.    Okay.

24              MR. BARRERA:  Colin, tell me when you get

25   to a point where we can break for lunch, so...

1 is reviewed by an approver and they must understand

2 the -- the details behind this before they approve the

3 transfer.

4    Q.    So that means that somebody saw that three

5 hours and said you need to change that?

6    A.    It could mean a number of things.  I doubt

7 somebody saw the three hours and said you need to change

8 that.

9    Q.    Please list all the things that it could mean.

10    A.    It could mean that he estimated do your -- on

11 the Time sheet Friday and that that needed to be

12 changed.  It could be that he entered it on the wrong

13 week, unintentionally entered it on the wrong grid of

14 the week.  It could be a number of different items.  And

15 that's why each case is looked at when they're -- when a

16 change in the accounting system is requested.

17    Q.    Could it mean somebody asked him to change it?

18    A.    It could.  But highly unlikely as that would be

19 a -- looking at those and identifying that he billed it

20 and needed to change it would be something that would be

21 brought to my attention, because that is a -- a serious

22 issue.

23    Q.    So how did you find out about what happened on

24 August 3rd?

25    A.    I was informed by Nick Hawkins.

1    Q.   How did Nick Hawkins find out?

2    A.   He was informed by Nova Cooper that Mary Ellen

3  tried to misrepresent her time in the accounting system.

4    Q.   But she could have corrected it on Monday,

5  correct, if she didn't work eight hours?

6    A.   No.  She was not estimating her time for the

7  afternoon.  She was --

8    Q.   I guess I'm confused.

9    A.   -- billing her time for morning in which she

10  was not present in the office.

11    Q.   Do people estimate their times on a Friday?

12    A.   Only afternoon.

13    Q.   Yes or no?  Do people estimate the time they

14  work on a Friday?

15              MR. BARRERA:  Objection.  Asked and

16  answered.  But go ahead and answer it again.

17    A.   They estimate part of their time on Friday.

18    Q.   (BY MR. WALSH)  Do they then correct that

19  later?

20    A.   Only if there is an error in the estimation.

21    Q.   So if they misestimated they get to correct it,

22  correct?

23    A.   Correct.

24    Q.   Without being fired for correcting that

25  misestimation?

1    Q.   So since this happened on a Tuesday he wasn't

2  estimating work in the afternoon, right?

3    A.   Unless he was operating at a remote site he was

4  not estimating work.

5    Q.   So does that raise any red flags?

6    A.   The changing of time here does raise questions,

7  and those questions would be addressed before it was

8  approved -- the change was approved.  However, these

9  changes -- Yeah.  So I -- so I would -- I don't have the

10  detail on those particular changes.

11    Q.   So somebody would have had to approve this

12  change?

13    A.   What I was just looking at was whether this was

14  a C16 or whether this was just a record of the time

15  sheet as it was entered.  It's unclear to me.

16    Q.   Do you know if Ms. Johnson's time sheet -- if

17  anybody ever approved Ms. Johnson's time sheets to be

18  changed?

19    A.   Yes.

20    Q.   They were approved?

21    A.   They were approved, yes.

22    Q.   Okay.

23    A.   In fact, there's --

24    Q.   And did she refuse to change them after they

25  told her that it was not right?

1    intentionally -- if he was furnished the wrong charge

2    number he would not have intentionally charged the wrong

3    charge number.

4        Q.    How does this document say that he wouldn't

5    have done that?

6        A.    This document does not say that.

7        Q.    Okay.  Regarding Ms. Johnson's termination we

8    discussed that she was terminated for falsifying time

9    sheets.  Was there any other reason?

10        A.    She was -- she was terminated for lack of

11    trustworthiness.

12        Q.    Okay.  And what caused the lack of

13    trustworthiness?

14        A.    A repeated demonstration of falsifying data on

15    a time sheet.

16        Q.    On -- Okay.  And by repeated you mean two

17    times, correct?

18        A.    Correct.

19        Q.    All right.  Any other reasons?

20        A.    That was the reason she was terminated is for

21    lack of trustworthiness.

22        Q.    But anything else that made her not

23    trustworthy?

24        A.    There were counselings on tardiness which are

25    related to time sheets that -- but those are the only --

1    that -- that is the center of the trustworthiness.

2         Q.   So tardiness you said?

3         A.   Correct.

4         Q.   And she was counseled on it?

5         A.   Yeah.  She was verbally counseled several

6    times.

7         Q.   Did you do the verbal counseling?

8         A.   No.

9         Q.   Who did?

10        A.   That would have been Nova Cooper.

11        Q.   Okay.  Is there anything written down about

12   that?

13        A.   On the notice -- on the recommendation for

14   termination there is documentation on her attendance.

15        Q.   Okay.  When did you decide to terminate

16   Ms. Johnson -- or to recommend Ms. Johnson's

17   termination?

18        A.   I came to the conclusion to recommend the

19   termination on the 7th and 8th of August.

20        Q.   And what caused you to decide to terminate her?

21        A.   The repeated intentional misrepresentation of

22   her time and my lack of ability to continue to trust

23   her.

24        Q.   And you only decided that you could do that on

25   the 7th, so it took you four days after you were

1    A.    That is all I recall.

2    Q.    Did that factor into your decision to

3  terminate?

4    A.    No.

5    Q.    Why not?

6    A.    I was clarifying information from a previous

7  effort.  I --

8    Q.    Okay.  Why didn't that factor into your

9  decision to terminate Ms. Johnson?

10    A.    Because it had no bearing on her immediate or

11  future performance.

12    Q.    Was Ms. Johnson terminated for performance

13  issues?

14    A.    She was terminated because she lost

15  trustworthiness.

16    Q.    And only because of the time sheet and the

17  tardiness, correct?

18    A.    Time sheet being the primary -- the

19  misrepresentation on the time sheets being the primary

20  function there.

21    Q.    Okay.  And so you didn't know if you were

22  firing -- if you were recommending Ms. Johnson be

23  terminated while an ongoing HR investigation was

24  happening, correct?

25    A.    That's correct.

1    Q.   If you had known if it was ongoing would you

2  have recommended her termination anyway?

3    A.   It would have no bearing on her performance at

4  that point in time.

5    Q.   Well, do you think it would have looked bad for

6  you to have terminated somebody while an HR

7  investigation into your department was going on?

8    A.   I would have feared a claim of retaliation if I

9  was aware of that fact.

10    Q.   So it would make sense to wait until it had

11  ended --

12    A.   I --

13    Q.   -- if you knew about it?

14    A.   If I was aware of it I don't know that it would

15  have -- it still does not have bearing on her

16  performance of the term -- for the termination, so... I

17  guess, I don't understand what you're trying to ask.

18    Q.   Maybe -- maybe I can rephrase it.

19         If you were aware of the HR investigation

20  would you have waited to term -- to recommend her

21  termination until after the HR investigation had

22  concluded?

23    A.   No.

24    Q.   Why not?

25    A.   Because it has no bearing on the reason that

1    she was terminated.

2       Q.   Even though you feared a retaliation for it?

3       A.   It wouldn't stop me from acting on the

4    immediate information.

5       Q.   What details were you provided on Monday that

6    you didn't have on August 3rd?

7       A.   On August 3rd I was notified very vaguely that

8    there was an issue with Mary Ellen's time sheet and that

9    we need to address the -- we need to -- we need to

10   address this situation.  I was unable to follow up on

11   the details of that until the following week.

12      Q.   So it wasn't an urgent issue?

13      A.   That's not true.  It was an issue that needed

14   to be dealt with along with other commitments.

15      Q.   But not immediately?

16      A.   If I had been fully aware of all of the details

17   it would have been more immediate.  However, I do not

18   make decisions on trustworthiness rashly, so it takes

19   time for consideration.

20      Q.   So what details -- so you were just told --

21   what? -- that there was an issue with her time sheet on

22   August 3rd and that's it by Nova Cooper?

23      A.   There was a -- I was told there was an issue

24   with the accounting on her time sheet and that it had to

25   be corrected.  I very specifically was going to a

1 meeting with my vice president that afternoon and did

2 not -- was not able to address the situation until the

3 following week.

4     Q.   Do you know if a C16 had to be filled out for

5 Ms. Johnson on August 3rd?

6     A.   As the time sheet had been closed out and

7 not -- as the time sheet system had not been closed out,

8 I do not think that there is a C16 that was filed.  She

9 had already signed and certified the time sheet, but her

10 supervisor did not sign and certify the time sheet,

11 identified the error, and the correction -- she unsigned

12 the time sheet and was -- the correction was made.

13     Q.   Do you think Nova Cooper would be in the best

14 position to know whether or not she had done something

15 wrong?

16               MR. BARRERA:  Objection.  Vague.

17     A.   He would be in a position to know that she had

18 done something wrong.

19     Q.   (BY MR. WALSH)  Did he think it was a fireable

20 offense?

21               MR. BARRERA:  Objection.  Calls for

22 speculation.

23     Q.   (BY MR. WALSH)  Did he tell you that he

24 thought it was a fireable offense?

25     A.   He did not -- he did not make any statement of

1      A.    He did not.  Time did not permit him to provide

2  anymore details.

3      Q.    How much time did you need to know the details

4  of what had happened?

5      A.    It would have taken tens of minutes for me to

6  fully appreciate the situation.

7      Q.    When did you draft the recommendation to

8  terminate?

9      A.    In the days preceding the 9th.  It would have

10  been in the -- in the date range of the 7th and 8th.

11      Q.    When did you start it?

12      A.    I don't recall a specific time I started it.

13      Q.    Was it on the 7th or the 8th?

14      A.    I don't recall a specific time I started it.

15      Q.    All right.  I'm going to hand you the next

16  exhibit.  Exhibit 8.

17                      (Exhibit No. 8 marked.)

18      Q.  (BY MR. WALSH)  Have you seen this document

19  before?

20      A.    I -- I wrote it.

21      Q.    So this is an e-mail from you to Tony and Bob

22  and this is a draft of your termination letter?

23      A.    Yes.

24      Q.    Could you take a moment and look over it and

25  tell me if this is the first draft or which draft this

1    is, or if there are any other drafts that you're aware

2    of?

3        A.   Not remembering the details of exactly the

4    writing from four years ago, I couldn't tell you if this

5    was the only draft or not.

6        Q.   How long did it take you to write this?

7        A.   Several hours.

8        Q.   Why did you send out a draft of this memo to

9    Tony and Bob?

10       A.   I don't -- I did not have the piece finalized.

11   I know that they are preparing for a different -- I know

12   that Tony was -- had already been in negotiate --

13   negotiation or discussions with Tony about the fact that

14   we would be proceeding -- I would be proceeding with

15   this recommendation.  He actually scheduled the --

16   the -- the PARC.  And I wanted to make sure that it was

17   complete so that I did not have to repeat the PARC

18   process.

19       Q.   When was the PARC scheduled?

20       A.   It was scheduled for the 10th.  I believe, it

21   is the Friday of that week.  I do not have a calendar in

22   front of me.

23       Q.   And when was it scheduled for the 10th?

24       A.   I do not recall the specific time.

25       Q.   Was it scheduled on August 8th?  August 7th?

1    practice?

2        A.    More specifically I know that the repeated

3    tardiness was part of that -- part of the other

4    actions -- the other behaviors.

5        Q.    Okay.  So that refers to tardiness.  Any other

6    behaviors?

7        A.    Not that I recall.  I -- I -- I'm remembering

8    from several years ago.

9        Q.    All right.  I want to ask you about the

10   tardiness.  How did you determine that she was tardy?

11       A.    There were several complaints levied about what

12   time she arrived at the office as normal working hours

13   for the department are 8:00 to 5:00.  Nova Cooper, at

14   one point, pulled door logs for all of his employees to

15   understand what the -- the attendance was and so he

16   noted those instances in which she was tardy.  The door

17   logs were provided in the documents.  They were attached

18   to the recommendation for termination.

19       Q.    And is that what the tardiness is based on?

20   Door logs?

21       A.    Yes.

22       Q.    I'm going to hand you Exhibit No. 10.

23                        (Exhibit No. 10 marked.)

24       Q.    (BY MR. WALSH)  Are these the door logs?

25       A.    These would appear to be the door logs very

1    A.    Mr. Cooper had verbal conversations with her.

2    Q.    About these tardinesses?

3    A.    Yes.

4    Q.    How do you know?

5    A.    He expressed this to me.  He -- I had a

6 conversation with him about it.

7    Q.    Did he put it in writing?

8    A.    Not that I'm aware of.

9    Q.    Do you know if he ever wrote Ms. Johnson up for

10 being tardy?

11    A.    I'm not aware of -- of any place he would have

12 written up for tardiness.

13    Q.    Okay.  Do you know if he ever warned her that

14 her tardiness could result in her termination?

15    A.    I was not in those discussions, so I cannot

16 tell you that he would have provided that information.

17    Q.    Did you compare these Access Attempts History

18 Reports for Ms. Johnson with them from any other

19 employee that Nova Cooper pulled?

20    A.    I personally did not compare them.  Nova --

21 Nova did do an assessment of the door logs.

22    Q.    Nova did.  Did he put that in writing?

23    A.    Not that I recall.

24    Q.    So he just told you that he did?

25    A.    Correct.

1       (Exhibit No. 12 marked.)

2       Q.  (BY MR. WALSH)  Have you ever seen this form

3   before?

4       A.  I have.

5       Q.  When did you see it?

6       A.  I saw it this week.

7       Q.  Had you seen it before?

8       A.  I had not specifically seen this form before.

9       Q.  Are the people listed below the members of the

10  PARC?

11      A.  Yes.

12      Q.  And this was on the 10th, which was the date of

13  the meeting, when it was all approved?

14      A.  Yes.

15      Q.  Did you know that they had offered Ms. Johnson

16  a severance package?

17      A.  I was aware of that.

18      Q.  When did you become aware of that?

19      A.  I was in the meeting that that was discussed.

20      Q.  Was that the PARC?

21      A.  Yes.

22      Q.  So then you knew at the time that she was being

23  terminated that she had an EEOC charge?

24      A.  Yes.  I found out that she had an EEOC charge.

25  To the best of my recollection I think it was stated it

1       A.      Facility security officer.

2       Q.      So what does he do?

3       A.      He ad -- he is the -- he oversees the secure

4    government access at the institute.

5       Q.      Did you draft this?

6       A.      I did not.

7       Q.      Do you know who did?

8       A.      I have not seen this before.

9       Q.      Do you know if this is normal to send reports

10   like this to the FSO after somebody is terminated?

11      A.      It is a requirement to notify the FSO if there

12   is adverse information.

13      Q.      So this would be a normal thing to send for

14   other people terminated, correct?

15      A.      If somebody was terminated for a cause that

16   qualified as adverse information this memo would be

17   generated.

18      Q.      Okay.  Do you know who normally generates

19   those?

20      A.      It would be a normal duty for the security

21   officer in the -- the division security officer.

22      Q.      And that's different than the facility security

23   officer?

24      A.      Yes, sir.

25      Q.      Who is the division security officer?

1    A.   Yes.

2    Q.   What does that mean?

3    A.   The term insider threat?

4    Q.   Yeah.

5    A.   The term insider threat is generally used to

6 describe a person who might spill information from with

7 inside your organization or inside your trust.

8    Q.   What do you mean by spill information?

9    A.   Information that is privileged in nature.

10    Q.   Okay.  Do you agree that that applies to

11 Ms. Johnson?

12    A.   I did not make this assessment.  And you are

13 asking me to comment on a document produced in a

14 government database, so I -- I don't understand.

15    Q.   Do you agree with this assessment?

16    A.   I agree -- I have lost trustworthiness in her,

17 therefore, I cannot trust her with privileged

18 information.

19    Q.   Do you agree that she may pose a security risk

20 by becoming an insider threat?

21    A.   I did not make that statement.

22    Q.   I -- I'm asking if you agree with it.

23    A.   Anybody who you do not trust poses an insider

24 threat.  Anybody who has access to privileged

25 information that you do not trust poses as an insider

1  utilization.

2      Q.   Well, does she have to account for what she did

3  during that time?  Or is it just a flat number that you

4  put into your time sheet?

5      A.   Per our time sheet system and audits performed

6  by the government she has to be able to account for what

7  she did during that time.

8      Q.   So do you know what she put in that time in

9  June?

10      A.   I have -- I -- I'm sorry.  I don't understand

11  which time you would like clarification on.

12      Q.   In June.  On her time sheet in June how did she

13  justify her time for that project?

14      A.   I am unclear of how she justified the time for

15  that project.  It is her responsibility to justify that

16  time when challenged by an authority.

17      Q.   And she admitted what she did during that time,

18  right?  She never lied about what she was doing,

19  correct?

20      A.   She misrepresented that she was conducting work

21  on a project.  She stated by certifying her time sheet

22  that she was conducting work on a project.

23      Q.   But how did she describe that work?

24      A.   The work that she did not do?

25      Q.   Yeah.

1    A.    She didn't describe that work.  And in later

2   discussions she revealed that she was idle during that

3   time not working on a project.  That was immediately

4   identified as a -- as an issue and corrective actions

5   were taken both to educate Mary Ellen and to remove the

6   charges that she placed on the contract.

7    Q.    Okay.  Well, I've asked you a lot of questions

8   and I may have cut you off a few times.  Is there

9   anything that you wanted to add to any of your answers?

10    A.    Not at this time.

11    Q.    Is there any question that you can remember

12   right now that you would like clarification on or that

13   wasn't clear or was not eventually made clear?

14    A.    No.  The only confusion was the difference

15   between the time -- the time sheet logs and the C16s.

16    Q.    Okay.

17              MR. WALSH:  Well, let's go off the record.

18              MR. BARRERA:  Okay.

19                    (Deposition ended 3:56 p.m.)

20                 *   *   *   *   *

21

22

23

24

25

CHANGES AND SIGNATURE

WITNESS: WILLIAM C. RYAN          DATE: 12/21/2016

| PAGE | LINE | CHANGE | REASON |
|------|------|--------|--------|
| 6 | 13 | "2016" to "2009" | Wrong date. |
| 20 | 8 | "2006" to "2009" | Wrong date. |
| 32 | 22 | "a Bachelor's" to "an Associate's" | Wrong degree. |
| 51 | 20 | After "She was" insert "counseled for her misappropriation of time." | Clarification. |
| 70 | 18 | Insert "No." at the beginning of the answer. | Clarification. |
| 74 | 14 | "decide" to "state" | Clarification. |
| 83 | 4 | Insert "Yes, and" at the beginning of the sentence. | Clarification. |
| 87 | 19 | "Possible" to "Impossible" | Incorrect word. |
| 95 | 25 | After "Yes," insert "including Mary Ellen." | Clarification. |

1   _____

2          I, WILLIAM C. RYAN, have read the foregoing

3   deposition and hereby affix my signature that same is

4   true and correct, except as noted above.

5

6                           WILLIAM C. RYAN, Witness

7   THE STATE OF _Texas_ )

8   COUNTY OF _Bexar_ )

9       Before me, _Carol Coleman McCaffrey_, on this day

10  personally appeared WILLIAM C. RYAN, known to me (or

11  proved to me under oath or through _____ )

12  (description of identity card or other document) to be

13  the person whose name is subscribed to the foregoing

14  instrument and acknowledged to me that they executed

15  the same for the purposes and consideration therein

16  expressed.

17      Given under my hand and seal of office this _2nd_

18  day of _February_ , _2017_ .

19

20                          Carol Coleman McCaffrey

21  [SEAL: CAROL COLEMAN MCCAFFREY    Notary Public in and for the
        Notary Public, State of Texas   State of _Texas_ .
        My Commission Expires
22      October 18, 2018]

23

24

25

1

2                IN THE UNITED STATES DISTRICT COURT

3                FOR THE WESTERN DISTRICT OF TEXAS

4                      SAN ANTONIO DIVISION

5   MARY ELLEN JOHNSON,        )
                               )
6          Plaintiff(s),       )
                               )        CIVIL ACTION NO.
7   VS.                        )   5:15-CV-00297-FB-HJB
                               )
8   SOUTHWEST RESEARCH         )
    INSTITUTE,                 )
9                              )
           Defendant(s).       )
10

11                  REPORTER'S CERTIFICATION
                 DEPOSITION OF WILLIAM C. RYAN
12                    DECEMBER 21, 2016

13       I, DICIE LEE EYTCHESON, a Certified Shorthand

14   Reporter in and for the State of Texas, do hereby

15   certify that the foregoing deposition is a full, true

16   and correct transcript;

17       That the foregoing deposition of WILLIAM C. RYAN,

18   the Witness, hereinbefore named was at the time named,

19   taken by me in stenograph on December 21, 2016, the

20   said Witness having been by me first duly cautioned

21   and sworn to tell the truth, the whole truth, and

22   nothing but the truth, and the same were thereafter

23   reduced to typewriting by me or under my direction.

24       ( ) That upon request by the witness and/or

25   counsel, the Witness shall have 30 days after being

1   notified by certified mail, return receipt requested,

2   by the deposition officer that the original deposition

3   transcript is available in Kim Tindall & Associates'

4   office for review and signature by the Witness and if

5   any corrections made are attached hereto;

6       ( ) That upon request by the witness and/or

7   counsel, a reading condensed copy of the deposition

8   transcript along with the full-sized original Changes

9   and Signature Sheet has been sent to _____

10  on _____ for review and signature within 30

11  days and if any corrections returned are attached

12  hereto;

13      ( ) That upon request by the witness and/or

14  counsel, the deposition officer is instructed to

15  release the original deposition transcript to

16  _____ on _____, for

17  review and signature, and the deposition officer is

18  thereafter released of any further responsibility with

19  regard to the original.

20      ( ) That upon request by the Witness and/or

21  counsel, the Witness shall have thirty (30) days for

22  review and signature of the original transcript and if

23  any corrections returned are attached hereto.

24      ( ) That the signed transcript ( ) was ( ) was not

25  received from the Witness within 30 days.

1    That the amount of time used by each party at the

2    deposition is as follows:

3               Colin Walsh - 4hrs:27min

4    That before the completion of the deposition, the

5    Deponent, and/or the Plaintiff/Defendant _____ did _____

6    did not request to review the transcript.

7    I further certify that I am neither counsel for,

8    related to, nor employed by any of the parties in the

9    action in which this proceeding was taken, and further

10   that I am not financially or otherwise interested in

11   the outcome of the action.

12   WITNESS MY HAND, this the _____ day of

13   _____, 2017.

14

15   _____
     DICIE LEE EYTCHESON, Texas CSR 5392

16   Expiration Date: 12/31/18
     TransPerfect Legal Solutions

17   Firm Registration No.
     216 East 45th Street, Suite 903

18   New York, New York  10017
     (212) 400-8845

19

20

21

22

23

24

25

# EXHIBIT 15

## EMPLOYEE DEVELOPMENT

### A. PURPOSE

This operating statement sets forth policy and procedure related to the operation of the Employee Development Office and the professional development of Institute employees.

### B. POLICY AND PROCEDURE

#### 1. Professional Development

The Institute encourages its staff members to improve themselves professionally by:

a. Maintaining an Employee Development Office with an overall mission to conduct or arrange educational and professional development programs that are responsive to the needs of the Institute's operating divisions and general and administrative departments. Headed by the Director of Employee Relations, Compensation & Development (DERCD), the Employee Development Office fulfills its mission by (a) identifying the continuing education needs of the Institute and individual employees, (b) establishing training goals and curricula, (c) identifying, responding to and developing educational programs, (d) arranging for qualified instructors and courses of instruction, and (e) fostering the professional growth and career development of Institute employees.

b. Reimbursing or advancing all or part of regular staff member's tuition and required fees related to pre-approved courses taken at accredited educational institutions (see Part B.2.).

c. Maintaining a central data base containing information on the educational history, continuing education and professional development activities of Institute employees. Staff members may request to have their relevant outside continuing education entered into the data base by submitting Institute Form E-6, Request for Entry of Continuing Education, and proof of successful completion to the Employee Development Office.

d. Awarding Continuing Education Units to staff members and other individuals who successfully complete eligible training programs conducted by the Institute (see Part B.6.).

e. Allowing Division/Department Heads (DH) the prerogative of changing working hours and granting leaves of absence to employees who wish to obtain additional college or university training.

f. Encouraging staff members to accept part-time teaching assignments at local colleges and universities or with professional associations (see Part B.7.).

g. Encouraging the writing and presentation of technical papers at national and regional meetings/conferences of professional societies. When judged appropriate by the DH, the employee's cost center will bear the cost of travel and per diem expenses to these meetings/conferences.

h. Encouraging membership and involvement in professional societies. At the discretion of the DH, attendance at regional and national meetings/conferences when not presenting a paper may be compensable when performed in conjunction with other Institute business. When judged appropriate by the DH, the employee's cost center will bear the cost of travel and per diem expenses to these meetings/conferences.

i. Conducting seminars and brown-bag programs for the staff that include Institute and guest speakers.

j. Encouraging use of print and electronic resources available through the SwRI library.


's Southwest Research Institute® 1

**SwRI Johnson 000122**

In addition, the senior staff of the Institute takes an active interest in the curricula of local colleges and universities and whenever appropriate and practical assists them in improving their programs. Also, from time to time, the Institute, in cooperation with government agencies or professional societies, co-sponsors symposia on subjects of national interest, with recognized speakers, in which employees may take part.

## 2. Educational Assistance

Employees eligible for educational assistance benefits include regular full-time employees and regular part-time employees in active service. Staff members in inactive service (see OPP 2.2.1, Part C.3.), such as long-term disability leave or leave of absence, are not eligible to apply for educational benefits. When an employee approved for educational benefits becomes classified as inactive service, continuance of his or her educational benefits will be determined by the Director of Employee Relations, Compensation and Development (DERCD) in consultation with the DH and appropriate sources. Temporary employees, temporary agency workers, employees of subcontractors, and consultants are not eligible for Institute educational assistance.

Institute DHs or their designated representatives, shall have discretionary authority to approve or disapprove employee requests for educational assistance based on factors such as: whether the course(s) or degree being sought is related to the field in which the employee is working or may reasonably be expected to work, relevance of the request to division or departmental business and/or strategic plans, staff training being considered for future management/leadership positions, division/department fiscal situation, and other prevailing business circumstances. Approval or disapproval of educational requests shall be made without regard to race, color, religion, sex, national origin, age, disability, veteran status and follow Institute equal employment opportunity standards.

Eligible employees who pursue courses required for the completion of a college or university degree, as well as those who pursue individual courses not required for the completion of a degree, may be reimbursed by the Institute for up to 100 percent of all required tuition and applicable fees (i.e., laboratory, special facilities, building use, and graduate entrance examination fees) minus any applicable payroll taxes, provided:

a. The degree being sought or the individual courses will, in the judgment of the DH, better suit the employee for his/her Institute career.

b. The courses are offered by an accredited college or university.

c. For regular full-time active employees, the course(s) taken require no more than six credit hours per semester (eight if classes have a lab requirement), or equivalent in time demands where credits are computed quarterly. By special arrangement with the DH and Employee Development Official (EDO), up to nine credits may be authorized under the following conditions: (a) when courses include mandatory laboratories; (b) to fulfill the residency requirement of a graduate degree program (nine-hour authorization limited to two semesters); or (c) when, by taking nine hours during one semester, the employee can complete the requirements for the degree being sought during that same semester.

d. For regular part-time active employees, education assistance is prorated based on the number of work hours scheduled.

e. Approved educational assistance requests may be reimbursed for up to 100 percent of required tuition and applicable fees for courses taken at accredited colleges and universities. However, the DH has the option of approving partial tuition support; for example, in the case of unusually expensive courses (including correspondence, online, and similar distance learning programs). In such cases, the approved dollar amount will



Southwest Research Institute® 2

**SwRI Johnson 000123**

be entered in the space provided in the Institute Form E-14, Courses tab in Forms Manager.

f. If the DH and EDO grant approval on the E-14 prior to enrollment in the course(s) and the class enrollment differs from what was originally approved, a new E-14 must be completed and submitted for approval.

g. Executive MBA and other similar programs generally are not eligible for tuition support. Exceptions must be requested in writing prior to enrollment and approved by the SwRI Executive Vice President.

h. The courses are successfully completed with a grade of "C" or higher.

To obtain reimbursement, approved employees should submit an electronic Check Request (Tuition Reimbursement option) approved by his/her DH, along with the following documents: the original fee statement; a copy of the approved E14; and a copy of his/her grade report. All documents must be submitted electronically in Forms Manager.

Reimbursement for regular full-time employees are for a maximum of six credit hours (except as noted in Part B.2.c., for lab requirements) and for regular part-time employees, reimbursement will be prorated based on the number of work hours scheduled. Regular part-time employees scheduled to work 20 to 29 hours per week will be reimbursed for three credit hours (four if class has a lab requirement). Regular part-time employees scheduled to work 30 to 39 hours per week will be reimbursed for four and one-half credit hours (six if class has a lab requirement).

Eligible employees attending state-supported colleges or universities have the option of requesting an advance to pay eligible tuition and fees as described in this section (OPP 3.1.2, Part B.2.). To use this option, the employee must submit an electronic Check Request (Tuition Advance Request option), along with the required supporting documentation listed on the

Approvals page (an approved E-14 and an official document from the school that supports the amount of the advance payment request). If the request is approved, the Institute Accounting Department will pay the advance subject to the terms and conditions set forth on the Check Request, Approvals page. Furthermore, if the advance represents taxable income to the employee, deductions will be made for all applicable payroll taxes. The advance can be requested no earlier than 30 days before payment is due to the school. If the terms and conditions listed on the Check Request, Approvals page are not complied with, the employee will be subject to immediate payroll deduction of the entire amount advanced.

When the tuition assistance is provided to maintain or improve job skills, it is not subject to taxes. The Internal Revenue Code (IRC) exempts from personal income tax employer-paid tuition assistance for *business/job-related* courses. To be business/job-related, the course must maintain or improve skills required by the Institute, or be needed to meet the express requirements of the Institute or of a law or regulation to retain the employee (pertains to E-14, courses tab, rationale section, 1st and 2nd radio buttons).

The IRC also stipulates that employer-paid tuition assistance in excess of the limit allowed annually for undergraduate and graduate courses that are not business/job-related is subject to personal income tax. If this occurs, the Institute will notify the employee of the tax liability. (pertains to E-14, courses tab, rationale section, 3rd and 4th radio buttons).

The determination of whether a course qualifies under the IRC's definition of business/job related will be based on the explanation provided by the employee and the DH on the E-14 form. General education courses that satisfy a business/job related degree plan can qualify as business related. The EDO has responsibility for reviewing the information and making this determination. Employees will receive email notification of all approval or disapproval determinations. A copy of submitted E-14s will be availa-

**SwRI Johnson 000124**

ble in the employee's Forms Manager, Sent folder.

In accordance with federal tax law, the cost of any courses that are deemed to be taxable to the employee will be reported as such at the time the advance or reimbursement is made.

The Institute will deduct the required withholding and FICA taxes generally in the subsequent pay period that a reimbursement or advance is made to or on behalf of the employee. These amounts will be included on the employee's year-end Form W-2, Wage and Tax Statement.

### 3. Record Keeping

Accurate record keeping is required to ensure that the Institute educational assistance policy is being applied fairly and on a nondiscriminatory basis. Accordingly, the following record keeping procedures shall be observed:

a. All requests for college and university tuition support, including disapproved requests, shall be documented on an E-14.

b. Disapproved requests shall be so marked on the E-14 and the reason(s) for disapproval recorded in the space provided.

c. All E-14s shall be forwarded to the EDO for administrative review, approval and entry into an electronic archive.

d. Records shall be maintained in accordance with applicable records maintenance policies.

### 4. Vocational Training

Regular full-time employees in active service who pursue programs designed to increase their vocational skills for continued career development, will be reimbursed for up to 100 percent of their expenses for all required fees, subject to the following conditions:

a. The employee's DH and the EDO grant approval to the proposed course of study prior to enrollment in the program.

b. The program does not require more classroom and study time than the equivalent of six college or university credit hours per semester.

c. As in the case of college and university tuition support, the DH shall have the option of approving partial reimbursement for vocational education programs. In such cases, the guidelines for partial support spelled out in OPP 3.1.2, Part B.2. shall apply.

d. An E-14 is submitted to the EDO.

e. The programs are successfully completed.

### 5. Technical Seminars, Special Short Courses and Management Training

Personnel are encouraged to attend specialized short courses and seminars directly related to their technical activity. The cost of this training will be charged to their respective cost centers, provided advance DH approval is obtained. From time to time, seminars of this type will be held on Institute facilities. In this case, the cost of the instruction will be charged to an appropriate Institute account and the time charged to the student's respective cost center.

An E-14 is required to be submitted prior to enrollment for technical seminars, special short courses, management training seminars/workshops, or similar educational programs when:

• The cost of the program exceeds $2,500, and/or

• Program completion will require more than six months.

Institute staff is encouraged to ensure such courses are maintained in their Institute educational transcripts.

Southwest Research Institute® 4

Staff members with management responsibilities, as well as those being considered for future management positions, will be encouraged to attend specialized short courses to enhance their management effectiveness. The cost of this training, including travel and per diem for out-of-town programs, will be borne by the employee's respective cost center. Advance DH approval is required.

To obtain payment, a check request approved by the DH will be submitted to the Accounts Payable Section of the Accounting Department. The check request must be accompanied by a copy of the registration form and/or other documentation showing the cost and an agenda or brief description of the course, seminar or training program.

## 6. Continuing Education Units

The Institute endorses and supports the mission, goals and objectives of the International Association for Continuing Education and Training and, as an Authorized Provider of the Association, complies with all criteria and guidelines established by the Association to regulate the awarding of Continuing Education Units (CEUs).

The EDO has sole administrative responsibility governing the awarding of CEUs to individuals who participate in continuing education programs offered by the Institute. The EDO has final authority to determine which programs qualify for CEUs. The EDO also has final authority to determine whether a participant has fulfilled the criteria for successful completion of a training or continuing education program that qualifies for CEUs.

A written statement concerning the policies and procedures that regulate the awarding of CEUs by the Institute shall be maintained in the Employee Development Office.

## 7. College, University and Professional Society Teaching Assignments

The Institute recognizes that part-time teaching assignments provide valuable opportunities for members of the staff to broaden their professional credentials, to avail themselves of new knowledge and developments in their areas of expertise, to foster closer ties with their professional counterparts in the academic and professional community, and, in general, to demonstrate Institute support for area colleges and universities and local, national and international professional societies. Therefore, staff members who wish to accept part-time college, university, or paid professional society teaching assignments are encouraged to do so, provided:

a. They receive prior approval from their division vice president or CCH by completing Institute Form E-22.

b. The teaching assignment does not conflict or interfere with the individual's Institute activities.

c. The employee informs the DERCD in writing of his/her teaching activities.

The DERCD shall serve as liaison and SwRI corporate point of contact for matters related to college, university and paid professional society teaching assignments involving Institute staff members.

## 8. Oversight of Employee Development

The Executive Vice President, through the Executive Director of Human Resources and the DERCD, shall monitor the employee development program and provide guidance for its execution.

SwRI Johnson 000126

# EXHIBIT 16

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

MARY ELLEN JOHNSON,            )
                               )
        Plaintiff(s),          )
                               )        CIVIL ACTION NO.
VS.                            )        5:15-CV-00297-FB-HJB
                               )
SOUTHWEST RESEARCH             )
INSTITUTE,                     )
                               )
        Defendant(s).          )


DEPOSITION OF

ANTHONY MAGARO

DECEMBER 21, 2016

San Antonio, Texas


Reported by: Dicie Lee Eytcheson

Job NO.: 17762

1          ORAL DEPOSITION of ANTHONY MAGARO, produced as a

2     witness at the instance of the Plaintiff(s), and duly

3     sworn, was taken in the above-styled and numbered

4     cause on the 21st day of December, 2016, from

5     4:06 p.m. to 6:45 p.m., before Dicie Lee Eytcheson,

6     CSR in and for the State of Texas, reported by machine

7     shorthand, at the law offices of NORTON ROSE

8     FULBRIGHT, Fulbright & Jaworski, LLP, 300 Convent

9     Street, Suite 2100, San Antonio, Texas 78205, pursuant

10    to the Federal Rules of Civil Procedure and the

11    provisions stated on the record or attached hereto.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    A P P E A R A N C E S

 2

    FOR THE PLAINTIFF(S):  MARY ELLEN JOHNSON
 3
         MR. COLIN WALSH, Esq.
 4       ROB WILEY, P.C.
         1011 San Jacinto Blvd., Suite 401
 5       Austin, Texas 78701
         PH: (512)271-5527
 6       cwalsh@robwiley.com

 7
    FOR THE DEFENDANT(S): SOUTHWEST RESEARCH INSTITUTE
 8
         MR. MARIO A. BARRERA, Esq.
 9       NORTON ROSE FULBRIGHT
         Fulbright & Jaworski, LLP
10       300 Convent Street, Suite 2100
         San Antonio, Texas 78205
11       PH: (210)224-5575
         mario.barrera@nortonrosefulbright.com
12
    Also Present:
13
         MARY ELLEN JOHNSON
14       KELLY ANDERSON

15                        * * * * * *

16

17

18

19

20

21

22

23

24

25
```

1    A.    As far as --

2    Q.    Do you administer those?

3    A.    Lawsuits?

4          I'm sorry.

5    Q.    Do you --

6    A.    I didn't hear what you said.

7    Q.    Well, let me -- Maybe I'm confusing.

8          Does Southwest have an antidiscrimination

9    policy?

10   A.    Antidiscim- -- yes, sir.

11   Q.    Does it have an anti-retaliation policy?

12   A.    Anti-retal- -- You're a little bit fast on your

13   verbiage.  If you don't mind slowing down, I would

14   appreciate it.

15   Q.    Does it have an anti-retaliation policy?

16   A.    Yes, sir.

17   Q.    Who enforces those?

18   A.    The institute enforces them through the

19   standards of conduct, through their compliance office

20   and through the human resources.

21   Q.    How do you verify that those are being complied

22   with?

23   A.    We verify compliance of anti-retaliation by

24   informing any employee who comes in to lodge a complaint

25   that they're aware of that.  We also have bulletin

1    boards across the institute that has that in policy

2    stated.

3         Q.   And what is the policy?

4         A.   That we do not retaliate against an employee

5    for exercising their rights under the policies of the

6    institute.

7         Q.   Have you, in your time since 2011, ever found

8    that an employee of the institute has retaliated against

9    someone else?

10        A.   Have I ever found that an employee of the

11   institute retaliated against another employee at the

12   institute or somebody else?

13        Q.   Yes.

14        A.   Well, I -- I can't -- I can't answer the

15   somebody else.  So I don't know that.  I've never seen

16   or -- a retaliation against an internal employee against

17   another employee.

18        Q.   Since 2011?

19        A.   I have had my job title since 2011.

20        Q.   How long have you been at the institute?

21        A.   Forty -- Almost 41 years.

22        Q.   In 41 years have you ever see an employee

23   retaliate against another employee?

24        A.   I cannot recall ever seeing that.

25        Q.   How long have you been in the human resources

1    A.   The report does include all of the statements

2  and all of the information provided during the

3  investigation.  It's a complete document.

4    Q.   I'm going to -- hand you Exhibit 18.

5               (Exhibit No. 18 marked.)

6    Q.  (BY MR. WALSH)  So have you ever seen this

7  before?

8    A.   Yes, sir.

9    Q.   What is this document?

10    A.   This is a Conclusion of Investigation.

11    Q.   Into what?

12    A.   Into an employee complaint.

13    Q.   From Ms. Johnson?

14    A.   Mary Ellen Johnson.

15    Q.   Do you remember anything about this

16  investigation?

17    A.   I certainly reviewed the report.

18    Q.   When did you review it?

19    A.   I reviewed the report back in 2012, and more

20  recently in -- in preparation for this.

21    Q.   Are most reports 16 pages long?

22    A.   I can't answer that.  I don't know.

23    Q.   Do you review all of the reports?

24    A.   I've reviewed any report that is completed

25  since 2011.

1    Q.    So how long are reports normally?

2    A.    I -- I can't give you an exact number of pages

3    that a report might be.

4    Q.    Well, what's the average length of a report?

5    A.    I can't even provide you that information.

6    Q.    Does this seem like a normal length, or long,

7    or short?

8    A.    I -- to provide you -- you're trying to get to

9    an average number of pages.  I -- I just don't -- I

10    don't recall.  I -- I can't give you that exact number

11    of pages.

12    Q.    Even though you review every report you have no

13    opinion as to whether or not something's long or short?

14    A.    Do I have an opinion about long and short?

15    Q.    Yeah.

16    A.    What do you mean by that?  Is --

17    Q.    About the length of this.

18    A.    The length of the report being?

19    Q.    Long or short.

20    A.    Relative to the average?  I -- That's hard for

21    me to say.  I -- I mean, would it be appropriate for me

22    to even guess that this would be a -- a long or a short

23    report?

24    Q.    Yes.  It would be appropriate.

25    A.    I -- I'm a little bit hesitant to -- to tell

1    you.

2        Q.    Why are you hesitant?

3        A.    Because I -- I -- I don't know.  You know,

4    you -- you've asked me to -- to give you the best

5    judgment, my best information, and I don't know.

6        Q.    Okay.  Well, so who was involved in this

7    investigation, if you remember?

8        A.    Well, according to the -- the individuals

9    interviewed were Bob Keys, vice president; Mary Massey,

10   the executive director; Bill Ryan, a director; Nova

11   Cooper was the senior research engineer; and then, of

12   course, Kevin Zajicek; and then Debbie Lange signed the

13   report.

14       Q.    Did Debbie Lange write the report?

15       A.    Debbie Lange wrote the report.

16       Q.    And how long has Debbie Lange worked in the HR

17   department?

18       A.    I -- I can't tell you exact number of years.

19       Q.    Many years?

20       A.    She's a long-term employee.

21       Q.    So was this complaint against Bob Key -- Keys?

22       A.    Well, the complaint alleged division management

23   retaliation due to tuition reimbursement, the department

24   management did not promote her to engineering

25   technologist, and her pay is less than her coworkers.

1   So it would be against the -- the -- the individual that

2   would make those decisions would be the vice president

3   of the division.

4      Q.   Which is Bob Keys?

5      A.   Which is Bob Keys.

6      Q.   And Bob Keys could have gotten a hold of this

7   report, correct?

8      A.   After the investigation Bob Keys could have

9   reviewed the report.

10      Q.   Do you know if he did?

11      A.   I do not know if he requested it or not.  I

12   don't recall.

13      Q.   Okay.  How does somebody make a request for a

14   copy?

15      A.   They would request it from me.

16      Q.   Verbally or in writing?

17      A.   Usually verbally.

18      Q.   So there would be no record of whether he

19   requested it?

20      A.   That is correct.

21      Q.   Why don't you make them do it in writing?

22      A.   It's just part of our procedures.  We have a

23   direct conversation with the vice president of the

24   division.

25      Q.   Did you provide a copy of this to the EEOC?

1    potential violations of policies or areas of concern.

2    We -- We've given written reprimands to employees.

3         Q.   Is verbal counseling required?

4         A.   No, sir.

5         Q.   So somebody can be fired the first time

6    something happens, correct?

7         A.   That would depend on what transpired.

8         Q.   So there are some circumstances where -- well,

9    give me an example of when somebody could be fired

10   without any verbal counseling.

11        A.   The institute has a formal process where if

12   there was a transgression, a problem with an employee,

13   then the -- the vice president has -- would make a

14   recommendation to the human resources department.  The

15   human resources department would then convene the

16   Personnel Action Review Committee, and that -- or PARC,

17   and that PARC, the vice president would come in and

18   present what occurred and a decision for separation of

19   employment would be made during that meeting.

20        Q.   Are you on the PARC?

21        A.   Yes, sir.

22        Q.   And does the PARC usually adopt the

23   recommendation that's made to them?

24        A.   From the vice president?

25        Q.   Yes.

1    Q.   So can anybody form a PARC for any

2  recommendation to separate or demote someone?

3    A.   A -- a division vice president or a vice

4  president can request the separation or the change in

5  status of employees involuntarily.

6    Q.   Is there a requirement that that recommendation

7  be supported with evidence?

8    A.   Well, it -- it -- there's a requirement that --

9  that the -- that we present the documentations assoc- --

10  associated with the recommendation to the members of the

11  PARC committee.

12    Q.   Yeah.  But does the vice president have to

13  provide any evidence for his recommendation?

14    A.   The vice president would -- would definitely

15  bring information concerning the recommendation, yes,

16  sir.

17    Q.   Does he have to, though?

18    A.   I cannot recall one that I've been part of that

19  would con- -- would be convened without a recommendation

20  and supporting documentation.

21    Q.   But it would be possible to do that, right?

22          MR. BARRERA:  Objection.  Calls for

23  speculation.

24    Q.  (BY MR. WALSH)  Based on your knowledge as the

25  executive director of HR it would be possible?

1  would the institute do that?

2      A.   Why would we hire somebody with -- with ITT

3  degrees?

4      Q.   Yeah.

5      A.   We would hire an individual based on their

6  qualifications and based on their -- on the job

7  requirements.

8      Q.   And ITT would be a valid qualification?

9      A.    ITT has some challenges with their

10 accreditation.

11     Q.   So is it a valid degree for qualification to

12 work at the institute?

13     A.   That's -- Can you be more specific with your

14 question?

15     Q.   Well, I asked if it was a valid qualification,

16 and you said ITT has issues with accreditation.  So why

17 don't you explain what that means as a response to my

18 question about whether or not ITT degrees are valid at

19 the institute?

20     A.   Well, ITT has a -- a national accreditation,

21 and that national accreditation doesn't allow its course

22 work to be res- -- to be transferred to regionally

23 accredited schools.  Regionally accredited schools in

24 the local area would be UTSA, St. Mary's, Our Lady of

25 the Lake.  So we are concerned about the -- the ITT

1    curriculum.

2        Q.    And so it's known that that's an issue with

3    ITT, correct?

4        A.    Yes, sir.

5        Q.    If you could, go to Exhibit 15.  Did you

6    receive this memo in June of 2010?

7        A.    I was carbon copied on the memo.

8        Q.    Do you know if Ms. Johnson was provided full

9    tuition reimbursement for the duration of her studies at

10   ITT?

11       A.    I believe the -- there's a statement that it

12   says, During this meeting it was agreed that we would

13   honor the agreement for the first two quarters, and that

14   was tuition in the amount of $1,000 per quarter, and the

15   tuition for the most recent quarter was reimbursed in

16   full.

17       Q.    Okay.  And so do you know whether or not she

18   received full reimbursement for the duration of her ITT

19   degree?

20       A.    In or around this time the institute moved to a

21   policy that capped the tuition reimbursement at the UTSA

22   rate.

23       Q.    So if you look at the sentence after the one

24   you just -- I'm sorry -- two sentences after the one you

25   just read, At this time we plan to continue full

1    Q.   Well, do you think there's a distinction

2  between what I just said?

3    A.   Well, there's a lack of trust in some aspect.

4  I -- I -- Did you lose confidence in her ability to do

5  something as opposed to losing trust in her?  I -- I

6  mean, what's the difference?

7    Q.   I guess, is one broader than the other.

8    A.   In the nature of the job that -- that Bob Keys

9  as the vice president of that division, and as I

10  understand his responsibility to his client and to the

11  federal government, if they lose -- if he loses trust in

12  somebody's -- in trust, period, in a person, in their

13  ability to do their job -- job functions that they're

14  performing, if he loses trust then he has no other

15  option but to -- to no longer allow that individual to

16  do the job.

17    Q.   Okay.  So at the end of this paragraph there's

18  a bunch of attachments.  When you were on the PARC did

19  you review these attachments?

20    A.   From the description here, and given that they

21  were part of the memo, and given that I was present at

22  the PARC, I -- and not having them attached here, my

23  assumption is, yes, I did review them.  But I don't have

24  them in front of me to say, yes, I did review them.

25    Q.   Would you have reviewed anything that was not

1    should be charged to that project.  But time not worked

2    on a project should not be charged to the project.

3            MR. WALSH:  Objection.  Nonresponsive.

4        Q.  (BY MR. WALSH)  Is it time sheet fraud to bill

5    time to a specific project for time spent waiting on

6    the project manager of that project?

7        A.   If the person was not working on the project

8    and charged that to the project -- that time? -- then

9    that would be inappropriate charging of time.

10       Q.   Would it be time sheet fraud?

11       A.   How do you define -- fraud is -- is that they

12   charged -- it was charged inappropriately?  Then yes.

13       Q.   Well, how would you define fraud?

14       A.   Charging inappropriately to a -- to a charge

15   number when the time is not worked is time sheet

16   fraud -- and signing the time sheet.

17       Q.   Okay.  Well, what if the project manager had

18   told the employee to wait, would that change your

19   analysis?

20       A.   If the person wasn't working on the project

21   then they shouldn't charge to the project.

22       Q.   What if the project manager had said, I have an

23   urgent project for you.  I'll be right back, would it be

24   appropriate then to charge that waiting time?

25       A.   If the person wasn't working on the project

<pre>
 1                 IN THE UNITED STATES DISTRICT COURT

 2                FOR THE WESTERN DISTRICT OF TEXAS

 3                     SAN ANTONIO DIVISION

 4    MARY ELLEN JOHNSON,          )
                                   )
 5           Plaintiff(s),         )
                                   )    CIVIL ACTION NO.
 6    VS.                          )    5:15-CV-00297-FB-HJB
                                   )
 7    SOUTHWEST RESEARCH           )
      INSTITUTE,                   )
 8                                 )
             Defendant(s).         )

 9

10                    REPORTER'S CERTIFICATION
                   DEPOSITION OF ANTHONY MAGARO
11                     DECEMBER 21, 2016

12        I, DICIE LEE EYTCHESON, a Certified Shorthand

13    Reporter in and for the State of Texas, do hereby

14    certify that the foregoing deposition is a full, true

15    and correct transcript;

16        That the foregoing deposition of ANTHONY MAGARO,

17    the Witness, hereinbefore named was at the time named,

18    taken by me in stenograph on December 21, 2016, the

19    said Witness having been by me first duly cautioned

20    and sworn to tell the truth, the whole truth, and

21    nothing but the truth, and the same were thereafter

22    reduced to typewriting by me or under my direction.

23        ( ) That upon request by the witness and/or

24    counsel, the Witness shall have 30 days after being

25    notified by certified mail, return receipt requested,
</pre>

1    by the deposition officer that the original deposition

2    transcript is available in Kim Tindall & Associates'

3    office for review and signature by the Witness and if

4    any corrections made are attached hereto;

5         ( ) That upon request by the witness and/or

6    counsel, a reading condensed copy of the deposition

7    transcript along with the full-sized original Changes

8    and Signature Sheet has been sent to _____

9    on _____ for review and signature within 30

10   days and if any corrections returned are attached

11   hereto;

12        ( ) That upon request by the witness and/or

13   counsel, the deposition officer is instructed to

14   release the original deposition transcript to

15   _____ on _____, for

16   review and signature, and the deposition officer is

17   thereafter released of any further responsibility with

18   regard to the original.

19        ( ) That upon request by the Witness and/or

20   counsel, the Witness shall have thirty (30) days for

21   review and signature of the original transcript and if

22   any corrections returned are attached hereto.

23        ( ) That the signed transcript ( ) was ( ) was not

24   received from the Witness within 30 days.

25        That the amount of time used by each party at the

1   deposition is as follows:

2              Colin Walsh - 2hrs:18min

3       That before the completion of the deposition, the

4   Deponent, and/or the Plaintiff/Defendant _____ did _____

5   did not request to review the transcript.

6       I further certify that I am neither counsel for,

7   related to, nor employed by any of the parties in the

8   action in which this proceeding was taken, and further

9   that I am not financially or otherwise interested in

10  the outcome of the action.

11      WITNESS MY HAND, this the _____ day of

12  _____, 2017.

13

14              _Dicie Lee Eytcheson_

15  DICIE LEE EYTCHESON, Texas CSR 5392
    Expiration Date:  12/31/18
16  TransPerfect Legal Solutions
    Firm Registration No.
17  216 East 45th Street, Suite 903
    New York, New York  10017
18  (212) 400-8845

19

20

21

22

23

24

25

# EXHIBIT 17

# SOUTHWEST RESEARCH INSTITUTE®
## EDUCATIONAL ADVANCEMENT REQUEST

☐ ORIGINAL SUBMISSION          ☐ REVISED SUBMISSION

## PART I – TO BE COMPLETED BY THE EMPLOYEE
The undersigned requests permission to enroll in the following course(s), under the program contained in SwRI® Operating Policies and Procedures (3.1.2)

| Course Number | Course Level* | Subject | No. of Hours | Start Date | Ending Date | Cost |
|---|---|---|---|---|---|---|
| IT 220 T | B | Network Standards | 4 | 8 Sep 09 | 28 NOV 09 | $1872.° |
| TM 380 T | B | Advanced Topics in TechMath | 4 | 8 Sep 09 | 28 NOV 09 | $1872.° |

*A-Associates, B-Bachelors, M-Masters, D-Doctorate

Degree Field/Major Field of Study __Electronics and Communications__

Course(s) offered by: __ITT Technical Institute__
                                                    School or Organization

Which category best describes the nature of the above course(s)/degree?

(1) ☒ Will maintain or improve skills required by the Institute.

(2) ☐ Needed to meet express or minimum requirements for current job position.

(3) ☐ Will qualify for a new trade or business.

(4) ☐ Are not related to current job.

Method of Instruction?
☒ Classroom Attendance
☐ Distance Learning/Correspondence Study

If you checked (1) or (2) above, indicating the course(s)/degree are business (job) related and, therefore, not a taxable fringe benefit, please explain how courses/degree requested would enhance current job (attach course catalog descriptions and justify relatedness to current position):
__This program will enhance my knowledge and quality at work as a Senior__
__Electronics technician.__

Employee #: __11838__     Org. ID (Div, Dept, Section): __11.01.03__     Extension: __2594__

Employment Status:     Regular ☒     Temporary ☐     Full-time ☒     Part-time ☐

Job Title: __Senior Electronics technician__

__MaryEllen Johnson__                              __MaryEllen Johnson__ Date: __30 July 09__
Type or Print Name                              Employee's Signature

## PART II – TO BE COMPLETED BY THE DIVISION VP OR DEPARTMENT DIRECTOR

Your request is:                    If approved for partial payment,
                                    state amount to be funded by SwRI:     $ __1000.00__

☐ Approved (Full Support)

☒ Approved (Partial Support)     If disapproved, state reason: _____

☐ Disapproved

I hereby certify that the approved course(s) is(are) business (job) related and required, unless noted below, with an appropriate justification.
Division VP or Department Director:
__WILLIAM RYAN / Bob Keys__          __Bob__ _____ Date: __10-5-09__
Type or Print Name                              Division VP or Department Director Signature

Explanation of approved course(s) that are not business (job) related [category (3) or (4) above]: _____

## PART III – TO BE COMPLETED BY THE STAFF DEVELOPMENT OFFICE
Administrative Review/Approval:                    Qualifies for Prepaid Tuition:     Yes ____ No ✓
__Susan Dale__ Date: __12/11/09__
VP Operations or Director of Staff Development Signature     Qualifies as Business (Job) Related: Yes ✓ No ____

See Page 2 for instructions and additional information regarding the taxability of tuition assistance.

Form E-14 – Revised February 2004

**SwRI Johnson 001386**

# EXHIBIT 18

# SOUTHWEST RESEARCH INSTITUTE®
## EDUCATIONAL ADVANCEMENT REQUEST

RECEIVED
APR 0 1 2010

☒ ORIGINAL SUBMISSION  ☐ REVISED SUBMISSION

### PART I – TO BE COMPLETED BY THE EMPLOYEE

The undersigned requests permission to enroll in the following course(s), under the program contained in SwRI® Operating Policies and Procedures (3.1.2)

| Course Number | Course Level* | Subject | No. of Hours | Start Date | Ending Date | Cost |
|---|---|---|---|---|---|---|
| ET390T | B | Embedded Systems | 4 | 15MAR10 | 5Jun10 | $1972.0 |
| TM420T | B | Technical Calculus | 4 | 15MAR10 | 5Jun10 | $1972.0 |

*A-Associates, B-Bachelors, M-Masters, D-Doctorate

Degree Field/Major Field of Study  _Electronics & Communications Engineering Technology_

Course(s) offered by:  _ITT Technical Institute_
School or Organization

Which category best describes the nature of the above course(s)/degree?
(1) ☒ Will maintain or improve skills required by the Institute.
(2) ☐ Needed to meet express or minimum requirements for current job position.
(3) ☐ Will qualify for a new trade or business.
(4) ☐ Are not related to current job.

Method of Instruction?
☒ Classroom Attendance
☐ Distance Learning/Correspondence Study

If you checked (1) or (2) above, indicating the course(s)/degree are business (job) related and, therefore, not a taxable fringe benefit, please explain how courses/degree requested would enhance current job (attach course catalog descriptions and justify relatedness to current position):
_These classes are included in my degree plan to continue to my Bachelors Degree in Engineering. These courses will enhance my knowledge & quality of work in my current position._

Employee #: _11838_  Org. ID (Div, Dept, Section): _11._  Extension: _2594_

Employment Status:  Regular ☒  Temporary ☐  Full-time ☒  Part-time ☐

Job Title: _Senior Electronics Technician_

_Mary Ellen Johnson_  _Mary Ellen Johnson_  Date: _18 Mar10_
Type of Print Name  Employee's Signature

### PART II – TO BE COMPLETED BY THE DIVISION VP OR DEPARTMENT DIRECTOR

Your request is:  If approved for partial payment, state amount to be funded by SwRI:  $ _$1,2—_
☒ Approved (Full Support)  _JM per B. Keys 4/8/10 — pay full tuition_
☐ Approved (Partial Support)  If disapproved, state reason:
☐ Disapproved  _This degree will not lead to an engineer title_

I hereby certify that the approved course(s) is(are) business (job) related and required, unless noted below, with an appropriate justification.
Division VP or Department Director:

Type or Print Name  Division VP or Department Director Signature  Date:

Explanation of approved course(s) that are not business (job) related [category (3) or (4) above]: _____

### PART III – TO BE COMPLETED BY THE STAFF DEVELOPMENT OFFICE

Administrative Review/Approval:  Qualifies for Prepaid Tuition:  Yes ___ No ✓
_Susan Dale_  Date: _4/1/10_
VP Operations or Director of Staff Development Signature  Qualifies as Business (Job) Related: Yes ✓ No ___

See Page 2 for instructions and additional information regarding the taxability of tuition assistance.

4/6/10  Form E-14 – Revised February 2004  ✶ _Discussed w/ Keys – She is pursuing a BS TM degree – already has BS – Director has discussed the fact that the classes are not transferable – she still wants to take them – approved for institute_

SwRI Johnson 001388

# EXHIBIT 19

# Memo

**Date:**  June 8, 2010

**To:**  MaryEllen Johnson

**From:**  Bill Ryan

**CC:**  Tony Magaro

**RE:**  Meeting Recap

---

On June 3, 2010, Kevin Zajicek (Group Leader) and I met with you to discuss tuition reimbursement and promotion considerations. The following are the conclusions from this meeting.

We discussed tuition reimbursement for the BSECET degree from ITT that you are currently enrolled in. During your first two quarters of enrollment, you were reimbursed for tuition in the amount of $1,000 per quarter. This is the amount that we agreed upon at the beginning of your enrollment in this program. During this meeting, it was agreed that we would honor this agreement for the first 2 quarters. The tuition for the most recent quarter was reimbursed in full. At this time, we plan to continue full reimbursement for these tuition expenses as long as the requirements in OPP 3.1.2 are satisfied. Lastly, we discussed the employment expectations upon degree completion. As we discussed when you first enrolled in the BSECET program, this degree is most appropriate for continuing growth to an Engineering Technologist position and not towards a position in the SE career ladder.

During the second part of the meeting we discussed promotion considerations. When you were first hired into the division we had a discussion about expectations and your skill level at that time. As a Senior Technician, you were inexperienced based on our specific requirements of a Senior Technician. It was discussed that it may take longer to achieve your next promotion. Since that time, you were successfully able to bridge the requirements and build upon it. You expressed concern that past performance has been overlooked on previous evaluations (specifically work performed on the TANG project and AEL work). We consider all input that is received during the review process. I will visit with you during this process to ensure that all relevant sources of performance information are contacted and considered. We also ask for and consider a self-review; this is a great way for you to highlight your skills.

Your skill sets are developing well, and we have considered what will be required to achieve the next step in your career ladder. As stated in the career ladder, the Principal Technician position requires expert level skills. I would like to see you become an expert in E-CAD and over-all electronics design.

As always, please do not hesitate to come speak with me about any topic, my door is always open.


**SwRI Johnson 000145**

# EXHIBIT 20

**Mary Ellen Johnson**

| | |
|---|---|
| From: | Bob Keys [bob.keys@swri.org] |
| Sent: | Wednesday, June 30, 2010 2:57 PM |
| To: | swri11@swri.org |
| Cc: | Tony Magaro |
| Subject: | Reimbursement for Education |

Effective October 1, 2010 reimbursement for education courses/degree plans and/or training taken by Division 11 employees will be limited to the UTSA equivalency.  Other than minor variations from the UTSA costs, will not be allowed.

This does NOT apply to any training mandated by Division 11 or SwRI management.

Bob Keys
Vice President R&D
Applied Power Division
Southwest Research Institute
6220 Culebra Road
San Antonio, Texas 78238

WARNING:  The information contained in this message is legally privileged and proprietary information intended only for the use of the individual or entity named above.  If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copy of this message is strictly prohibited.  If you have received this message in error, please immediately delete the original message and notify us by telephone at (210) 522-3436.  Communication of any of the information contained in the message to any unauthorized persons may be a violation of state or federal laws.

1

SwRI Johnson 000650

# EXHIBIT 21

# ITT TECHNICAL INSTITUTE

BY VIRTUE OF THE AUTHORITY GRANTED TO THEM
BY THE TEXAS HIGHER EDUCATION COORDINATING BOARD
CERTIFIES THAT

## MARY ELLEN JOHNSON

IS AWARDED THIS

## BACHELOR OF SCIENCE DEGREE

IN

## ELECTRONICS AND COMMUNICATIONS ENGINEERING TECHNOLOGY

IN WITNESS WHEREOF WE AFFIX OUR SIGNATURES

Given at San Antonio, Texas, this 22nd day of March, 2012.

Dean

Director

SwRI Johnson 001068

EEOC527 of 597

# EXHIBIT 22

## ADVANCEMENT POLICIES AND PROCEDURES AND SALARY ADMINISTRATION

### A. ADVANCEMENT POLICY

The achievement of Institute objectives is heavily dependent on the retention and professional advancement of existing staff and the acquisition and engagement of additional innovative employees with the required skills and knowledge. The advancement of staff can best be accomplished by a promotion policy that is impartial, competitive, and conducive to continued career development and personal improvement. The Institute's advancement procedures are directed toward achieving these goals.

### 1. Promotion Procedures

Recommendations for promotions or change in titles are initiated by the Cost Center Head (CCH) using the Institute's Salary Review and Analysis (SRA) system. Explanation and justification for promotions must be uploaded into the SRA's document feature by clicking on the paper clip image located next to the Effective Date. A current Performance Evaluation Summary (Form E-15) must be completed and submitted to Human Resources (HR) to support the merit of the promotion recommendation, the current being not more than one year old. Although justification for a promotion of the staff member varies widely, depending upon type and level of position involved, justification should be sufficient to distinguish the employee's capabilities and achievements and to explain the employee's qualifications for the new position relative to the Institute Career Ladder Guidelines.

HR evaluates a recommendation for a promotion and, if necessary, discuss it with the CCH to acquire additional supporting information or alternatives. Executive management approval is required for all promotions and title changes. Title changes are usually made within the limits of the job titles comprising the existing career ladders. New job descriptions, job guidelines and titles, however, may be prepared for approval by the Institute Compensation Committee.

### 2. Salary Changes Accompanying Promotions

In accordance with the Institute's salary administration program, an annual review of the salaries of all Institute staff is scheduled at or near the end of the fiscal year. When a salary increase accompanies a promotion, the increase should be in accordance with the allocated fiscal year budget established by executive management upon advice from the Institute Compensation Committee at the beginning of the fiscal year. The budget values are noted throughout the year in the SRA system.

### B. SALARY ADMINISTRATION

The Institute maintains a salary administration program which aids in the acquisition, engagement and retention of highly qualified staff at all levels. HR is responsible to the President and Executive Vice President for the administration of the program; for monitoring current salary trends and economic conditions; for advising cost center heads of salary policies and practices; for providing cost center heads advice on job titles, salary levels and career growth plans; for distributing, in a timely manner, salary survey, salary range and other information pertinent to making informed salary decisions; and for maintaining the SRA system.

In general, an annual salary review of all staff is scheduled on or about the end of the fiscal year. Salary increases are based strictly on merit, however, such factors as changes in the economy, the Institute's competitive position, need for


Southwest Research Institute® 1

**SwRI Johnson 000112**

particular skills, and labor market conditions may also be considered. HR is responsible for communication with the CCHs concerning the annual review and related salary analyses. Out-of-cycle recommendations for special consideration salary increases are submitted through the SRA. Each recommendation is reviewed by HR and forwarded to executive management for approval.

### C. PROMOTION AND SALARY CHANGES FOR DIRECTORS, CHIEF AUDIT EXECUTIVE AND INSTITUTE OFFICERS

#### 1. Promotion and Salary Changes for Directors

Promotions to the level of Director and accompanying salary changes are approved by the President.

#### 2. Promotion and Salary Changes for Institute Officers

Officer Compensation is administered by the Compensation Committee of the Institute Board of Directors. Corporate officer elections and salary changes are approved by the Institute Board.

#### 3. Promotion and Salary Changes for the Chief Audit Executive

Promotion and salary changes for the Chief Audit Executive are approved by the Audit Committee of the Institute Board.

Southwest Research Institute® 2

**SwRI Johnson 000113**

# EXHIBIT 23

# SwRI Employee Profile

**Employee Name:** Johnson, MaryEllen C
**Employee ID:** 011838
**Status:** IN
**Exempt:** N

**Hire Date:** 04/03/2000
**Calc Adj Hire Date:**
**Term Date:** 08/15/2012

**Birth Date:** ▮▮▮▮▮
**Gender:** F
**Race:** W

Reustle-Johnson, Mary

**Address:** 9707 Charline Lane

SAN ANTONIO, TX 78254

| CC | Career Ladder | Title Desc | GLC | Detl Job Code | Effect Date | Hrly Amt | Salary | Pct Incr Rt | Act Rsn Cd | Empl Type | Work State |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1.11.01.03 | TS-4 | Principal Technician | 13 | 3056218 | 08/15/2012 | 24.2500 | 50,440 | 0.0000 | XB | R | TX |
| 1.11.01.03 | TS-4 | Principal Technician | 13 | 3056218 | 10/01/2011 | 24.2500 | 50,440 | 0.0325 | SI | R | TX |
| 1.11.01.03 | TS-4 | Principal Technician | 13 | 3056218 | 04/02/2011 | 23.4865 | 48,852 | 0.0500 | PRSI | R | TX |
| 1.11.01.03 | TS-3 | Sr. Technician | 13 | 3004218 | 09/25/2010 | 22.3681 | 46,526 | 0.0280 | SI | R | TX |
| 1.11.01.03 | TS-3 | Senior Technician | 13 | 3004218 | 09/26/2009 | 21.7589 | 45,259 | 0.0300 | SICCS | R | TX |
| 1.14.04 | TS-3 | Senior Technician | 13 | 300421823 | 09/27/2008 | 21.1251 | 43,940 | 0.0800 | SI | R | TX |
| 1.14.04 | TS-3 | Senior Technician | 13 | 300421823 | 02/02/2008 | 19.5603 | 40,685 | 0.1139 | SI | R | TX |
| 1.14.04 | TS-3 | Senior Technician | 13 | 300421823 | 09/29/2007 | 17.5603 | 36,525 | 0.0700 | SI | R | TX |
| 1.14.04 | TS-3 | Senior Technician | 13 | 300401523 | 09/30/2006 | 16.4115 | 34,136 | 0.0450 | SI | R | TX |
| 1.14.04 | TS-3 | Senior Technician | 13 | 300401523 | 10/01/2005 | 15.7048 | 32,666 | 0.0400 | SI | R | TX |
| 1.14.04 | TS-3 | Senior Technician | 13 | 300401523 | 09/25/2004 | 15.1008 | 31,410 | 0.0400 | SI | R | TX |
| 1.14.04 | TS-3 | Senior Technician | 13 | 300401523 | 07/31/2004 | 14.5200 | 30,202 | 0.0000 | CC | R | TX |
| 1.16.20.20 | TS-3 | Senior Technician | 13 | 300401523 | 03/13/2004 | 14.5200 | 30,202 | 0.0416 | PRSI | R | TX |
| 1.16.20.20 | TS-2 | Technician | 14 | 300701522 | 01/31/2004 | 13.9400 | 28,995 | 0.0000 | SUFFIX | R | TX |
| 1.16.20.20 | TS-2 | Technician | 14 | 300701622 | 09/27/2003 | 13.9400 | 28,995 | 0.0419 | SI | R | TX |
| 1.16.20.20 | TS-2 | Technician | 14 | 300701622 | 09/28/2002 | 13.3800 | 27,830 | 0.0552 | SI | R | TX |

SwRI Johnson 000516

# EXHIBIT 24

## STANDARDS OF CONDUCT

### A. PURPOSE

This Operating Statement includes the policies that are set forth in the Institute's Standards of Conduct booklet. All current and future employees of the Institute are required to acknowledge receipt of this booklet and that they have read it. This acknowledgement must be documented in writing as a condition of employment. The members of the Institute's Board of Directors have adopted this Standards of Conduct to govern their conduct as well. The contents of the Standards of Conduct booklet, included in Part C below, are general in scope and speak to principles rather than specifics.

### B. BACKGROUND

Southwest Research Institute conducts its business with integrity in accordance with the highest ethical and professional standards. The Institute and its employees are accountable to clients while adhering to all pertinent laws, rules and regulations.

The Institute's corporate values are firmly founded in a dedication to excellence–in both its technical performance and its business operations. Excellence is every employee's responsibility; compromising these standards of conduct is unacceptable.

### C. POLICY

#### 1. Corporate and Individual Rights and Responsibilities

The Institute is responsible for maintaining an open, ethical work environment fostering the highest standards of conduct.

Employees and Board Directors are entitled to:

- Be dealt with honestly, in good faith
- Have work-related matters reviewed without prejudice

Employees and Board Directors are charged to:

- Be honest in dealings with the Institute and its clients
- Observe all Institute policies and procedures

- Obey all of the laws of the United States and the other countries with which we do business
- Safeguard Institute and Client-Owned property against damage, misappropriation, improper use, loss or theft
- Accept no less than these standards of conduct from all fellow employees and Board Directors

Board Directors are additionally charged to:

- Exercise care and diligence in the performance of their responsibilities
- Further the interest of the Institute to fulfill its stated purposes
- Assure the activities of the Institute and staff conform to applicable legal requirements

#### 2. Standards of Conduct

The standards of conduct described herein are based on long-standing policy. These standards reinforce the importance of ethical principles that guide the Institute's relationships with clients. However, a written statement of policy is only the beginning. Adherence to these standards of conduct depends on the honor and integrity of each employee and Board Director.

#### 3. Quality of Performance

The Institute's reputation and business viability depend directly on client satisfaction. Work must be performed to the highest standards of quality in compliance with contractual commitments. Plagiarism, falsification or misrepresentation of research results will not be tolerated.

Work should be completed on schedule, within budget, and should provide all contractual deliverables including documentation, materials, equipment and data. Deviation from contract schedule, cost, deliverables or exceptions to performance specifications is acceptable only with written client approval. For contracts with the United States Government, only the appropriate contracting officer can authorize modifications to the terms of a contract. For commercial contracts, an individual in the client's purchasing organization is usually responsible for change authorization.


Southwest Research Institute ⁴ 1

**SwRI Johnson 000011**

#### 4. Proposal Pricing

Under federal law, the Institute must submit to the United States Government pricing and cost data that, to the best of its knowledge, are accurate, complete and current. In addition, the Institute must justify the basis for pricing the cost elements. Individuals involved in proposal price estimation must provide adequate documentation to the Institute Contract Specialist to support the cost data and must inform the Contract Specialist of any price changes of which they become aware before contract negotiations are completed. Failure to do so can result in serious penalties, including loss of the contract and erosion of the United States Government's confidence in the Institute's integrity.

#### 5. Cost Recording

Each element of cost must be charged to the specific account to which it applies. Materials, services and staff time incurred for the benefit of a specific contract must be charged to the project number(s) assigned to that contract. Activities not directly attributable to a specific contract must be charged to the appropriate indirect account.

Employees and their supervisors are responsible for ensuring that hours are accurately recorded on a timely basis. Generally, time charges should be posted daily, after the fact, using the Institute's electronic timekeeping system or the biweekly time report form.

Charging project costs to overhead accounts or overhead activities to project numbers is prohibited. Uncertainty regarding the appropriate account for charging costs should be discussed with the employee's supervisor. Improper charging is a serious offense. If done with the intent to defraud, it could result in criminal, administrative and financial penalties to the Institute and the individual(s) involved.

#### 6. Procurement

Under its United States Government-approved purchasing system, the Institute is obligated to obtain competitive bids to the maximum extent practicable and acquire the best quality of materials and services appropriate to the work being accomplished. Employees must not enter into discussions or arrangements with suppliers or subcontractors that could lead to a contractual or financial obligation outside the Institute's normal purchasing process.

In addition, Institute employees and Board Members and members of their families must not accept gifts, favors or services, directly or indirectly, from any person, firm, corporation or other entity that is engaged in procurement activities or business transactions of any sort with the Institute that might be reasonably interpreted as affecting, or give the appearance of affecting, the objectivity and impartiality of decisions with these parties.

#### 7. Proprietary Information and Confidential Information

All staff members and Board Directors must refrain from improperly disclosing information that is proprietary and confidential to the Institute or to clients. The private nature of such information must be protected in accordance with each employee's employment agreement and governing contract(s) with clients, potential clients and other third parties.

Classified United States Government information must be controlled in strict accordance with applicable security regulations under the guidance of the Institute Security Department.

Improper disclosure includes, but is not limited to, the wrongful use of client proprietary and confidential information in the performance of other Institute projects, the public disclosure of proprietary and confidential information or the disclosure of proprietary and confidential information to any individual without a need to know.

Technology transfer outside the United States must adhere to federal export regulations. The discussion of technical information, even within the United States to a foreign national, may require export authorization. Because so many factors influence the licensing of export materials and technology, such as the destination and intended use, all potential exports should be discussed with the Institute Legal Department.

#### 8. SwRI & Client-Owned Property

Property, facilities and equipment acquired and owned by SwRI should be used for the purpose of fulfilling one or more of SwRI's stated charitable purposes including, scientific, testing for public safety, literary or educational purposes. SwRI staff is expected to use SwRI property, facilities and equipment with proper care and for authorized business purposes. Before SwRI property, facilities or equip-


Southwest Research Institute® 2

ment may be used for non-business purposes, SwRI staff must have been granted approval for such use as provided in an existing Institute written policy, such as the SwRInet Acceptable Use Policy.

Client-owned property should only be used in furthering the client's project, unless directed otherwise by the client, and should not be used for personal benefit or other non-business purposes. Government property in SwRI's possession is strictly controlled and accounted for and shall only be used for furthering the appropriate Government client's project objectives. Such property should not be used for the personal benefit of SwRI staff, other non-business purposes or for any other Government, unless otherwise authorized by the appropriate Government client, or commercial client.

## 9. Conflict of Interest

Clients often select the Institute as their research and development and/or testing/evaluation organization because of its reputation for objectivity. Damage to this reputation would severely diminish the Institute's value to its clients.

Each employee and Board Director is obligated to reveal any existing or potential conflict of interest as soon as it is discovered. Examples would include simultaneously working on projects for more than one client with similar research objectives or having a relationship with a business that might affect an employee's objectivity.

In addition, employees often have access to sensitive Institute or client information that could be used for personal gain. The use of such information for personal advantage is strictly prohibited.

The payment or receipt of gratuities to induce favorable action is forbidden.

Board Directors will also follow the requirements of the Conflict of Interest provision of the Institute's By-laws and Board of Directors Conflict of Interest Policies and Procedures.

## 10. Scientific Ethics

Institute employees are expected to conduct research and development according to the highest ethical and professional standards. Misconduct in science, defined as fabrication, falsification, plagiarism or other activi-

ties that seriously deviate from accepted scientific practices, is strictly prohibited.

## 11. Statutory Compliance

### a. Equal Employment Opportunity

It is Institute policy to ensure equal opportunity in employment in a fair and nondiscriminatory manner without regard to race, color, religion, sex, national origin, age, disability or veteran status. The Institute takes affirmative action to ensure equal opportunity in all aspects of employment for qualified minorities, females, individuals with disabilities and Vietnam era veterans. This policy applies to all personnel activities including employment, upgrading, promotion, demotion, transfer, recruitment, layoff or termination, rates of pay or other forms of compensation and selection for training.

### b. Harassment

It is Institute policy to provide employees with a workplace that is free from harassment. Harassment in any manner on the basis of race, color, religion, sex, national origin, age (over 40), disability or veteran status in violation of Title VII of the Civil Rights Act of 1964, as amended, and other statutes, is expressly prohibited.

### c. Drug-Free Workplace

It is Institute policy to provide a safe, drug-free work environment.

### d. Environmental, Health and Safety

Each employee and Board Director is responsible for compliance with environmental, health and safety laws and regulations. Environmental or safety concerns should be reported to the Institute Safety Officer. Radiation protection concerns should be reported to the Institute Radiation Safety Officer.

### e. Government Contracts

It is Institute policy to conduct its operations in compliance with all applicable laws and regulations. Furthermore, as a United States Government contractor, the Institute is subject to additional compliance requirements that are far-reaching and complex.


Southwest Research Institute® 3

**SwRI Johnson 000013**

### f. Institute Compliance Program

To formalize its commitment to compliance with applicable laws and regulations at all levels, the Institute maintains a Compliance Program. The Institute Compliance Program should be used in conjunction with this operating statement and other Institute Operating Policies and Procedures. Compliance questions or concerns should be directed to the Institute Compliance Officer.

### 12. Political Contributions and Activities

It is Institute policy not to take an advocacy position on public or political issues, and not to support or oppose candidates for political office. Employees and Board Directors should not make any contribution of Institute funds, property or services or personal funds in the name of the Institute to any political party or committee or to any candidate for or holder of any office of any government. No direct or indirect pressure in any form should be directed toward any employee to make any political contributions or participate in the support of a political party or the political candidacy of any individual.

It is Institute policy not to attempt to influence legislation through lobbying efforts, except that which directly affects its operations and existence. Employees and Board Directors are not to engage in such conduct unless specifically requested to do so by Institute senior management, in consultation with the Institute Legal Department.

All personal political activities of employees and Board Directors must be carried on outside of the Institute's workday and workplace and without any inference that the individual represents the Institute or any of its clients.

Seeking or holding public office by Institute employees or Board Directors may give rise to situations where there is a conflict between the staff member's obligation to the community and to the Institute. In such situations, the employee or Board Director should make every effort to be excluded from decision-making processes where such conflicts are involved.

### 13. SwRInet Acceptable Use Policy

The Institute's computer network and all Institute computer systems and their content are Institute Property. The use of the Institute's computer network and computer systems is to be consistent with the purposes set forth in OPP 1.1.5 (SwRInet Acceptable Use Policy).

### 14. Institute Policy on Human Trafficking

The Federal government adopted a zero tolerance policy prohibiting Federal contractors and contractor employees from engaging in or supporting severe forms of trafficking in persons, procuring commercial sex or using forced labor. As a Federal contractor, the Institute is committed to complying with the U.S. government's zero tolerance policy and violations of this Federal policy will not be tolerated.

As defined by the Federal Acquisition Regulations, "**commercial sex act**" means any sex act on account of which anything of value is given or received by any person; "**severe forms of trafficking in persons**" means (1) sex trafficking in which a commercial sex act is induced by force, fraud, or coercion, or in which the person induced to perform such act has not attained 18 years of age, or (2) the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection of involuntary servitude, peonage, debt bondage, or slavery; and "**sex trafficking**" means the recruitment, harboring, transportation, provision, or obtaining of a person for the purpose of a commercial sex act.

It is Institute policy that neither the Institute nor its employees engage in, support or promote any of these activities. The Institute and its employees are expected to operate with the highest respect for individual human rights. Any violation, by an Institute employee, of this policy or any applicable U.S. or host country law or regulation related to trafficking in persons may result in disciplinary action including, but not limited to, removal from the applicable Federal government contract, removal from the applicable host country, reprimand, suspension and/or termination of employment. It is each employee's responsibility to report any actual or suspected violation of this policy.

### 15. Disclosure of Unethical or Unlawful Activities

Institute employees and Board Directors are obligated to promptly report any information indicating that unlawful or unethical conduct has occurred or is about to occur. Such conduct includes improper time charges, theft of property, violations of the SwRInet Acceptable Use Policy or Institute Policy on Human Trafficking,



Southwest Research Institute® 4

misrepresentation or falsification of research results, awarding subcontracts to family members, kickbacks or other unlawful or unethical activities.

Normally, employees should report such information directly to a supervisor. If an employee is uncomfortable discussing this matter with a supervisor or suspects the supervisor might be involved in the violation, the employee should report the information to the Institute Internal Audit Department at InternalAudit@swri.org or the Institute Compliance Officer at ComplianceOfficer@swri.org or call the Compliance Helpline at (210) 523-5016. Because charges of this nature can seriously damage an individual's reputation and career, great care should be taken to ensure that all reported information is accurate and documented.

There will be no reprisal against any employee for making a report, and every effort will be made to protect the identity of the reporting employee.

If, after a reasonable time for investigation, the reporting employee is unsatisfied with the investigation's progress, the employee has the right to bring the concern to the Institute President.

NOTHING IN THESE STANDARDS OF CONDUCT SHALL BE CONSTRUED TO PROHIBIT EMPLOYEES FROM REPORTING ANY SUSPECTED ILLEGAL ACTIVITY OR VIOLATION OF APPLICABLE LAW DIRECTLY TO ANY FEDERAL, STATE, OR LOCAL GOVERNMENT AGENCY.

### 16. Mandatory Disclosure to the U.S. Government

As a U.S. Government contractor, the Institute is required to timely disclose to appropriate U.S. Government officials, in connection with its award, performance, or closeout of a U.S. Government contract, credible evidence of a violation of Federal criminal law involving fraud, conflict of interest, bribery and gratuities found in Title 18 of the United States Code, or violations of the Civil False Claims Act. Therefore, it is important for Institute employees to promptly report any actual or potential unethical or unlawful conduct to their supervisor, the Institute Internal Audit Department, the Institute's Compliance Officer or the Compliance Helpline at (210) 523-5016.

### 17. Disciplinary Action

Upholding the standards of conduct described above is the responsibility of each employee and Board Director. Failure to comply with these standards or other laws and regulations may result in appropriate disciplinary action, including formal warning, reprimand, probation, reduction in compensation, demotion, suspension or dismissal.

Southwest Research Institute® 5

SwRI Johnson 000015

# EXHIBIT 25

# DOCUMENT FILED
# UNDER SEAL

# EXHIBIT 26

# DOCUMENT FILED UNDER SEAL

# EXHIBIT 27

# DOCUMENT FILED UNDER SEAL

# EXHIBIT 28

# DOCUMENT FILED UNDER SEAL

# EXHIBIT 29

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | |
| ☒ EEOC | 451-2012-02452 |

**Texas Workforce Commission Civil Rights Division** and EEOC

*State or local Agency, if any*

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone *(Incl. Area Code)* | Date of Birth |
|---|---|---|
| **Ms. Mary Ellen Johnson** | **(210) 389-6606** | ▮▮▮ |

| Street Address | City, State and ZIP Code |
|---|---|
| **9707 Charline, San Antonio, TX 78254** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| **SOUTHWEST RESEARCH INSTITUTE** | **500 or More** | |

| Street Address | City, State and ZIP Code |
|---|---|
| **6220 Culebra Road,  San Antonio, TX 78254** | |

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

☐ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☐ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ GENETIC INFORMATION
☐ OTHER *(Specify)*

| DATE(S) DISCRIMINATION TOOK PLACE | |
|---|---|
| Earliest | Latest |
| 06-06-2012 | 08-03-2012 |

☒ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

In or about February of, 2010, I became aware of a male co-worker named Robin Cotton who received full reimbursement from Southwest Research Institute for his school tuition. In contrast, I was only reimbursed a small percentage of my school tuition. I complained to Ernest Gomez human resources counselor regarding the disparity in benefits. After my complaint to Human Resources the Institute was informed that they needed to pay me the difference in benefits but only starting from when I made the complaint. In other words they failed to reimburse me back to September 2009 when I first started school. Mr. Cotton was reimbursed for his full school tuitions.

Division policy was created twelve days after the institute agreed to pay my tuition that only UTSA rates would apply to tuition reimbursements to all division employees. I found out on June 6, 2012, that another male co-worker named Allen Craig was grandfathered in for full reimbursement at Incarnate Word University and promoted to his agreed upon position. In contrast, I was made to follow division policy even with my resolution from Human Resources to continue to be paid in full.

I believe I have been discriminated against because of my sex, female and pay/benefits in violation of Title VII of the Civil Rights act, as amended and the Equal Pay Act of 1963, as amended.

| | |
|---|---|
| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| **Aug 03, 2012** _____ *Date* | X *Mary Ellen Johnson* *Charging Party Signature* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

# EXHIBIT 30

# DOCUMENT FILED UNDER SEAL

# EXHIBIT 31

# SOUTHWEST RESEARCH INSTITUTE®

6220 CULEBRA RD.  78238-5166  •  P.O. DRAWER 28510  78228-0510  •  SAN ANTONIO, TEXAS, USA  •  (210) 684-5111  •  WWW.SWRI.ORG

APPLIED POWER DIVISION - 11

**DATE:**     09 August 2012

**TO:**       Bob Keys

**FROM:**     William Ryan  ᴡ ᶜᴿ

**SUBJECT:**  Recommendation of Termination of Mary Ellen Johnson

---

Ms. Johnson has become increasingly difficult to manage. Her line managers, Nicholas Hawkins and Nova Cooper, address issues as they arise, but her behavior continues to demonstrate a disregard for her workplace. Ms. Johnson is a capable electronics technician and has been valuable to several projects in her career at the Institute. However, her communication and professionalism continue to degrade. She seems responsive when verbally counseled, but she repeatedly disregards specific management direction and deadlines. These items have been addressed as they occurred and were to be formally addressed in her annual review, but the most recent event, timesheet fraud, caused me to make this recommendation. This behavior violates Institute policy and standards of conduct.

Ms. Johnson has misrepresented hours on her timesheet on several occasions. One specific case involved charging a government project while she was admittedly idle (see attachment "Email – Subject: Tasking – Warning – I'm PISSED"). When her line management was made aware of this, they informed her that idle time was not a valid project charge and to transfer the time to overhead (see attachment "Email – Subject: Meeting minutes 09 July 2012"). This was accomplished, but only after being reminded to do so several times. Another case involved overhead hours; she called in at 0805 on August 3, 2012 ("Timesheet Friday") to inform line management she had a personal appointment that she had not previously disclosed. When she arrived (after noon), she completed and signed her timesheet. She billed eight hours to overhead for August 3, 2012. Management caught this discrepancy and insisted that the timesheet be corrected to reflect the absence. She then corrected it. Attached is an action log for her time on the referenced day. This event was the final event that caused this recommendation. After being warned once of timesheet coding violations of OPP, she again violated this policy. Such blatant disregard for policy is not tolerated.

Ms. Johnson has also been in regular violation of the Division 11 attendance and call-in policy. The Division 11 workday is from 0800-1700 with a one hour lunch. As per division policy, individuals arriving late are to call and speak (in person) to designated administrative staff if they will be reporting to work after 0815. Voice messages and emails are not sufficient. Ms. Johnson has arrived late to work 40 of her last 69 working days. Furthermore, she has violated the call-in procedures 18 times in the last three months. Attached is a summary table of her tardiness and call-in violations. Ms. Johnson has been counseled verbally (AND IN WRITING) about the call-in requirements.



HOUSTON, TEXAS (713) 977-1377  •  WASHINGTON, DC (301) 881-0226

Ms. Johnson has committed timesheet fraud on multiple instances. This is a very serious violation. She has continued this behavior even after direct counseling. Coupled with other behaviors that are not consistent with Institute policy and practice, Ms. Johnson has lost the trust of her management to work in the manner required and serve as an effective staff member. Ms. Johnson's continued employment after such repeated violations is not warranted. It is my recommendation that we terminate Ms. Johnson's employment.

Attachments:   Email – Subject: Tasking – Warning – I'm PISSED
Email – Subject: Meeting minutes 09 July 2012
Email – Regarding help ticket 150844 – Available Time Data
Image – Aug32012 Change Explanation
Image – 20120607_08 MEJ Timesheet
Log – Mary Ellen Johnson Tardiness Log
Logs – All Access Attempts History Report

2

**SwRI Johnson 002172**

**Subject:** Tasking - Warning - I'm PISSED!

**Date:** Friday, June 8, 2012 3:27:53 PM CT

**From:** Johnson, MaryEllen C.

**To:** Cooper, Nova

Nova,

I'm about to rant, so just bare with me. You have been hounding us to stay billed. I have bonding work, Terry's work and had some work helping Mark with a test set up. I put Mark ahead of everyone because his stuff was 'urgent'. Here's my problem, I sit and wait for Mark for HOURS and he never calls. Says he will but doesn't. Just grabs whoever is in the immediate area – even after he said he was going to call or stop by – and has *them* do the work.

I waited for several hours yesterday afternoon for the go ahead to meet him at 216, and didn't get the call till late that he was, in fact, waiting on someone else for whatever he had to get done. We agreed we would do the configuration at 216 in the morning. I saw him when I came in, he said had something quick to do and we would go over. 0900, I'm tired of waiting, I stop by his lab, he's still working, I say I'll be in the AEL when he is ready. He never stopped by. Never called. I saw him after lunch and he said Jeremy got it done.

My question is, do you really want me on your team? Seriously, am I to fucking sit around all day when in fact Mark is just waiting for someone else to free up and do the work! Well – you can just kiss my ass! This favorites bullshit has got to stop. This happens over and over. You asked why I don't do work in the division – THIS is why. People promise work, I wait around for the go ahead and they fill in with they're favorites. I wanna work for someone who wants me to work for them, not for someone who thinks I'm second string. Like, I'm what you get when everyone else is busy. That is a crock of shit. I've got more talent, education and experience in my little finger than most of these yahoos around here. It's management's fault I don't get billed because they allow engineers to play the favorites game.

Mary Ellen Johnson
Principal Technician
Applied Power Division
Southwest Research Institute
San Antonio, Tx
210) 522-2594

SwRI Johnson 002173

**Subject:** Meeting minutes 09 July 2012

**Date:** Monday, July 9, 2012 3:37:11 PM CT

**From:** Cooper, Nova

**To:** Johnson, MaryEllen C.

**CC:** Cooper, Nova

Mary Ellen,

I just wanted to send an email to summarize the meeting we had this morning about the email sent back on June 8, 2012. Listed are the meeting points that we discussed and the resulting action, if any, required.

1. *The language and general tone of the email was professionally inappropriate and hostile.* You were fully aware of this and further expressed your apologies for sending the email. I let you know my door was always open if you felt upset about something and needed to discuss further. **Action required:** No action required.
2. *The email was threatening to management and coworkers.* In response to your email, I said I have not seen any favoritism occur in the division. Additionally, I stated that favoritism would not be tolerated, and I should be informed of specific cases. **Action required:** Inform me if/when you observe a specific case of favoritism.
3. *You should not simply "sit and wait" for work.* According to your email, you sat and waited for work. You were asked to be more active in your pursuit of work and told to continuing working other tasks instead of being idle. We evaluated your timesheet and agreed you charged some time to project while waiting for the project work. You were informed this is not a valid project charge. You agreed, informed me this was not a common practice, and assured me it would not happen again. **Action required:** Complete a C-16 (labor transfer) to move 6hrs of idle time (4hrs on 7 June 2012 and 2hrs on 8 June 2012) from the Daytona project to Overhead charge number 00751.009.

Please let me know how I can help in the future, well before you find yourself wanting to send something like this. Like I said before, my door is always open. My final message to you is that I would like to see you secure future work with urgency to support the division's goals. We all need to do our part to succeed.

Thank you, Mary Ellen.

K. Nova Cooper
Sr. Research Engineer, Applied Power
SOUTHWEST RESEARCH INSTITUTE
6220 Culebra Rd, San Antonio, TX 78238
Phone: 210.522.2707
mailto:nova.cooper@swri.org

SwRI Johnson 002174

**Subject:** Regaring help ticket 150844 -- Available Time Data

**Date:** Tuesday, August 7, 2012 12:38:15 PM CT

**From:** Nino, Nanette L.

**To:** Cooper, Nova

We do not have detailed timesheet entry logs, but we do keep track of certain actions like saving and signing timesheets. We also do not store this data for more than 4 weeks, so the only data I have available is for 8/3/2012. This is the data that is available for 8/3/2012.

|  | User ID | Timesheet Page | Action Taken | New Page | Time Stamp |
|---|---|---|---|---|---|
| 1 | E11838 | Regular Time | SAVE | | 8/3/2012 12:17:21 PM |
| 2 | E11838 | Regular Time | SAVEFORCE | | 8/3/2012 12:17:27 PM |
| 3 | E11838 | Regular Time | Switch | Overtime | 8/3/2012 12:17:34 PM |
| 4 | E11838 | Overtime | VALIDATE | | 8/3/2012 12:17:59 PM |
| 5 | E11838 | Overtime | Switch | Regular Time | 8/3/2012 12:18:02 PM |
| 6 | E11838 | Regular Time | SIGN | | 8/3/2012 12:18:12 PM |
| 7 | E11838 | Regular Time | EXIT_NO_SAVE | | 8/3/2012 12:18:19 PM |
| 8 | E11838 | Regular Time | EXIT_NO_SAVE | | 8/3/2012 12:30:56 PM |
| 9 | E11838 | Regular Time | UNSIGN | | 8/3/2012 12:31:44 PM |
| 10 | E11838 | Regular Time | SIGN | | 8/3/2012 12:32:13 PM |
| 11 | E11838 | Change Explanations | SIGN | | 8/3/2012 12:32:46 PM |
| 12 | E11838 | Regular Time | UNSIGN | | 8/3/2012 12:32:53 PM |
| 13 | E11838 | Regular Time | SIGN | | 8/3/2012 12:33:04 PM |
| 14 | E11838 | Regular Time | EXIT_NO_SAVE | | 8/3/2012 12:33:26 PM |

Please let me know if you have any questions.

Nanette Nino
Principal Analyst
Financial Data Systems
Southwest Research Institute
(210) 522-2805

**SwRI Johnson 002175**



Menu         ⇐ Period Selection ⇒        Org        ⇐ Employee ⇒      Print

Timesheet     Change Explanations     FY: 2012 PD: 11 SUB: 2     1.11.01.03     011838     Go

## Record of Timesheet Changes

Empl: 011838 Name: Johnson, MaryEllen C Org: 1.11.01.03 GLC: 13 Title: Principal Technician FLSA: Non-exempt

The timesheet period is closed. No updates allowed.

| Sequence No. | | Proj ID | Org ID | Hours | OT | Changed Date | Changed By | Reason | Last Update |
|---|---|---|---|---|---|---|---|---|---|
| 1 | OLD | 00751.00G | 1.11.01.03 | 0.00 | N | 08/03/2012 | E11838 | Entered in Error | ⬅ |
| | NEW | 00751.00G | 1.11.01.03 | 4.00 | | | | | |

**Return to Timesheet**       Next       Prev       **Logout**       **Recap**

Done Loading.             100%

SwRI Johnson 002176



Menu | ⇦ Period Selection ⇨ | Org | ⇦ Employee ⇨ | Print

Timesheet | Regular Time | FY: 2012 PD: 9 SUB: 2 | 1.11.01.03 | 011838 | Go

## Timesheet Regular

Empl: 011838 Name: Johnson, MaryEllen C  Org: 1.11.01.03  GLC: 13  Title: Principal Technician  FLSA: Non-exempt

The timesheet period is closed. No updates allowed

| Line | Corrected FY/PD/Sub | Fringe Description | Sat May 26 | Sun May 27 | Mon May 28 | Tue May 29 | Wed May 30 | Thu May 31 | Fri Jun 1 | Week 1 Total | Fringe Description | Sat Jun 2 | Sun Jun 3 | Mon Jun 4 | Tue Jun 5 | Wed Jun 6 | Thu Jun 7 | Fri Jun 8 | Week 2 Total | Total Hours | Memo | Last Update |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | Floating Holiday | | | | | | | | | Floating Holiday | | | | | | | | | | | |
| 2 | | Institute Holiday | | | 8.00 | | | | | 8.00 | Institute Holiday | | | | | | | | | 8.00 | | |
| 3 | | Personal Leave | | | | | | | | | Personal Leave | | | | | | | | | | | |
| 4 | | M&BL - Personal Illness/Injury | | | | | | | | | M&BL - Personal Illness/Injury | | | 8.00 | | | | | 8.00 | 8.00 | | |

| Line | Corrected FY/PD/Sub | Proj ID | Org ID | Lab Loc | PLC | Sat May 26 | Sun May 27 | Mon May 28 | Tue May 29 | Wed May 30 | Thu May 31 | Fri Jun 1 | Total | Proj ID | Org ID | Lab Loc | PLC | Sat Jun 2 | Sun Jun 3 | Mon Jun 4 | Tue Jun 5 | Wed Jun 6 | Thu Jun 7 | Fri Jun 8 | Total | Total Hours | Memo | Last Update |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | 15294.07.114 | 1.16.20.80 | | 010 | | | | 2.00 | 1.00 | | | 3.00 | 15294.07.114 | 1.16.20.80 | | 010 | | | | | 1.00 | 2.00 | | 3.00 | 6.00 | K. Donaho | |
| 2 | | 16889.01.340 | 1.11.02.04 | | | | | | | | | | | 16889.01.340 | 1.11.02.04 | | | | | | | | | | | | | |
| 3 | PD 12-1, 2012 Approval Pending | 00751.006 | 1.11.01.03 | | | | | | 6.00 | 7.00 | 4.00 | | 17.00 | 00751.006 | 1.11.01.03 | | | | | | 8.00 | | 4.00 | 2.00 | 14.00 | 31.00 | Time spent waiting | |
| 4 | | 17268.11.220 | 1.11.02.04 | | | | | | | | 4.00 | | 4.00 | 17268.11.220 | 1.11.02.04 | | | | | | | | | | | 4.00 | S Broderick | |
| 5 | | 17268.11.210 | 1.11.02.04 | | | | | | | | | 8.00 | 8.00 | 17268.11.210 | 1.11.02.04 | | | | | | | | | | | 8.00 | test prep | |
| 6 | PD 12-1, 2012 Approval Pending | 16660.30.111 | 1.11.01.02 | | | | | | | | | | | 16660.30.111 | 1.11.01.02 | | | | | | 8.00 | | | | 8.00 | 8.00 | Time spent waiting | |
| 7 | | 20105.05.310 | 1.14.03 | 011838 | | | | | | | | | | 20105.05.310 | 1.14.03 | 011838 | | | | | | 3.00 | 4.00 | 7.00 | 7.00 | | |
| | | | | | | | | 8.00 | 8.00 | 8.00 | 8.00 | 8.00 | 40.00 | | | | | 8.00 | 8.00 | 8.00 | 8.00 | 8.00 | | 40.00 | 80.00 | | |

Next | Logout | Recap

SwRI Johnson 002177

## Mary Ellen Johnson Tardiness Log (04/30/2012 – 08/07/2012)

|    | Date | Arrival Time | Call-in Necessary | Called In |
|----|------|--------------|-------------------|-----------|
| 1  | 05/03/2012 | 08:07 |   |   |
| 2  | 05/04/2012 | 08:50 | ✔ |   |
| 3  | 05/16/2012 | 08:05 |   |   |
| 4  | 05/17/2012 | 08:05 |   |   |
| 5  | 05/18/2012 | 08:07 |   |   |
| 6  | 05/22/2012 | 08:21 | ✔ |   |
| 7  | 05/23/2012 | 08:43 | ✔ |   |
| 8  | 05/24/2012 | 08:13 |   |   |
| 9  | 05/29/2012 | 08:26 | ✔ |   |
| 10 | 05/30/2012 | 08:17 | ✔ |   |
| 11 | 05/31/2012 | 08:26 | ✔ |   |
| 12 | 06/01/2012 | 08:13 |   |   |
| 13 | 06/05/2012 | 08:27 | ✔ | ✔ |
| 14 | 06/06/2012 | 08:21 | ✔ |   |
| 15 | 06/07/2012 | 08:07 |   |   |
| 16 | 06/12/2012 | 08:07 |   |   |
| 17 | 06/10/2012 | 08:10 |   |   |
| 18 | 06/14/2012 | 08:14 |   |   |
| 19 | 06/15/2012 | 08:09 |   |   |
| 20 | 06/18/2012 | 08:06 |   |   |
| 21 | 06/27/2012 | 08:14 |   |   |
| 22 | 06/28/2012 | 08:39 | ✔ |   |
| 23 | 06/29/2012 | 08:13 |   |   |
| 24 | 07/05/2012 | 08:14 |   |   |
| 25 | 07/06/2012 | 08:10 |   |   |
| 26 | 07/09/2012 | 08:46 | ✔ | ✔ |
| 27 | 07/12/2012 | 08:26 | ✔ |   |
| 28 | 07/13/2012 | 09:41 | ✔ | ✔ |
| 29 | 07/16/2012 | 08:18 | ✔ |   |
| 30 | 07/17/2012 | SICK | ✔ | Voicemail |
| 31 | 07/18/2012 | 08:18 | ✔ |   |
| 32 | 07/19/2012 | 08:19 | ✔ |   |
| 33 | 07/23/2012 | 09:34 | ✔ |   |
| 34 | 07/24/2012 | 08:19 | ✔ |   |
| 35 | 07/25/2012 | 08:18 | ✔ |   |
| 36 | 07/26/2012 | 08:19 | ✔ |   |
| 37 | 07/27/2012 | 08:09 |   |   |
| 38 | 08/01/2012 | 08:29 | ✔ |   |
| 39 | 08/02/2012 | 09:48 | ✔ | ✔ |
| 40 | 08/03/2012 | 12:12 | ✔ | ✔ |
| 41 | 08/07/2012 | 08:08 |   |   |

Summary: Ms. Johnson was late (after 08:05) 40 of the last 69 workdays.
Ms. Johnson failed to call in 17 of the required 22 days she was more than 15 minutes late.
Ms. Johnson did not actually speak to staff and left a voicemail on 07/17/2012.

**SwRI Johnson 002178**

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|
| 3:39:18PM | Valid Access | johnson, mary ellen | Normal | 233 - 238  Bldg B  2.306 hall ent dr (lab2) | 2 - Division 14 | No |

*Total for 8/7/2012: 5*

*Total Access Attempts Reported: 27*

SwRI Johnson 002179

2.306

## Access Attempts for 4/30/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|
| 5:17:59PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

*Total for 4/30/2012: 1*

## Access Attempts for 5/2/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|
| 1:07:07PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 1:14:32PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 2:54:26PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 4:26:17PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 6:18:23PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

*Total for 5/2/2012: 5*

## Access Attempts for 5/3/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|
| 8:07:11 AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 8:15:09AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 9:54:55AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 12:01:16PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 12:04:52PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

SwRI Johnson 002180

## Access Attempts for 5/3/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|
| 12:12:01PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 1:23:15PM | Valid Access | johnson, mary ellen | Normal | 231 - 238 Bldg B 2.302 hall ent dr (lab1) | 2 - Division 14 | No |
| 4:03:38PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 4:39:58PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

*Total for 5/3/2012: 5*

## Access Attempts for 5/4/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|
| 8:50:34AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 9:53:58AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 10:15:22AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 10:18:00AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 10:53:24AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 10:58:46AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 12:52:37PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 1:32:32PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 2:23:20PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 3:28:25PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 3:56:13PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

*Total for 5/4/2012: 11*

## Access Attempts for 5/8/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|

SwRI Johnson 002181

## Access Attempts for 5/8/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|
| 12:01:28PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 12:39:54PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 12:41:31PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

Total for 5/8/2012: 3

## Access Attempts for 5/9/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|
| 7:54:00AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 7:59:22AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

Total for 5/9/2012: 2

## Access Attempts for 5/10/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|
| 3:12:04PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 4:37:28PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

Total for 5/10/2012: 2

## Access Attempts for 5/11/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|
| 8:01:47AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 8:07:48AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 11:14:09AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 3:46:11PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

Total for 5/11/2012: 4

SwRI Johnson 002182

## Access Attempts for 5/14/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|---|---|---|---|---|---|---|
| 12:17:05PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 12:44:53PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 1:39:56PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 1:51:01 PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 5:22:39PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

Total for 5/14/2012: 5

## Access Attempts for 5/15/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|---|---|---|---|---|---|---|
| 3:57:02PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 5:15:25PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

Total for 5/15/2012: 2

## Access Attempts for 5/16/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|---|---|---|---|---|---|---|
| 8:05:16AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 3:58:43PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 4:59:11 PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 5:02:20PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

Total for 5/16/2012: 4

## Access Attempts for 5/17/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|---|---|---|---|---|---|---|
| 8:05:13AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

SwRI Johnson 002183

## Access Attempts for 5/17/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|
| 8:13:32AM | Valid Access | johnson, mary ellen | Normal | 233 - 238  Bldg B  2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 8:38:48AM | Valid Access | johnson, mary ellen | Normal | 233 - 238  Bldg B  2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 10:53:42AM | Valid Access | johnson, mary ellen | Normal | 233 - 238  Bldg B  2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 12:56:16PM | Valid Access | johnson, mary ellen | Normal | 233 - 238  Bldg B  2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 1:40:23PM | Valid Access | johnson, mary ellen | Normal | 233 - 238  Bldg B  2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 3:23:33PM | Valid Access | johnson, mary ellen | Normal | 233 - 238  Bldg B  2.306 hall ent dr (lab2) | 2 - Division 14 | No |

Total for 5/17/2012: 7

## Access Attempts for 5/18/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|
| 8:07:39AM | Valid Access | johnson, mary ellen | Normal | 233 - 238  Bldg B  2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 8:37:32AM | Valid Access | johnson, mary ellen | Normal | 233 - 238  Bldg B  2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 9:58:06AM | Valid Access | johnson, mary ellen | Normal | 233 - 238  Bldg B  2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 10:02:09AM | Valid Access | johnson, mary ellen | Normal | 233 - 238  Bldg B  2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 12:51:09PM | Valid Access | johnson, mary ellen | Normal | 233 - 238  Bldg B  2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 2:20:37PM | Valid Access | johnson, mary ellen | Normal | 233 - 238  Bldg B  2.306 hall ent dr (lab2) | 2 - Division 14 | No |

Total for 5/18/2012: 6

## Access Attempts for 5/21/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|
| 8:01:42AM | Valid Access | johnson, mary ellen | Normal | 233 - 238  Bldg B  2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 8:06:01 AM | Valid Access | johnson, mary ellen | Normal | 231 - 238  Bldg B  2.302 hall ent dr (lab1) | 2 - Division 14 | No |
| 9:41:45AM | Valid Access | johnson, mary ellen | Normal | 233 - 238  Bldg B  2.306 hall ent dr (lab2) | 2 - Division 14 | No |

As of  7/30/2012  5:01:33PM

All Access Attempts History Report - Selected Cardholders - Selected Devices
C:\Program Files\Schlage\Data\Reports\TrnHis11.rpt
Page 5 of 31

SwRI Johnson 002184

## Access Attempts for 5/21/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|---|---|---|---|---|---|---|
| 10:29:25AM | Valid Access | johnson, mary ellen | Normal | 233 - 238  Bldg B  2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 10:44:53AM | Valid Access | johnson, mary ellen | Normal | 233 - 238  Bldg B  2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 12:17:22PM | Valid Access | johnson, mary ellen | Normal | 233 - 238  Bldg B  2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 1:36:44PM | Valid Access | johnson, mary ellen | Normal | 233 - 238  Bldg B  2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 3:02:58PM | Valid Access | johnson, mary ellen | Normal | 233 - 238  Bldg B  2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 6:02:26PM | Valid Access | johnson, mary ellen | Normal | 233 - 238  Bldg B  2.306 hall ent dr (lab2) | 2 - Division 14 | No |

Total for 5/21/2012: 6

## Access Attempts for 5/22/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|---|---|---|---|---|---|---|
| 8:21:19AM | Valid Access | johnson, mary ellen | Normal | 233 - 238  Bldg B  2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 8:33:35AM | Valid Access | johnson, mary ellen | Normal | 233 - 238  Bldg B  2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 9:28:43AM | Valid Access | johnson, mary ellen | Normal | 233 - 238  Bldg B  2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 12:53:09PM | Valid Access | johnson, mary ellen | Normal | 233 - 238  Bldg B  2.306 hall ent dr (lab2) | 2 - Division 14 | No |

Total for 5/22/2012: 4

## Access Attempts for 5/23/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|---|---|---|---|---|---|---|
| 8:43:46AM | Valid Access | johnson, mary ellen | Normal | 233 - 238  Bldg B  2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 9:09:44AM | Valid Access | johnson, mary ellen | Normal | 233 - 238  Bldg B  2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 11:03:16AM | Valid Access | johnson, mary ellen | Normal | 233 - 238  Bldg B  2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 2:26:38PM | Valid Access | johnson, mary ellen | Normal | 233 - 238  Bldg B  2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 2:29:44PM | Valid Access | johnson, mary ellen | Normal | 233 - 238  Bldg B  2.306 hall ent dr (lab2) | 2 - Division 14 | No |

SwRI Johnson 002185

## Access Attempts for 5/23/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|
| 3:53:07PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 4:34:06PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

Total for 5/23/2012: 7

## Access Attempts for 5/24/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|
| 8:13:21 AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 1:04:15PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 1:05:54PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 3:21:05PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 4:15:02PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

Total for 5/24/2012: 5

## Access Attempts for 5/25/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|
| 7:53:54AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 8:29:03AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 9:31:55AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 12:19:47PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 1:14:41 PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

Total for 5/25/2012: 5

## Access Attempts for 5/29/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|

SwRI Johnson 002186

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|
| 8:26:00AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 8:52:08AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 9:01:16AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 11:14:03AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 11:25:26AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 12:17:17PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 1:42:31PM | Valid Access | johnson, mary ellen | Normal | 231 - 238 Bldg B 2.302 hall ent dr (lab1) | 2 - Division 14 | No |
| 4:20:37PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

Total for 5/29/2012: 8

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|
| 8:17:38AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 9:03:24AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 10:57:29AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 12:54:25PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 2:15:44PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 3:33:35PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 3:35:28PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 4:02:54PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

Total for 5/30/2012: 8

SwRI Johnson 002187

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|
| 8:26:46AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 8:53:46AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 10:44:43AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 12:27:25PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 12:30:44PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 1:44:04PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 3:22:23PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

*Total for 5/31/2012: 7*

## Access Attempts for 6/1/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|
| 8:13:29AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 8:21:44AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 10:01:13AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 10:47:47AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 10:54:44AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 12:57:22PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 1:10:27PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 1:36:03PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 1:49:01PM | Valid Access | johnson, mary ellen | Normal | 231 - 238 Bldg B 2.302 hall ent dr (lab1) | 2 - Division 14 | No |
| 2:51:09PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 3:10:14PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

*Total for 6/1/2012: 11*

SwRI Johnson 002188

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|---|---|---|---|---|---|---|
| 8:27:52AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 8:34:50AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 9:59:41AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 10:05:47AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 10:41:54AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 11:19:36AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 11:45:52AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 12:29:49PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 1:38:01PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 2:09:45PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

Total for 6/5/2012 10

Access Attempts for 6/6/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|---|---|---|---|---|---|---|
| 8:21:52AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 8:24:45AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 10:07:54AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 11:16:12AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 11:30:12AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 1:07:44PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 1:13:14PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 1:20:10PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

SwRI Johnson 002189

## Access Attempts for 6/6/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|
| 3:06:10PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 3:23:26PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 3:49:14PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

Total for 6/6/2012  11

## Access Attempts for 6/7/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|
| 8:07:54AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 8:51:53AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 9:01:47AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 9:47:57AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 9:52:22AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 10:19:18AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 12:29:06PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 1:31:20PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 2:45:06PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 4:26:05PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 4:32:02PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

Total for 6/7/2012  11

## Access Attempts for 6/8/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|
| 7:45:34AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

SwRI Johnson 002190

## Access Attempts for 6/8/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|
| 8:56:11AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 10:09:51AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 10:45:16AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 10:51:17AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 1:39:37PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 3:18:49PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 3:22:09PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

Total for 6/8/2012: 8

## Access Attempts for 6/11/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|
| 8:04:24AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 8:09:44AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 8:12:46AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 9:36:01AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 9:40:12AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 9:50:36AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 10:19:51AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 10:22:51AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 10:26:07AM | Valid Access | johnson, mary ellen | Normal | 231 - 238 Bldg B 2.302 hall ent dr (lab1) | 2 - Division 14 | No |
| 10:43:34AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 11:12:34AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

SwRI Johnson 002191

## Access Attempts for 6/11/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|---|---|---|---|---|---|---|
| 12:31:30PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 1:39:28PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 2:20:26PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 2:52:53PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 4:20:57PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 4:43:30PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

Total for 6/11/2012:  17

## Access Attempts for 6/12/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|---|---|---|---|---|---|---|
| 8:07:57AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 9:11:33AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 10:41:18AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 12:53:40PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 1:57:58PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 2:03:11PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 3:30:19PM | Valid Access | johnson, mary ellen | Normal | 231 - 238 Bldg B 2.302 hall ent dr (lab1) | 2 - Division 14 | No |
| 3:30:54PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 4:01:39PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 4:11:33PM | Valid Access | johnson, mary ellen | Normal | 231 - 238 Bldg B 2.302 hall ent dr (lab1) | 2 - Division 14 | No |
| 4:18:30PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

Total for 6/12/2012:  11

SwRI Johnson 002192

## Access Attempts for 6/13/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|---|---|---|---|---|---|---|
| 8:10:07AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 8:22:15AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 9:49:23AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 10:20:05AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 10:37:11AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 10:49:51AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 12:30:31PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 1:20:50PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 2:56:18PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 3:49:21PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 3:53:17PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

Total for 6/13/2012: 11

## Access Attempts for 6/14/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|---|---|---|---|---|---|---|
| 8:10:08AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 8:27:21AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 8:35:10AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 8:42:55AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 9:59:44AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 10:21:01AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 1:05:21PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

SwRI Johnson 002193

## Access Attempts for 6/14/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|
| 1:22:24PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 1:47:31PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 2:26:38PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 3:14:20PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 3:58:32PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 4:36:02PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

Total for 6/14/2012: 13

## Access Attempts for 6/15/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|
| 8:09:29AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 8:50:43AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 10:26:34AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 10:56:33AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 12:36:40PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 1:37:11PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 2:05:55PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 4:18:47PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

Total for 6/15/2012: 8

## Access Attempts for 6/18/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|
| 8:06:29AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

SwRI Johnson 002194

## Access Attempts for 6/18/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|
| 8:40:57AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 11:24:12AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 11:28:10AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 1:04:21 PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 3:25:34PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 3:29:29PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

Total for 6/18/2012: 7

## Access Attempts for 6/19/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|
| 8:03:46AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 8:25:09AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 9:07:23AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 10:01:36AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 11:36:34AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 12:42:56PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 1:22:01 PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 2:23:55PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 3:17:07PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 4:26:11 PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

Total for 6/19/2012: 10

## Access Attempts for 6/20/2012

SwRI Johnson 002195

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|
| 8:00:42AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 8:33:15AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 9:11:05AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 10:29:04AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 10:44:26AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 12:18:20PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 12:22:13PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 12:38:49PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 12:50:52PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 12:58:38PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 2:15:43PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 2:20:19PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 2:50:49PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

Total for 6/20/2012: 13

Access Attempts for 6/25/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|
| 12:59:41PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 2:54:23PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 4:26:45PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 4:45:29PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

Total for 6/25/2012: 4

Access Attempts for 6/26/2012

SwRI Johnson 002196

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|---|---|---|---|---|---|---|
| 8:02:22AM | Valid Access | johnson, mary ellen | Normal | 233 - 238  Bldg B  2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 8:08:01AM | Valid Access | johnson, mary ellen | Normal | 233 - 238  Bldg B  2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 9:50:10AM | Valid Access | johnson, mary ellen | Normal | 233 - 238  Bldg B  2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 10:02:57AM | Valid Access | johnson, mary ellen | Normal | 233 - 238  Bldg B  2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 10:51:31AM | Valid Access | johnson, mary ellen | Normal | 233 - 238  Bldg B  2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 12:00:41PM | Valid Access | johnson, mary ellen | Normal | 233 - 238  Bldg B  2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 1:26:32PM | Valid Access | johnson, mary ellen | Normal | 233 - 238  Bldg B  2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 1:47:09PM | Valid Access | johnson, mary ellen | Normal | 233 - 238  Bldg B  2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 2:30:19PM | Valid Access | johnson, mary ellen | Normal | 233 - 238  Bldg B  2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 2:42:18PM | Valid Access | johnson, mary ellen | Normal | 233 - 238  Bldg B  2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 4:44:09PM | Valid Access | johnson, mary ellen | Normal | 233 - 238  Bldg B  2.306 hall ent dr (lab2) | 2 - Division 14 | No |

Total for 8/26/2012: 11

### Access Attempts for 6/27/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|---|---|---|---|---|---|---|
| 8:14:00AM | Valid Access | johnson, mary ellen | Normal | 233 - 238  Bldg B  2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 8:30:11AM | Valid Access | johnson, mary ellen | Normal | 233 - 238  Bldg B  2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 8:33:39AM | Valid Access | johnson, mary ellen | Normal | 233 - 238  Bldg B  2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 8:39:03AM | Valid Access | johnson, mary ellen | Normal | 233 - 238  Bldg B  2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 10:42:49AM | Valid Access | johnson, mary ellen | Normal | 233 - 238  Bldg B  2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 12:31:08PM | Valid Access | johnson, mary ellen | Normal | 233 - 238  Bldg B  2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 1:37:56PM | Valid Access | johnson, mary ellen | Normal | 233 - 238  Bldg B  2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 3:12:17PM | Valid Access | johnson, mary ellen | Normal | 233 - 238  Bldg B  2.306 hall ent dr (lab2) | 2 - Division 14 | No |

SwRI Johnson 002197

## Access Attempts for 6/27/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|
| 4:51:46PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

Total for 6/27/2012: 1

## Access Attempts for 6/28/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|
| 8:39:38AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 9:08:16AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 12:29:04PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 12:54:27PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 3:49:30PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 4:20:31PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 4:24:59PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 5:35:23PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

Total for 6/28/2012: 8

## Access Attempts for 6/29/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|
| 8:13:17AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 9:03:35AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 12:16:58PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 12:24:33PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 12:39:55PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 2:09:27PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

SwRI Johnson 002198

## Access Attempts for 6/29/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|
| 2:57:43PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 4:58:04PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

Total for 5/29/2012 : 8

## Access Attempts for 7/2/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|
| 7:59:14AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 9:08:24AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 10:38:15AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 10:52:35AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 12:44:35PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 12:46:19PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 1:01:51 PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 1:06:46PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 1:09:18PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 1:13:59PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 1:22:52PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 1:29:34PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 2:29:59PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 2:32:26PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 3:44:01 PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 4:06:09PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

SwRI Johnson 002199

## Access Attempts for 7/2/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|
| 4:16:36PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 4:41:34PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 5:03:34PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

*Total for 7/2/2012: 15*

## Access Attempts for 7/3/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|
| 7:58:39AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 8:02:16AM | Valid Access | johnson, mary ellen | Normal | 231 - 238 Bldg B 2.302 hall ent dr (lab1) | 2 - Division 14 | No |
| 8:31:26AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 11:13:04AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 11:18:50AM | Valid Access | johnson, mary ellen | Normal | 231 - 238 Bldg B 2.302 hall ent dr (lab1) | 2 - Division 14 | No |
| 2:26:44PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 3:02:45PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 4:45:13PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

*Total for 7/3/2012: 8*

## Access Attempts for 7/5/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|
| 8:14:16AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 8:19:41AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 9:01:41AM | Valid Access | johnson, mary ellen | Normal | 231 - 238 Bldg B 2.302 hall ent dr (lab1) | 2 - Division 14 | No |
| 9:37:48AM | Valid Access | johnson, mary ellen | Normal | 231 - 238 Bldg B 2.302 hall ent dr (lab1) | 2 - Division 14 | No |

SwRI Johnson 002200

## Access Attempts for 7/5/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|
| 10:54:53AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 10:58:04AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 12:52:13PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 1:58:19PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

Total for 7/5/2012  4

## Access Attempts for 7/6/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|
| 8:10:57AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 8:41:19AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 10:23:42AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 10:31:09AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 12:18:02PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 12:32:43PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 12:45:52PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 12:57:49PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 2:09:29PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

Total for 7/6/2012  9

## Access Attempts for 7/9/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|
| 8:46:33AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 10:15:14AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

**SwRI Johnson 002201**

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|
| 10:56:51AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 12:01:56PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 12:59:53PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 1:28:34PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 3:18:18PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 5:10:57PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

Total for: 1/9/2012: 6

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|
| 8:03:42AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 9:00:19AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 9:40:04AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 10:11:40AM | Valid Access | johnson, mary ellen | Normal | 231 - 238 Bldg B 2.302 hall ent dr (lab1) | 2 - Division 14 | No |
| 12:40:45PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 12:47:39PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 12:57:50PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 2:11:30PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 3:50:07PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 4:43:40PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

Total for: 7/10/2012: 10

SwRI Johnson 002202

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|
| 8:26:12AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 8:59:09AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 10:44:17AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 11:13:06AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 11:23:07AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 12:30:44PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 12:33:39PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 2:55:47PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 3:26:19PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 5:28:34PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

*Total for 7/12/2012: 10*

## Access Attempts for 7/13/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|
| 9:41:43AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 10:59:30AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 12:51:39PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 2:01:01PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 4:04:13PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

*Total for 7/13/2012: 5*

## Access Attempts for 7/16/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|
| 8:18:12AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

SwRI Johnson 002203

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|
| 8:44:00AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 9:43:50AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 9:46:51AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 9:59:34AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 10:05:41AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 11:20:01AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 12:51:36PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 12:55:05PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 2:02:02PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 2:16:27PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 2:22:42PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 2:26:21PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 2:29:39PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 2:41:32PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 2:56:02PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 3:03:09PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 3:17:56PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 3:22:32PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 3:38:49PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 3:54:57PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 4:29:37PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

SwRI Johnson 002204

## Access Attempts for 7/16/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|
| 4:48:14PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 5:06:47PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 5:14:43PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 5:29:27PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 5:39:30PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

*Total for 7/16/2012: 3?*

## Access Attempts for 7/18/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|
| 8:18:39AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 10:12:33AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 10:14:26AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 11:02:53AM | Valid Access | johnson, mary ellen | Normal | 231 - 238 Bldg B 2.302 hall ent dr (lab1) | 2 - Division 14 | No |
| 11:05:40AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 11:09:40AM | Valid Access | johnson, mary ellen | Normal | 231 - 238 Bldg B 2.302 hall ent dr (lab1) | 2 - Division 14 | No |
| 11:10:37AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 3:30:55PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 3:52:41 PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 4:56:20PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

*Total for 7/18/2012: 10*

## Access Attempts for 7/19/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|

As of 7/30/2012 5:01:33PM

All Access Attempts History Report - Selected Cardholders - Selected Devices
C:\Program Files\Schlage\Data\Reports\TrnHis11.rpt
Page 26 of 31

SwRI Johnson 002205

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|
| 8:18:17AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 8:43:00AM | Valid Access | johnson, mary ellen | Normal | 231 - 238 Bldg B 2.302 hall ent dr (lab1) | 2 - Division 14 | No |
| 8:47:07AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 12:45:25PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 1:31:32PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 1:34:07PM | Valid Access | johnson, mary ellen | Normal | 231 - 238 Bldg B 2.302 hall ent dr (lab1) | 2 - Division 14 | No |
| 1:52:51PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 1:57:17PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 3:43:39PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

Total for 7/19/2012 9

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|
| 10:25:38AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 10:58:24AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 11:30:21AM | Valid Access | johnson, mary ellen | Normal | 231 - 238 Bldg B 2.302 hall ent dr (lab1) | 2 - Division 14 | No |
| 12:54:51 PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 1:16:02PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 3:29:04PM | Valid Access | johnson, mary ellen | Normal | 231 - 238 Bldg B 2.302 hall ent dr (lab1) | 2 - Division 14 | No |
| 4:22:28PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 4:57:27PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 5:07:50PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

SwRI Johnson 002206

## Access Attempts for 7/23/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|
| 9:34:06AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 9:37:34AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 10:08:05AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 11:23:44AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 12:23:38PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 1:11:27PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 1:39:00PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 2:26:39PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

## Access Attempts for 7/24/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|
| 8:19:13AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 8:42:44AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 10:32:05AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 11:25:29AM | Valid Access | johnson, mary ellen | Normal | 231 - 238 Bldg B 2.302 hall ent dr (lab1) | 2 - Division 14 | No |
| 12:42:13PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 1:01:07PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 2:22:08PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 3:12:22PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 3:40:33PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

SwRI Johnson 002207

## Access Attempts for 7/24/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|
| 6:06:51 PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

*Total for 7/24/2012 : 10*

## Access Attempts for 7/25/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|
| 8:18:27AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 8:29:32AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 9:17:03AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 10:05:15AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 12:31:33PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 1:15:00 PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 2:02:18PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 2:40:32PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 3:03:25PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 3:19:37PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 4:12:55PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

*Total for 7/25/2012 : 11*

## Access Attempts for 7/26/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|
| 8:19:09AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 8:54:10AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 10:51:27AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

*As of 7/30/2012 5:01:33PM*
**All Access Attempts History Report - Selected Cardholders - Selected Devices**
*C:\Program Files\Schlage\Data\Reports\TrnHis11.rpt*
*Page 29 of 31*

**SwRI Johnson 002208**

## Access Attempts for 7/26/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|
| 11:21:19AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 11:22:53AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 12:37:46PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 1:09:38PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 1:32:32PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 2:09:04PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 2:24:01PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 2:50:27PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 3:02:32PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 3:08:03PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 6:50:34PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

Total for 7/26/2012: 11

## Access Attempts for 7/27/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|
| 8:09:45AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 8:57:43AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 10:33:27AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 12:37:59PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 4:22:08PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 9:58:46PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

Total for 7/27/2012: 6

SwRI Johnson 002209

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|
| 8:04:30AM | Valid Access | johnson, mary ellen | Normal | 233 - 238  Bldg B  2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 8:36:43AM | Valid Access | johnson, mary ellen | Normal | 233 - 238  Bldg B  2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 9:15:40AM | Valid Access | johnson, mary ellen | Normal | 233 - 238  Bldg B  2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 11:15:14AM | Valid Access | johnson, mary ellen | Normal | 233 - 238  Bldg B  2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 11:31:30AM | Valid Access | johnson, mary ellen | Normal | 233 - 238  Bldg B  2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 1:00:28PM | Valid Access | johnson, mary ellen | Normal | 233 - 238  Bldg B  2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 1:41:05PM | Valid Access | johnson, mary ellen | Normal | 233 - 238  Bldg B  2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 2:22:03PM | Valid Access | johnson, mary ellen | Normal | 233 - 238  Bldg B  2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 3:17:40PM | Valid Access | johnson, mary ellen | Normal | 233 - 238  Bldg B  2.306 hall ent dr (lab2) | 2 - Division 14 | No |

Total for 7/30/2012: 9

Total Access Attempts Reported: 485

SwRI Johnson 002210

# ALL ACCESS ATTEMPTS HISTORY REPORT
## Selected Cardholders - Selected Devices
### between 8/1/2012 12:00:00AM and 8/7/2012 11:59:59PM

## Access Attempts for 8/1/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|---|---|---|---|---|---|---|
| 8:29:26AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 8:57:51AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 10:19:25AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 10:54:35AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 11:25:55AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 4:07:04PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

*Total for 8/1/2012: 6*

## Access Attempts for 8/2/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|---|---|---|---|---|---|---|
| 9:48:37AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 12:50:08PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 3:49:35PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 5:50:30PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

*Total for 8/2/2012: 4*

## Access Attempts for 8/3/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|---|---|---|---|---|---|---|
| 12:12:15PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

SwRI Johnson 002211

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|
| 12:27:25PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 1:52:25PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 4:57:39PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 5:10:33PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

Total for 8/3/2012: 5

Access Attempts for 8/6/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|
| 8:02:06AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 11:59:18AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 12:45:18PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 1:19:21 PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 1:38:16PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 3:46:10PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 5:04:23PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

Total for 8/6/2012: 7

Access Attempts for 8/7/2012

| Time | Transaction | Cardholder Name | Cred Function | Device | Area | Deleted |
|------|-------------|-----------------|---------------|--------|------|---------|
| 8:08:49AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 11:23:51AM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 12:21:54PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |
| 2:31:42PM | Valid Access | johnson, mary ellen | Normal | 233 - 238 Bldg B 2.306 hall ent dr (lab2) | 2 - Division 14 | No |

SwRI Johnson 002212

# EXHIBIT 32

**Bowles, Lisa B.**

| | |
|---|---|
| **From:** | Bowles, Lisa B. |
| **Sent:** | Monday, July 23, 2012 8:40 AM |
| **To:** | SwRI11 |
| **Subject:** | Call In Procedure-CHANGE IN POC |

## Call In Procedure-CHANGE IN POC

You must remember to call into Monica Sanchez (ext. 3826) or Elisa Leija (ext. 3821) if you are going to be in late or out for the day. It may be a good idea to program these numbers in your cell phones.

DO NOT LEAVE A VOICEMAIL OR CALL OTHER STAFF TO REPORT THAT YOU WILL BE IN LATE/ OUT!!!

It is division policy that you must speak with an individual and to call in no later than 8:15 a.m. Monica and Elisa are available for call ins from 7:45 a.m. to 8:15 a.m. Monday thru Friday.  If you do not follow these procedures your line manager will be notified.

Thank you,

*Lisa Bowles*
*Administrative Coordinator*
*Applied Power-Division 11*
*Desk(210) 522-5948*
*Pager(210) 220-7665*

1

**SwRI Johnson 002604**

# EXHIBIT 33

Meeting w/ Mary Ellen Regarding Inappropriate Email

Meeting Points:
1. Language/Tone – Inappropriate, hostile, belligerent
2. Threatening – To management and coworkers. Favoritism has not been observed and is definitely not supported by management.
3. Idle Time – "Sitting around" and waiting for work. Should be more active.

Final Message – Mary Ellen needs to secure work with urgency to support Division 11 goals and fill out the OH utilization form accordingly.

1) Yeah. Apologize.

2) Example of Comments on outskirts... chose Jeremy over MS

3) Waiting → being charged to project
   - Recommendation → don't charge for idle time
   - Trying to figure out OH idle hours vs Daytime Time
   - 4 hrs waiting on July 7th + 2 hrs waiting on July 8th
   * Not common.                    ↳ Timesheet Friday

Utilization

Full time through
Terry Sewing → Wed afternoon 50%
              0% next week.

# EXHIBIT 34

SwRI Johnson 000147



# Timesheet Regular

Empl: **011838** Name: **Johnson, MaryEllen C** Org: **1.11.01.03** GLC: **13** Title: **Principal Technician** FLSA: **Non-exempt**

The timesheet period is closed. No updates allowed.



**Week 1** (Sat May 26 / Sun May 27 / Mon May 28 / Tue May 29 / Wed May 30 / Thu May 31 / Fri Jun 1)
**Week 2** (Sat Jun 2 / Sun Jun 3 / Mon Jun 4 / Tue Jun 5 / Wed Jun 6 / Thu Jun 7 / Fri Jun 8)

| Line | Fringe Description | Mon May 28 | Week 1 Total | Mon Jun 4 | Tue Jun 5 | Week 2 Total | Total Hours | Memo |
|---|---|---|---|---|---|---|---|---|
| 1 | Floating Holiday | | | | | | | |
| 2 | Institute Holiday | 8.00 | 8.00 | | | 8.00 | 8.00 | |
| 3 | Personal Leave | | | | | | | |
| 4 | M&BL - Personal Illness/Injury | | | 8.00 | | 8.00 | 8.00 | |

**Week 1** (Sat May 26 / Sun May 27 / Mon May 28 / Tue May 29 / Wed May 30 / Thu May 31 / Fri Jun 1)
**Week 2** (Sat Jun 2 / Sun Jun 3 / Mon Jun 4 / Tue Jun 5 / Wed Jun 6 / Thu Jun 7 / Fri Jun 8)

| Line | Proj ID | Org ID | Lab Loc | PLC | Tue | Wed | Thu | Fri | Week 1 Total | Mon | Tue | Wed | Thu | Fri | Week 2 Total | Total Hours | Memo |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 15294.07.114 | 1.16.20.40 | 010 | | 2.00 | 1.00 | | | 3.00 | 15294.07.114 | 1.16.20.40 | 013 | | 1.00 | 2.00 | 3.00 | 6.00 | K. Donaho |
| 2 | 16659.01.240 | 1.11.02.04 | | | | | | | | 16659.01.240 | 1.11.02.04 | | | | | | | |
| 3 | 00751.006 | 1.11.01.03 | | | 6.00 | 7.00 | 4.00 | | 17.00 | 00751.005 | 1.11.01.03 | | 8.00 | | | 8.00 | 25.00 | OV-Lab - AFI |
| 4 | 17268.11.220 | 1.11.02.04 | | | | | 4.00 | | 4.00 | 17268.11.220 | 1.11.02.04 | | | | | | 4.00 | S Brodenck |
| 5 | 17268.11.210 | 1.11.02.04 | | | | | | 8.00 | 8.00 | 17268.11.210 | 1.11.02.04 | | | | | | 8.00 | test prep |
| 6 | 16660.30.111 | 1.11.01.02 | | | | | | | | 16660.30.111 | 1.11.01.02 | | 8.00 | 4.00 | 2.00 | 14.00 | 14.00 | Daytona |
| 7 | 20106.05.310 | 1.14.03 | 011838 | | | | | | | 20106.05.310 | 1.14.03 | 011838 | | 3.00 | 4.00 | 7.00 | 7.00 | |
| | | | | | 8.00 | 8.00 | 8.00 | 8.00 8.00 | 40.00 | | | | 8.00 8.00 | 8.00 8.00 8.00 | 40.00 | 80.00 | |

[Next] [Logout] [Recap]



SwRI Johnson 002177

# EXHIBIT 35

## TIME CONTROL AND PAYROLL ADMINISTRATION

### A. PURPOSE

This operating statement sets forth the policy and procedures for recording time and for administering the payroll process.

### B. POLICY AND PROCEDURES

#### 1. Normal Work Week and Pay Periods

The normal work week of the Institute, for computing overtime and complying with United States Government labor regulations, begins at 12:01 a.m. Saturday and ends at midnight the following Friday. The regular work hours for most operations are 8 a.m. to 5 p.m., five days per week, Monday through Friday. The Institute's pay period for all employees is biweekly. Modifications to the normal work week or regular work hours to accommodate long-term client requirements must be approved, in advance, by executive management.

#### 2. Time Reporting

#### a. Electronic Timekeeping System

All Institute employees are required to record their worked time and paid time off (fringe) in an accurate and timely manner using the Web Electronic Timekeeping System (WebET). Time charges can be reported in tenth or quarter of an hour increments. If other fractions of hours are used, the system will round them to the nearest valid fraction. Normally, time charges are to be recorded on a daily basis. Time charges should be posted by the end of each day, or within the first hour of the next morning. A system should be established in each cost center with oversight responsibility assigned to the Cost Center Head (CCH), or his/her designee, to ensure that these procedures are followed and that daily recording of timesheet charges is accomplished.

Procedural guidance for use of the WebET is provided at the WebET Training web site maintained by the Staff Development Office.

Each employee and his/her timesheet approver will electronically sign the on-line Biweekly Time Report. The WebET prompts this activity with an on-line message and system controls.

#### b. Charge Numbers

It is the responsibility of each employee to ensure that his/her time is reported using correct charge numbers. Time charges fall into two categories: Worked Time and Paid Time Off (fringe). The table presented in Exhibit A provides authorized charge numbers and definitions.

#### c. Time Reporting for Employees on Travel

Employees on travel must record previously unrecorded time immediately upon return to the Institute. When the duration of travel extends beyond the biweekly pay period, the employee must make arrangements to properly complete and close his/her Biweekly Time Report. Employees may access the WebET while on travel or complete their time reporting prior to departure. Any changes must be reported by the end of the pay period to the employee's time sheet approver.

#### d. Time Reporting for Exempt Personnel

Exempt personnel are paid on a salary basis each biweekly period.

- **Paid Time Off (Fringe)**

  Time away from work for which compensation is received must be charged to an appropriate paid time off (fringe) account, that is, personal leave, holiday, M&BL or industrial sick leave (see OPP 2.3.1). Paid time off taken during a normally scheduled work day should be taken to make the day

 SOUTHWEST RESEARCH INSTITUTE  1

**SwRI Johnson 000106**

whole to ensure a full day of pay. Paid time off (fringe), other than designated Institute holidays, cannot be used to pay a person for more than 8 hours per day (except for the Demil sites).

Exempt employees are paid biweekly on a salary basis. Therefore, in cases where an employee is absent from work, the appropriate account must be used to ensure full payment of the employee's biweekly salary. If an exempt employee is absent for a partial day without a sufficient balance in his/her fringe account or he/she is not able to use compensatory time during that two week pay period, then his/her personal leave account will be used to ensure a full day of pay.

As noted below, compensatory time during a two week pay period may also be used to ensure full payment of the employee's salary.

• **Time Off Without Pay**

An *exempt* employee must schedule time off without pay for personal reasons in full day increments. An exempt employee must use a bona-fide fringe account for partial day absences. However, after two consecutive payroll periods in which a regular full-time employee charges less than 80 hours, the employee's CCH must consider an employee status change to regular part-time if charging less than 80 hours will continue. Under regular part-time status, certain benefits are reduced or pro-rated, based on scheduled biweekly work hours.

Any employee requesting and receiving a leave of absence may have established a break in service (see OPP 2.3.1).

• **Overtime**

The CCH, or his/her designee, may schedule an *exempt* employee (see definition in OPP 2.2.1) to work at times outside of the Institute's normal work hours. This would only occur when, in the CCH's judgment, such an effort is critically necessary to meet project or extraordinary operating requirements. Because e*xempt* employees are paid on a salary basis, additional compensation for work outside regular work hours can be granted only in special circumstances, such as:

(1) the required work has been approved by the sponsor.

(2) the project requires the conduct of field work away from the Institute in accordance with a work schedule set by the client.

(3) extraordinary operating requirements that do not allow for compensatory time in the same biweekly pay period.

Extra compensation for work outside regular work hours is considered justified when approval is obtained from the CCH or his/her designee and the special circumstances requiring additional compensation are documented in the overtime section of the Biweekly Time Report. Extra compensation for such work will be granted at straight time hourly rate. It is the Institute's policy not to provide compensation for overtime requirements of an executive employee (director and above).

• **Compensatory Time**

If an *exempt* employee is scheduled to work outside the Institute's normal work hours, and if work schedules permit, compensatory time may be granted within the same biweekly pay period. For example, it is acceptable to indicate eight (8) hours

Southwest Research Institute®  2

**SwRI Johnson 000107**

worked on Saturday and no time for a normal workday, or 12 hours worked on a normal workday and four (4) hours on another workday in the same biweekly pay period.

### e. Time Reporting for Non-Exempt Personnel

Non-exempt personnel are paid hourly for recorded hours for each work week within the biweekly pay period.

- **Paid Time Off (Fringe)**

Time away from work for which compensation is received may be charged to an appropriate paid time off (fringe) account, that is, personal leave, holiday, M&BL or industrial sick leave (see OPP 2.3.1). Paid time off taken during a normally scheduled work day should be taken to make the day whole and ensure a full day of pay. Paid time off (fringe), other than designated Institute holidays, cannot be used to pay a person for more than 8 hours per day (expect for the Demil sites).

- **Time Off Without Pay**

Days may be taken off without pay only after an employee has exhausted all accrued personal leave and/or floating holiday leave (see OPP 2.3.1). However, after two consecutive payroll periods in which a regular full-time employee charges less than 80 hours, the employee's CCH must consider an employee status change to regular part-time if charging less than 80 hours will continue. Under regular part-time status, certain benefits are reduced or pro-rated, based on scheduled biweekly work hours.

Any employee requesting and receiving a leave of absence may have established a break in service (see OPP 2.3.1).

- **Overtime**

Non-exempt personnel are required to be paid extra compensation for overtime work. Such work will normally be scheduled by their immediate supervisor. Non-exempt personnel are paid one and one-half time their regular rate for hours worked [not including paid time off (fringe)] in excess of forty (40) hours per week. The overtime section of the Biweekly Time Report must be completed to document the overtime worked.

- **Compensatory Time**

Non-exempt employees may elect to use compensatory time within the same work week if work schedules permit and if approved by the CCH or his/her designated representative.

### f. Time Reporting for Part-time Personnel

Part-time personnel are paid hourly for recorded hours.

- **General**

In order for an employee to be designated as regular part-time, s/he must be regularly scheduled to work 20 hours or more per work week or 40 hours or more during a two-week pay period. A regular part-time employee's scheduled hours must be approved by their CCH on a Form E-4. Additionally, their posted time should be routinely reviewed by their cost center's management to ensure that the employee biweekly time charges do not fall below his/her biweekly working schedule. Since part-time employees work on an hourly basis, they are classified as nonexempt.

- **Paid Time Off (Fringe)**

Paid time off (fringe) for part-time em-

SwRI Johnson 000108

ployees must be charged to the appropriate account and cannot exceed the person's biweekly working schedule. Paid Time off (fringe) must be used to make the employee whole relative to the total biweekly hours in the employee's approved biweekly working schedule.

## g. Time Reporting Cutoff

To facilitate a timely payroll closing, the last entry for any biweekly time reporting should be made by noon on the last work day of the period. Divisional WebET administrators should close out their WebET no later than 3:30 p.m. that same day.

If any estimated time charges require correction after Divisional WebET administrators have closed their respective cost centers, the employee and his/her time sheet approver must make the correction by generating an online Labor Transfer (Form C-16).

## h. Error Correction

Labor Transfer (Form C-16) must be used to correct labor charges and/or amounts paid after the WebET time sheets are processed. If an error is found, an online Labor Transfer must be generated and routed for approvals. The Labor Transfer (Form C-16) corrections are processed and posted in the accounting period in which all required levels of approval have been obtained.

## 3. Payroll Closing and Processing

Payroll Section staff review the WebET exception report, with the assistance of each cost center WebET coordinator, to correct invalid exceptions not later than 5:00 pm on the last day of the pay period. After all exceptions are corrected, the Payroll Section staff closes access to WebET to allow these files to be imported in to the Costpoint Payroll System. The Payroll Section staff notifies any CCH, or his/her designee, of employees who have insufficient or excessive paid time off (fringe) hours charged prior to processing the CostPoint Payroll.

Each Biweekly Payroll Register must be approved and signed by the Treasurer or his/her designee to fund payroll and close the pay period.

## 4. Payroll Disbursements

All payroll disbursements are made electronically to employees by ACH direct deposit of their net pay to a qualified financial institution(s) of their choice. Designation of the financial institution(s) is made by each employee electronically by completing the pay direct deposit designation form found on the I2net, FDS apps page, Employee Self Service (ESS) application.

Payroll disbursements are available on Wednesday following the end of each biweekly pay period. Payroll advices are available to staff on Wednesday in ESS following the end of each biweekly payroll period.

Southwest Research Institute® 4

## Exhibit A– Charge Numbers and Definitions

It is the responsibility of each staff member to ensure that their time is reported using correct charge numbers. Time charges fall into two categories: paid time off (fringe) and worked time. The table below provides authorized charge numbers and definitions.

| Paid Time Off | Charge No. | Definition |
|---|---|---|
| Holiday/Floating Holiday<br>M&BL Types:<br>  Medical Appointments<br>  Dental Appointments<br>  Personal Illness/Injury<br>  Immediate Family Hospital<br>  Bereavement<br>  Workers Comp<br>  Adoption/Paternity<br>Personal leave<br>Military Leave<br>Jury Duty<br>Industrial Sick | *<br>*<br><br><br><br><br><br><br><br>*<br>*<br>*<br>*<br>WebET automatically assigns the charge number | Authorized time absent from work in accordance with OPP 2.3.1, Personal Leave, Holidays, and Other Leave, and OPP 2.3.3, Sick Leave, Medical Emergency Leave, Paternity & Adoption Leave and Bereavement Leave (M&BL ) |
| **Worked Time** | | |
| Project | Number assigned by the Contracts Department | Time expended which can be identified with the accomplishment of the technical scope and objectives set forth in individual contract agreements or internal research programs. |
| Preliminary Project | Number assigned by the Contracts Department | Time expended which can be identified with the accomplishment of the technical scope and objectives of a proposed project prior to and in anticipation of the execution of the contract agreement. |
| Work Order | Number assigned by the Accounting Department | Time expended which can be identified with the accomplishment of the scope and objectives set forth in an authorized work order. |
| Administration or Supervision | 00751.001<br>00851.001 | Time expended in general administration or supervision activity which, because of its common nature, is not identifiable with any single project activity. This includes normal exempt staff unbilled functions as well as participation with Institute operating, management, or technical advisory committees. |
| Bid and Proposal Activities | 00751.002 | Time expended in preparing, submitting, and supporting proposals, including revisions thereto, from the time a proposal is specifically identified until it is completed in acceptable form for delivery to a prospective client. |
| Selling, Promotion, or Negotiation Activities | 00751.003 | Time expended on direct selling activity, or market planning and promotion of ideas to maintain or expand the Institute's overall technical program, or an activity relating to technical issues introduced by potential clients before identifying a specific scope of work or proposal, or negotiations after a proposal is submitted but no contract has been awarded. |
| Professional Activities | 00751.004<br>00851.004 | Time expended on technical and professional activities, such as participation in symposia, meetings of professional organizations, preparation of technical papers, and similar activities which, because of their nature and purpose, are not carried out in support of a project. |
| Training | 00751.005<br>00851.005 | Time expended for on-the-job training that is not directly related to project performance. |
| Maintenance of Laboratory Equipment | 00751.006<br>00851.006 | Time expended in calibrating and cleaning Institute-owned laboratory equipment, and in making minor repairs to such equipment and facilities. |
| Toxic Waste Disposal | 00751.007<br>00851.007 | Time expended for divisional chemical waste disposal and removal. |
| General Activities | 00751.008<br>00851.008 | Time expended that cannot be identified as directly beneficial to a project, work order, or other 00751.XXX account. |
| Idle Activities | 00751.009<br>00851.009 | Time expended that is nonproductive to other overhead accounts, work orders, or projects. |



® Southwest Research Institute® 5

**SwRI Johnson 000110**

| | | |
|---|---|---|
| Clerical and Utility | 00751.010 00851.010 | Time expended by clerical or lab assistant nonexempt staff which, because of its common nature, is not identifiable with any single project or with bid and proposal activity. |
| Clerical Bid and Proposal Activities | 00751.020 | Time expended by clerical or lab assistant, nonexempt staff for assisting with proposals submitted to clients. |
| Off-site Support Activities | 00751.040 | Time expended for assistance to staff working at off-site offices/labs provided and maintained by the client or buying agency. This includes unbilled time for management or supervision activity; selling, promotion or negotiation activity; professional activity; training; general activity; and administrative, technical or clerical support that benefit off-site staff. It does not include unbilled time expended for Bid and Proposal activity. |
| Concurrent off-site and On-site Support Activities | 00751.050 | Time expended for assistance that concurrently benefits both a) staff working at off-site offices/labs provided and maintained by the client or buying agency and b) staff working at offices/labs owned or leased by the Institute. This includes unbilled time for management or supervision activity; selling, promotion or negotiation activity; professional activity; training; general activity; and, administrative, technical or clerical support. It does not include unbilled time expended for Bid and Proposal activity. Only employees in cost centers that have staff in both of these categories should use this account. |
| Unallowable Activities | 00751.099 00851.099 | Time expended supporting activities that are unallowable according to the Federal Acquisition Regulations. |
| Trade Shows and Exhibits | 00751.993 00851.993 | Time expended participating at technical trade shows or exhibits that are held primarily to introduce Institute capabilities as part of a general marketing effort. |

Southwest Research Institute®  6

**SwRI Johnson 000111**

# EXHIBIT 36

**Subject:** Tasking - Warning - I'm PISSED!
**Date:** Friday, June 8, 2012 3:27:53 PM CT
**From:** Johnson, MaryEllen C.
**To:** Cooper, Nova

Nova,

I'm about to rant, so just bare with me. You have been hounding us to stay billed. I have bonding work, Terry's work and had some work helping Mark with a test set up. I put Mark ahead of everyone because his stuff was 'urgent'. Here's my problem, I sit and wait for Mark for HOURS and he never calls. Says he will but doesn't. Just grabs whoever is in the immediate area – even after he said he was going to call or stop by – and has *them* do the work.

I waited for several hours yesterday afternoon for the go ahead to meet him at 216, and didn't get the call till late that he was, in fact, waiting on someone else for whatever he had to get done. We agreed we would do the configuration at 216 in the morning. I saw him when I came in, he said had something quick to do and we would go over. 0900, I'm tired of waiting, I stop by his lab, he's still working, I say I'll be in the AEL when he is ready. He never stopped by. Never called. I saw him after lunch and he said Jeremy got it done.

My question is, do you really want me on your team? Seriously, am I to fucking sit around all day when in fact Mark is just waiting for someone else to free up and do the work! Well – you can just kiss my ass! This favorites bullshit has got to stop. This happens over and over. You asked why I don't do work in the division – THIS is why. People promise work, I wait around for the go ahead and they fill in with they're favorites. I wanna work for someone who wants me to work for them, not for someone who thinks I'm second string. Like, I'm what you get when everyone else is busy. That is a crock of shit. I've got more talent, education and experience in my little finger than most of these yahoos around here. It's management's fault I don't get billed because they allow engineers to play the favorites game.

Mary Ellen Johnson
Principal Technician
Applied Power Division
Southwest Research Institute
San Antonio, Tx
210) 522-2594

# EXHIBIT 37

**Subject:** Meeting minutes 09 July 2012

**Date:**  Monday, July 9, 2012 3:37:11 PM CT

**From:**  Cooper, Nova

**To:**  Johnson, MaryEllen C.

**CC:**  Cooper, Nova

Mary Ellen,

I just wanted to send an email to summarize the meeting we had this morning about the email sent back on June 8, 2012. Listed are the meeting points that we discussed and the resulting action, if any, required.

1. *The language and general tone of the email was professionally inappropriate and hostile.* You were fully aware of this and further expressed your apologies for sending the email. I let you know my door was always open if you felt upset about something and needed to discuss further. **Action required:** No action required.

2. *The email was threatening to management and coworkers.* In response to your email, I said I have not seen any favoritism occur in the division. Additionally, I stated that favoritism would not be tolerated, and I should be informed of specific cases. **Action required:** Inform me if/when you observe a specific case of favoritism.

3. *You should not simply "sit and wait" for work.* According to your email, you sat and waited for work. You were asked to be more active in your pursuit of work and told to continuing working other tasks instead of being idle. We evaluated your timesheet and agreed you charged some time to project while waiting for the project work. You were informed this is not a valid project charge. You agreed, informed me this was not a common practice, and assured me it would not happen again. **Action required:** Complete a C-16 (labor transfer) to move 6hrs of idle time (4hrs on 7 June 2012 and 2hrs on 8 June 2012) from the Daytona project to Overhead charge number 00751.009.

Please let me know how I can help in the future, well before you find yourself wanting to send something like this. Like I said before, my door is always open. My final message to you is that I would like to see you secure future work with urgency to support the division's goals. We all need to do our part to succeed.

Thank you, Mary Ellen.

K. Nova Cooper
Sr. Research Engineer, Applied Power
SOUTHWEST RESEARCH INSTITUTE
6220 Culebra Rd, San Antonio, TX 78238
Phone: 210.522.2707
mailto:nova.cooper@swri.org

# EXHIBIT 38

## <u>AFFIDAVIT</u>

STATE OF TEXAS     §
                         §
COUNTY OF BEXAR   §

       BEFORE ME, the undersigned Notary Public, on this day personally appeared KARL NOVA COOPER, who being by me duly sworn on his oath deposed and testified as follows:

1.    "My name is Karl Nova Cooper. I am over 21 years old. I understand the nature of an oath, have never been convicted of a crime, and am otherwise competent to testify to matters stated in this Affidavit. This testimony is based on my own personal knowledge, and the facts stated herein are true and correct.

2.    I am currently employed by Southwest Research Institute as a Sr. Research Engineer in Division 11. I was Mary Ellen Johnson's supervisor during the last year of her employment.

3.    On Friday, August 3, 2012 at 8:09 a.m., I received an e-mail from Monica Sanchez, the Administrative Coordinator for Division 11, informing me that Mary Ellen called in at 8:05 a.m. stating that she had an 8:30 a.m. appointment and would be in right after. *See* 8/3/12 e-mail from M. Sanchez to N. Cooper, attached as Exhibit "A".

4.    Shortly thereafter, around mid-morning, I called Mary Ellen on her cellphone to remind her that she needed to complete and sign her timesheet for the day. She did not answer so I left her a voice-mail.

5.    At 12:21 p.m., after arriving at work, Mary Ellen sent me an e-mail apologizing for the timesheet delay and informing me that it was completed, saved and signed. *See* 8/3/12 e-mail from M. Johnson to N. Cooper, attached as Exhibit "B". It is important to note that under Southwest Research Institute's policy, an employee is required to carefully review his/her time

53034547.1                      - 1 -

**SwRI Johnson 000149**

sheet before saving it and when he/she electronically signs it, they are attesting that the hours set forth therein are true and correct.

6. A few minutes later, she brought her Overhead Justification Form to my office. *See* Overhead Justification Form, attached as Exhibit "C". Upon reviewing this form, I saw that she had billed 8.00 hours to overhead for the day. I was very surprised that she had done so since I knew that she had been out of the office that morning for a personal appointment. Therefore, I called and advised her of the time keeping error. I also told her that she needed to unsign the time sheet and correct it to reflect her half day absence. She said she understood, complied with my directive and transferred 4 of the 8 hours from overhead to her personal time. *See* SwRI Time Sheet Correction, attached as Exhibit "D". I then marked through the 8.00 hours on the Overhead Justification Form, wrote 4.00 hours, and initialed it in red ink. *See* Exhibit "C".

7. Since I had just spoken to her about having made similar time keeping errors a few weeks earlier, I felt a duty to report this latest incident to my supervisor Nick Hawkins on the same day, August 3, 2012. At the time I spoke to Mr. Hawkins, I had no knowledge that Mary Ellen had filed a charge of discrimination.

Further affiant sayeth not."

KARL NOVA COOPER, Affiant

SUBSCRIBED AND SWORN TO BEFORE ME the undersigned authority on this

_18_ day of October, 2013.

SYLVIA A. RODRIGUEZ
Notary Public, State of Texas
My Commission Expires
November 14, 2013

Notary Public in and for
the State of Texas

My Commission Expires: _Nov 14, 2013_

**SwRI Johnson 000150**

**Bowles, Lisa B.**

| | |
|---|---|
| **From:** | Sanchez, Monica E. |
| **Sent:** | Friday, August 03, 2012 8:09 AM |
| **To:** | Cooper, Nova; King, David E. |
| **Cc:** | Bowles, Lisa B.; Gribbon, Sheryl D.; Summers, Pamela A.; Hanson, Laura A.; Mills, Chanise A.; Leija, Elisa A. |
| **Subject:** | MaryEllen Johnson - In Late |

Good Morning,

Mary Ellen called at 8:05 a.m.; she has an 8:30 appointment and will be in right after.

Thank you,

# Monica Sanchez
*Division 11*
*Administrative Coordinator*
*Ext. 3826*

Exhibit A

From:        Johnson, Mary Ellen C
Sent:        Friday, August 03, 2012 12:34 PM
To:          Cooper Nova, Hawkins, Nicholas E
Subject:     Time Sheet

Nova, Nic,

My apologies for the timesheet delay. It is now completed, saved and signed.

Mj

Mary Ellen Johnson
Principal Technician
Applied Power Division
Southwest Research Institute
San Antonio, Tx
210) 522-2594

**Exhibit B**

1



## Overhead Justification Form

COMPLETION REQUIRED WHEN UTILIZATION IS LESS THAN 90% FOR A GIVEN WORKWEEK.

Employee Name: Mary Ellen
Employee Title: P.T.
Date: 3 Aug 12

Period: 11
Sub-period: 1 / ②
Week: 1 / ②

| Day | No. of Hrs | Nature of Work | Value Added |
|-----|-----------|----------------|-------------|
| SAT | | | |
| SUN | | | |
| MON | 4.00 | Continue to set up equip - Lab 5 | none |
| TUE | | | |
| WED | | | |
| THU | | | |
| FRI | 4.00 8.00 | unknown - no work available at this time | non |

*(had to fill out time sheet before day is done)*

**Instructions:**
1) This form is to be filled out for each week in which utilization is below 90%. It is due by COB Monday following the referenced workweek.
2) Fill out Employee Name, Title, and Date, and initial next to your name.
3) Fill out the Period, Sub-period, and Week for which the OH hours were charged.
4) For each day OH hours were worked, record the following fields:
   a. No. of Hrs: The number of hours charged to OH for that day. This may be broken up to outline different OH tasks on the same day.
   b. Nature of Work: Include OH charge number and the specific nature of the work (e.g. 00751.003 - Promotional work for Acme Inc., 00751.00S - IPC training)
   c. Value Added: Describe how this task benefited the department or the division as a whole.

Exhibit C



Record of Timesheet Changes

Empl 011838 Name Johnson, MaryEllen C Org 1.11.01.03 GLC 13 Title Principal Technician FLSA Non-exempt

Message from webpage

Johnson, MaryEllen C (E11838) on 08/03/2012 at 12:32:46 pm

OK

Return to Timesheet          Logout

Monday, Aug 13, 2012 10:18 AM

Exhibit D

SwRI Johnson 000154

# EXHIBIT 39

| | |
|---|---|
| **From:** | Sanchez, Monica E. |
| **Sent:** | Friday, August 03, 2012 8:09 AM |
| **To:** | Cooper, Nova; King, David E. |
| **Cc:** | Bowles, Lisa B.; Gribbon, Sheryl D.; Summers, Pamela A.; Hanson, Laura A.; Mills, Chanise A.; Leija, Elisa A. |
| **Subject:** | MaryEllen Johnson - In Late |

Good Morning,

Mary Ellen called at 8:05 a.m.; she has an 8:30 appointment and will be in right after.

Thank you,

# Monica Sanchez
*Division 11*
*Administrative Coordinator*
*Ext. 3826*

ı

**Exhibit A**

**SwRI Johnson 000151**

# EXHIBIT 40

From:       Johnson, Mary Ellen E
Sent:       Friday, August 03, 2012 12:34 PM
To:         Casper Nova, Hawkins, Nicholas E
Subject:    Time Sheet

Nova, Nic,

My apologies for the timesheet delay. It is now completed, saved and signed.

Mj

Mary Ellen Johnson
Principal Technician
Applied Power Division
Southwest Research Institute
San Antonio, Tx
210) 522-2594

**Exhibit B**

1

# EXHIBIT 41



**Record of Timesheet Changes**

Empl **011838** Name **Johnson, MaryEllen C** Org **1.11.01.03** GLC **13** Title **Principal Technician** FLSA **Non-exempt**

Message from webpage

Johnson, MaryEllen C (E11838) on 08/03/2012 at 12:32:46 pm

OK

Return to Timesheet

Logout

Exhibit D

SwRI Johnson 000154

# EXHIBIT 42



SwRI Johnson 002176

# EXHIBIT 43

**From:** Ryan, Bill
**Sent:** Wednesday, August 08, 2012 9:37 PM
**To:** Magaro, Tony; Keys, Bob
**Subject:** Mary Ellen Johnson Memo
**Attachments:** MEJohnson 2012 Termination Letter.docx


Attached is a draft of Mary Ellen's termination memo.  Please let me know if you have any questions or comments.  I will initial the memo and clean up the attachments in the morning.

Bill Ryan

**SwRI Johnson 002213**

APPLIED POWER DIVISION - 11

**DATE:**      08 August 2012

**TO:**         Bob Keys

**FROM:**     William Ryan

**SUBJECT:**  Recommendation of Termination of Mary Ellen Johnson

---

Ms. Johnson has become increasingly difficult and time consuming to manage.  Her line managers, Nicholas Hawkins and Nova Cooper, have invested significant time addressing issues as they arise.  Ms. Johnson is a capable electronics technician and has been valuable to several projects in her career at the Institute.  However, her communication and professionalism continue to degrade.  She seems responsive when verbally counseled on these items, but she repeatedly disregards specific management direction and deadlines to remedy these problems.  These items would normally be addressed in her annual review, but Mary Ellen has now committed time sheet fraud.  This behavior is unallowable.

Ms. Johnson has misrepresented hours on her timesheet on several occasions. One specific case involved charging a government project while she was admittedly idle (see attachment "Email – Subject: Tasking – Warning – I'm PISSED").  When her line management was made aware of this, they informed her that idle time was not a valid project charge and to transfer the time to overhead (see attachment "Email – Subject: Meeting minutes 09 July 2012").  This was accomplished, but only after being reminded to do so several times.  Another case involved overhead hours; she called in at 0805 on August 3, 2012 ("Timesheet Friday") to inform line management she had a personal appointment that she had not previously disclosed.  When she arrived (after noon), she completed and signed her timesheet.  She billed eight hours to overhead for August 3, 2012.  Management caught this discrepancy and insisted that the timesheet be corrected to reflect the absence.  She then corrected it.  Attached is an action log for her time on the referenced day.  No in-depth investigation has been completed except for the two dates mentioned here.

Ms. Johnson has also been in regular violation of the Division 11 attendance and call-in policy.  The Division 11 workday is from 0800 -1700 with a one hour lunch.  As per division policy, individuals arriving late are to call and speak (in person) to designated administrative staff if they will be reporting to work after 0815.  Voice messages and emails are not sufficient.  Ms. Johnson has arrived late to work 40 of her last 69 working days.  Furthermore, she has violated the call-in procedures 18 times in the last three months.  Attached is a summary table of her tardiness and call-in violations.

Ms. Johnson has purposefully committed time sheet fraud on multiple instances.  This is a very serious violation.  She has continued this behavior even after direct counseling.  Ms. Johnson has lost the trust and integrity required to be an effective staff member.  Ms. Johnson's continued employment has no benefit to Division 11.  It is my recommendation that we terminate Ms. Johnson's employment.

Attachments:     Email – Subject: Tasking – Warning – I'm PISSED
                 Email – Subject: Meeting minutes 09 July 2012
                 Email – Regarding help ticket 150844 – Available Time Data
                 Image – Aug32012 Change Explanation
                 Image – 20120607_08 MEJ Timesheet
                 Logs – All Access Attempts History Report
                 Log – Mary Ellen Johnson Tardiness Log



**SwRI Johnson 002214**

# EXHIBIT 44

**Magaro, Tony**

| | |
|---|---|
| **From:** | Keys, Bob |
| **Sent:** | Thursday, August 09, 2012 1:31 PM |
| **To:** | Magaro, Tony |
| **Cc:** | Ryan, Bill |
| **Subject:** | Mary E. Johnson |
| **Attachments:** | MEJohnson Termination Memo.pdf |

Tony:

I fully concur with Bill's memo and assessment; strongly recommend immediate termination for cause.

Bob

1

SwRI Johnson 000726

# SOUTHWEST RESEARCH INSTITUTE®

6220 CULEBRA RD.  78238-5186  ●  P.O. DRAWER 28510  78228-0510  ●  SAN ANTONIO, TEXAS, USA  ●  (210) 684-5111  ●  WWW.SWRI.ORG

APPLIED POWER DIVISION · 11

**DATE:**     09 August 2012

**TO:**       Bob Keys

**FROM:**     William Ryan

**SUBJECT:**  Recommendation of Termination of Mary Ellen Johnson

---

Ms. Johnson has become increasingly difficult to manage. Her line managers, Nicholas Hawkins and Nova Cooper, address issues as they arise, but her behavior continues to demonstrate a disregard for her workplace. Ms. Johnson is a capable electronics technician and has been valuable to several projects in her career at the Institute. However, her communication and professionalism continue to degrade. She seems responsive when verbally counseled, but she repeatedly disregards specific management direction and deadlines. These items have been addressed as they occurred and were to be formally addressed in her annual review, but the most recent event, timesheet fraud, caused me to make this recommendation. This behavior violates Institute policy and standards of conduct.

Ms. Johnson has misrepresented hours on her timesheet on several occasions. One specific case involved charging a government project while she was admittedly idle (see attachment "Email – Subject: Tasking – Warning – I'm PISSED"). When her line management was made aware of this, they informed her that idle time was not a valid project charge and to transfer the time to overhead (see attachment "Email – Subject: Meeting minutes 09 July 2012"). This was accomplished, but only after being reminded to do so several times. Another case involved overhead hours; she called in at 0805 on August 3, 2012 ("Timesheet Friday") to inform line management she had a personal appointment that she had not previously disclosed. When she arrived (after noon), she completed and signed her timesheet. She billed eight hours to overhead for August 3, 2012. Management caught this discrepancy and insisted that the timesheet be corrected to reflect the absence. She then corrected it. Attached is an action log for her time on the referenced day. This event was the final event that caused this recommendation. After being warned once of timesheet coding violations of OPP, she again violated this policy. Such blatant disregard for policy is not tolerated.

Ms. Johnson has also been in regular violation of the Division 11 attendance and call-in policy. The Division 11 workday is from 0800-1700 with a one hour lunch. As per division policy, individuals arriving late are to call and speak (in person) to designated administrative staff if they will be reporting to work after 0815. Voice messages and emails are not sufficient. Ms. Johnson has arrived late to work 40 of her last 69 working days. Furthermore, she has violated the call-in procedures 18 times in the last three months. Attached is a summary table of her tardiness and call-in violations. Ms. Johnson has been counseled verbally (AND IN WRITING) about the call-in requirements.

 HOUSTON, TEXAS (713) 977-1377  ●  WASHINGTON, DC (301) 881-0226

SwRI Johnson 000727

EEOC186 of 597

Ms. Johnson has committed timesheet fraud on multiple instances. This is a very serious violation. She has continued this behavior even after direct counseling. Coupled with other behaviors that are not consistent with Institute policy and practice, Ms. Johnson has lost the trust of her management to work in the manner required and serve as an effective staff member. Ms. Johnson's continued employment after such repeated violations is not warranted. It is my recommendation that we terminate Ms. Johnson's employment.

Attachments:   Email – Subject: Tasking – Warning – I'm PISSED
               Email – Subject: Meeting minutes 09 July 2012
               Email – Regarding help ticket 150844 – Available Time Data
               Image – Aug32012 Change Explanation
               Image – 20120607_08 MEJ Timesheet
               Log – Mary Ellen Johnson Tardiness Log
               Logs – All Access Attempts History Report

SwRI Johnson 000728

# EXHIBIT 45

Bill's Notes:

1) Lack of communication / professionalism
   a. Ignoring technical direction (performance feedback)
   b. Arguing / belaboring points with tasking leads (performance feedback)
   c. Hostile / profane correspondence (attached "I'm PISSED" email)
2) Lack of safety / professionalism
   a. Roller skates
3) Attendance / Call in policy (attached summary table and door logs)
   a. Late 40 of last 69 working days
   b. Failed to call in 18 times in last 3 months
4) Timesheet fraud
   a. Idle time charged to project (attached meeting minutes email)
      i. Management caught
      ii. She admitted
      iii. C-16 (attached timesheet)
   b. OH hours (attached ITC log email and timesheet)
      i. Charged 8 hrs to OH when she took the morning off (not previously cleared but did call in)
      ii. Signed timesheet but caught by management
      iii. Instructed to change verbally

# EXHIBIT 46

## E4: Personnel Transaction Request

| Name: MaryEllen C Johnson | Emp. No: 011838 | Form ID: 0000004963 |
|---|---|---|
| Org ID: 1.11.01.03 | Job Title: Principal Technician | Form Date: 08-15-2012 |
| CC: APPLIED POWER | Dep: APPLIED SCIENCE | Sec: ELECTRICAL SYSTEMS |
| | | Work State: Texas |
| Requestor: Medina, Julia A | Requestor Phone: (210) 522-5960 | Work Schedule: SWRI - 8 Hours per Day |
| Owner: Medina, Julia A | Owner Phone: (210) 522-5960 | |
| **SEPARATION** | | |
| Separation Date: 08-15-2012 | Involuntary Separation | |
| **PERSONNEL ACTION REASON** | | |
| Description: Sep-do not use-for CP exit | | |
| **REMARKS** | | |
| Involuntary Separation effective 08-15-2012 (severance pkg. deadline 09-05-12) | | |

| Approval Block/Title | Approved By | Date |
|---|---|---|
| Requestor | Medina, Julia A | 08/15/2012 06:28:29 PM |
| Dir. of Human Resources | Magaro, Anthony | 08/16/2012 10:19:13 AM |
| Submitted By | Magaro, Anthony | 08/16/2012 10:20:25 AM |

**X - Sep-do not use-for CP exit**
**08-15-2012**

SwRI Johnson 000021

# EXHIBIT 47

| From: | Cooper, Nova |
| --- | --- |
| **Sent:** | Tuesday, August 14, 2012 8:51 AM |
| **To:** | Hawkins, Nicholas E. |
| **Cc:** | Ryan, Bill |
| **Subject:** | FW: Mary Ellen Johnson - Sick |

Nick,

Mary Ellen is out today. I spoke with her yesterday as she was returning from the SwRI clinic. Apparently she injured herself over the weekend roller skating. I'm not sure if the ER visit was related, although her justification does sound as if she is not coming to work today because she is tired. I did speak to Monica, who received the call, and she was not given any more information than bellow.

Thanks.

K. Nova Cooper
Sr. Research Engineer, Applied Power
SOUTHWEST RESEARCH INSTITUTE
6220 Culebra Rd, San Antonio, TX 78238
Phone: 210.522.2707
mailto:nova.cooper@swri.org

---

**From:** <Sanchez>, "Monica E." <monica.sanchez@swri.org>
**Date:** Tuesday, August 14, 2012 8:09 AM
**To:** Nova Cooper <nova.cooper@swri.org>, "King, David E." <david.king@swri.org>
**Cc:** "Bowles, Lisa B." <lisa.bowles@swri.org>, "Gribbon, Sheryl D." <sheryl.gribbon@swri.org>, "Summers, Pamela A." <pamela.summers@swri.org>, "Hanson, Laura A." <laura.hanson@swri.org>, "Mills, Chanise A." <chanise.mills@swri.org>, "Rodriguez, Cynthia N." <cynthia.rodriguez@swri.org>
**Subject:** Mary Ellen Johnson - Sick

Good Morning,

Mary Ellen called at 8:06 a.m. She will be out sick today due to a late night in the ER.

Thank you,

# Monica Sanchez

*Division 11*
*Administrative Coordinator*
*Ext. 3826*

1

**SwRI Johnson 002159**

# EXHIBIT 48

# SOUTHWEST RESEARCH INSTITUTE®

6220 CULEBRA RD  78238-5166  •  P.O DRAWER 28510 78228-0510  •  SAN ANTONIO, TEXAS, USA  •  (210) 684-5111  •  WWW.SWRI.ORG

August 15, 2012

Ms. MaryEllen C. Johnson
9707 Charline Lane
San Antonio, TX  78254

Dear Ms. Johnson:

We have made the decision to terminate your employment with the Applied Power Division of Southwest Research Institute effective today, August 15, 2012.  The reason for your employment termination is your repeated violations of our timekeeping operating policies and procedures, which has resulted in serious doubts as to your trustworthiness.  This personnel action was recommended by your management and has been approved.

For the next twenty-one (21) days, until September 5, 2012, the Institute will offer you a severance package of $50,000 (less appropriate taxes) plus payment of the outstanding balance you owe to ITT Technical Institute for tuition cost, and outplacement assistance in return for your agreement to execute the *Severance Agreement and General Release* enclosed.  A *Severance Plan* is attached providing more detail on the available benefits. Staff members in Human Resources, the Employee Benefits Office and the SwRI Retirement Plan Representative are prepared to discuss with you the specific details of these benefits.

I encourage you to discuss this offer with your family members, financial advisor and attorney.  If you decide to accept, please sign the *Severance Agreement and General Release*, and return it to me or Human Resources by September 5, 2012.

Sincerely,

Bob Keys
Vice President
Applied Power Division

Attachments

cc:    D. Bates
       W. Downing
       J. McLeod
       T. Magaro



HOUSTON, TEXAS  (713) 977-1377  •  WASHINGTON, DC  (301) 881-0226

**SwRI Johnson 000009**

# EXHIBIT 49

# Timesheet Regular

Fiscal Year: 2012   Period Number: 12   Sub Period Number: 1

Empl: 011838   Name: Johnson, MaryEllen C   Org: 1.11.01.03   GLC: 13   Title: Principal Technician   FLSA: Non-exempt   Est Bi-weekly Hrs: 80

The timesheet period is closed. No updates allowed.
Print Preview
Stamped Unavailable by Moczygemba, Lynette B (E11967) on 08/22/2012 at 09:19:17 AM
Approved by Hawkins, Nicholas E (E12553) on 08/17/2012 at 09:13:04 AM

| Line | Fringe Description | Acct ID | Sat Aug 4 | Sun Aug 5 | Mon Aug 6 | Tue Aug 7 | Wed Aug 8 | Thu Aug 9 | Fri Aug 10 | Week 1 Total | Sat Aug 11 | Sun Aug 12 | Mon Aug 13 | Tue Aug 14 | Wed Aug 15 | Thu Aug 16 | Fri Aug 17 | Week 2 Total | Total Hours | Memo |
|------|------|------|------|------|------|------|------|------|------|------|------|------|------|------|------|------|------|------|------|------|
| | | | | | | | | | | | | | | | | | | | | |
| 1 | Floating Holiday | | | | | | | | | | | | | | | | | | | |
| 2 | Personal Leave | 307-003 | | | | | 1.00 | | | 1.00 | | | | | | | | | 1.00 | Beats being on |
| 3 | M&BL - Personal Illness/Injury | 405-000 | | | | | | 8.00 | | 8.00 | | | 1.00 | 8.00 | | | | | 9.00 | 17.00 | Clinic |

| Line | Charge Number | | | | | | | | | Acct ID | Sat Aug 4 | Sun Aug 5 | Mon Aug 6 | Tue Aug 7 | Wed Aug 8 | Thu Aug 9 | Fri Aug 10 | Week 1 Total | Sat Aug 11 | Sun Aug 12 | Mon Aug 13 | Tue Aug 14 | Wed Aug 15 | Thu Aug 16 | Fri Aug 17 | Week 2 Total | Total Hours | Memo |
|------|------|------|------|------|------|------|------|------|------|------|------|------|------|------|------|------|------|------|------|------|------|------|------|------|------|------|------|------|
| | Proj ID | Org ID | Shift Prem | Diff | Lab Loc | PLC | Serv CD | AL | | | | | | | | | | | | | | | | | | | |
| 1 | 00751.006 | 1.11.01.03 | $0.00 | | | | | | 751-006 | | | | | | | | | | | | 3.00 | | | | | 3.00 | 3.00 | |
| 2 | 00751.008 | 1.11.01.03 | $0.00 | | | | | | 751-008 | | | | 4.00 | 4.00 | 3.00 | | 8.00 | 19.00 | | | 4.00 | | 3.50 | | | 7.50 | 26.50 | Looking for work - |
| 3 | 16595.02.408 | 1.15.04.44 | $0.00 | | | | | | 701-101 | | | | 4.00 | 4.00 | | | | 8.00 | | | | | | | | | 8.00 | Ribbon Bonding for Dlv |
| 4 | 16814.21.120 | 1.11.02.04 | $0.00 | | | | | | 701-101 | | | | | 4.00 | | | | 4.00 | | | | | | | | | 4.00 | Cable harnessing for |
| | | | | | | | | | | | | | 8.00 | 8.00 | 8.00 | 8.00 | 8.00 | 40.00 | | | 8.00 | 8.00 | 3.50 | | | 19.50 | 59.50 | |

My signature/approval certifies my understanding and compliance with SwRI Standards of Conduct and timekeeping procedures (OPP 5.1.1).

SwRI Johnson 000155

Print this page

Print without notes

# Timesheet Regular

Fiscal Year: 2012    Period Number: 12    Sub Period Number: 1

Empl: 011838    Name: Johnson, MaryEllen C    Org: 1.11.01.03    GLC: 13    Title: Principal Technician    FLSA: Non-exempt    Est Bi-weekly Hrs: 80

The timesheet period is closed. No updates allowed.
Print Preview
Stamped Unavailable by Moczygemba, Lynette B (E11967) on 08/22/2012 at 09:19:17 AM
Approved by Hawkins, Nicholas E (E12553) on 08/17/2012 at 09:13:04 AM

| Line | Fringe Description | Acct ID | Week 1 Sat Aug 4 | Sun Aug 5 | Mon Aug 6 | Tue Aug 7 | Wed Aug 8 | Thu Aug 9 | Fri Aug 10 | Week 1 Total | Week 2 Sat Aug 11 | Sun Aug 12 | Mon Aug 13 | Tue Aug 14 | Wed Aug 15 | Thu Aug 16 | Fri Aug 17 | Week 2 Total | Total Hours | Memo |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Floating Holiday | | | | | | | | | | | | | | | | | | | |
| 2 | Personal Leave | 307-003 | | | | 1.00 | | | | 1.00 | | | | | | | | | 1.00 | Beats being on overhead. |
| 3 | M&BL - Personal Illness/Injury | 405-000 | | | | | 8.00 | | | 8.00 | | | 1.00 | 8.00 | | | | 9.00 | 17.00 | Clinic |

| Line | Charge Number Proj ID | Org ID | Shift Prem | Diff | Lab Loc | PLC | Serv CD | AL | Acct ID | Week 1 Sat Aug 4 | Sun Aug 5 | Mon Aug 6 | Tue Aug 7 | Wed Aug 8 | Thu Aug 9 | Fri Aug 10 | Week 1 Total | Week 2 Sat Aug 11 | Sun Aug 12 | Mon Aug 13 | Tue Aug 14 | Wed Aug 15 | Thu Aug 16 | Fri Aug 17 | Week 2 Total | Total Hours | Memo |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 00751.006 | 1.11.01.03 | $0.00 | | | | | | 751-006 | | | | | | | | | | | 3.00 | | | | | 3.00 | 3.00 | |
| 2 | 00751.008 | 1.11.01.03 | $0.00 | | | | | | 751-008 | | | 4.00 | 4.00 | 3.00 | | 8.00 | 19.00 | | | 4.00 | | 3.50 | | | 7.50 | 26.50 | Looking for work - networking with managers - waiting on parts delivery |
| 3 | 16595.02.406 | 1.15.04.44 | $0.00 | | | | | | 701-101 | | | 4.00 | 4.00 | | | | 8.00 | | | | | | | | | 8.00 | Ribbon Bonding for Div 16 |
| 4 | 16814.21.120 | 1.11.02.04 | $0.00 | | | | | | 701-101 | | | | | 4.00 | | | 4.00 | | | | | | | | | 4.00 | Cable harnessing for Sean 4th fl. |
| | | | | | | | | | | 8.00 | 8.00 | 8.00 | 8.00 | 8.00 | | | 40.00 | | | 8.00 | 8.00 | 3.50 | | | 19.50 | 59.50 | |

My signature/approval certifies my understanding and compliance with SwRI Standards of Conduct and timekeeping procedures (OPP 5.1.1).

SwRI Johnson 000156

# EXHIBIT 50

All:

Effective immediately Ms. Johnson is no longer an employee of SwRI. She has been debriefed from access to any classified information and has no authorization for access to any SwRI information or facilities.

Bob

1

# EXHIBIT 51

*The U.S. Equal Employment Opportunity Commission*

| | | **Number** |
|---|---|---|
| | | N-915-041 |
| **EEOC** | ***NOTICE*** | **Date** |
| | | 5/01/89 |

1. SUBJECT: Policy Guidance on the use of the national security exception contained in § 703(g) of Title VII of the Civil Rights Act of 1964, as amended.

2. PURPOSE: This policy guidance reflects the Commission's position on charges where the employer or other entity covered by Title VII raises the national security exception contained in § 703(g) as a defense to a charge of discrimination.

3. EFFECTIVE DATE: Upon receipt.

4. EXPIRATION DATE: As an exception to EEOC Order 205.001, Appendix V, Attachment 4, § a(5), this Notice will remain in effect until rescinded or superseded.

5. ORIGINATOR: Coordination Division, Office of Legal Counsel.

6. INSTRUCTIONS: ~~File behind p. 8 of Section 622 of Volume II of the Compliance Manual, after § 622.4, National Security Exception.~~

7. SUBJECT MATTER:

I. Introduction

Section 703(g) provides that:

> Notwithstanding any other provisions of this title, it shall not be an unlawful employment practice for an employer to fail or refuse to hire and employ any individual for any position, for an employer to discharge any individual from any position, or for an employment agency to fail or refuse to refer any individual for employment in any position, if--
>
> > (1) the occupancy of such position, or access to the premises in or upon which any part of the duties of such position is performed or is to be performed, is subject to any requirement imposed in the interest of the national security of the United States under any security program in effect pursuant to or administered under any statute of the United States or any Executive Order of the President; and
> >
> > (2) such individual has not fulfilled or has ceased to fulfill that requirement.

Section 703(g) is an affirmative defense to a charge of discrimination. As such, respondents must raise it and prove that the challenged employment decision was made because of national security requirements imposed by statute or Executive Order. The scope of the national security exception is also discussed in § 622.4 of Volume II of the Compliance Manual. The Commission's position is that so long as the two conditions in § 703(g) are met, "it is not an unlawful employment practice to deny employment opportunities to any individual who does not fulfill the national security requirements..." of the position being applied for.[1] Thus, analysis of this exception should focus on the position in question and the individual applicant's circumstances to ensure that the job (s)he applied for is in fact subject to national security requirements imposed by statute or Executive Order and that the charging party in fact cannot meet the necessary national security requirements.

Charges alleging national origin discrimination where there is a citizenship requirement that is imposed by statute or Executive Order in the interest of national security are CDP. See § 622.4(b) of the Compliance Manual. This policy guidance provides guidance on how to process a charge when the employer raises a national security requirement other than citizenship as a defense to a charge.

SwRI Johnson 000713

EEOC172 of 597

## Background

The Federal government, in the interest of national security, may require that entities performing or engaging in business with the government, assign only persons with security clearances to work on government projects. However, "no one has a 'right' to a security clearance."[2] Security clearances are granted at the discretion of the designated agency official. The general standard is that a clearance may be granted only when it is "clearly consistent with the interests of the national security."[3] Agencies may evaluate an individual's request for a security clearance on the basis of past or present conduct[4] or on concerns unrelated to conduct such as having relatives residing in a foreign countrycontrolled by a government whose interests or policies are hostile to or inconsistent with those of the United States.[5]

Review of the denial or revocation of security clearances is limited. The Supreme Court recently stated that nonexpert bodies cannot second guess the discretionary decisions of agency heads in determining who is qualified to receive security clearance.[6] The Commission is therefore precluded from reviewing the substance of security clearance decisions. The Commission is also precluded from reviewing the validity of the security requirement itself. However, the legislative history of § 703(g) makes clear that the Commission is not precluded from determining whether the grant, denial or revocation of security clearances is conducted in a nondiscriminatory manner.

## II. Legislative History

The legislative history of § 703(g) indicates that this provision was only intended to except from Title VII liability situations where employers refuse to hire or discharge persons who are unable to obtain a required security clearance.[7]

However, section 703(g) only made express what was required even without the section, *i.e.*, that "employers would not, and could not, ignore valid national security regulations if they are engaged in governmental work involving the application of these regulations."[8] However, the national security requirements must be applied equally without regard to race, sex, color, religion or national origin. Employers cannot, merely by invoking national security, exempt themselves from coverage of the nondiscrimination provisions of the act.[9] Senator Humphrey stated:

> An employer could not deny employment to a qualified Negro on the ground that he does not have security clearance and employ a white person without clearance.... Nor could an employer prefer one employee or applicant over another by seeking security clearance for him while refusing to request clearance for another, if such preference is based on discriminatory considerations.[10]

## III. Court Decisions

Only one court has decided a case where the § 703(g) national security exception was raised. In *Molerio v. F.B.I.*, 749 F.2d 815 (D.C. Cir. 1984), the court upheld the FBI's refusal to hire Molerio as a special agent after completing a background investigation required for a "top secret" security clearance. The FBI determined that Molerio could not get the necessary security clearance because he had relatives in Cuba and the agency generally attached special weight to the fact that an applicant "had relatives residing in any foreign country controlled by a government whose interests or policies are hostile to or inconsistent with those of the United States."[11] The FBI asserted that Molerio was not qualified for the job because he could not obtain the necessary security clearance validly required pursuant to an Executive Order. Molerio asserted that the FBI's policy regarding his relatives was discriminatory and had a disparate impact on applicants of Cuban ancestry.

The court held that the FBI's security policy has no greater impact on Cubans than it does on persons from other communist countries. It also held that § 703(g) "specifically acknowledges the general validity of national security clearance requirements," and "the mere fact that such requirements impose special disabilities on the basis of connection with particular foreign countries is not alone evidence of discrimination."[12]

## IV. Commission Precedent

In an unpublished decision, the Commission found that a private employer that performs work for the military acted in good faith and did not violate Title VII when it failed to promote a naturalized United States citizen from Yugoslavia. The employer did not promote the employee even though he was the most qualified applicant for the promotion, because it would take six months to a year for the employee to receive the necessary security

SwRI Johnson 000714

clearance for the job since he still supported family residing in Yugoslavia. The Commission held that it is not a violation of Title VII for an employer to fail to promote an employee because he has relatives in a communist country where it would take six months to a year before the employee could get the required security clearance and the employer had to fill the position immediately. Critical to the Commission's decision were the facts that no one from within the company was promoted to the position, the employer ultimately hired persons who *already* had the required security clearance and there was no evidence that applicants of other nationalities received more favorable treatment in securing the position.[13]

## EXAMPLES

Example 1 - CP applies to work for X company. X company has a contract with a federal agency. The agency's regulations, pursuant to an Executive Order, require that all of X's employees working on the government contract have a top secret security clearance. CP does not have a top secret security clearance. The investigation indicates that he has applied for one in the past and been denied such a clearance for legitimate nondiscriminatory reasons. X does not hire CP. X is entitled to the § 703(g) exception because it was prohibited from employing anyone who did not have or could not get a top secret security clearance.

Example 2 - CP applies to work with Y company which does primarily government contract work. Y's government contracts require that personnel assigned to work on the projects have security clearances. In addition, Y requires that its employees and their families reside in the United States for security clearance reasons although this is not required in the government contract nor by statute or Executive Order. CP has family living in Mexico. Y refuses to hire CP because he has family that resides in a foreign country. Y is not entitled to the § 703(g) national security exception because its decision not to hire the CP was not made because of national security requirements imposed by statute or Executive Order. The charge should be investigated to determine whether the failure to hire the CP was for a discriminatory reason. For example, such a policy would discriminate against Hispanics if it were applied only to applicants who had family residing in Mexico.

Example 3 - Z company loses a senior scientist two months before the deadline on a large defense contract with the federal government. In order to meet the contract deadline, Z must hire a replacement scientist immediately. Statutes dictate that persons working on defense contracts of this nature have a security clearance. CP, a woman, is selected as the most qualified scientist for the position. Z's security specialist looks over CP's security clearance forms and discovers that CP has relatives living in a communist country. The security specialist knows, from past experience, that this will result in a lengthy security clearance process of greater duration than the contract. Z does not hire CP but hires another qualified scientist, who is male, and who already has the required security clearance. Z's employment actions in this situation were based on legitimate nondiscriminatory reasons and thus do not violate Title VII.

Example 4 - ACME Military Manufacturing has contracts with the federal government requiring that all ACME employees working on government contracts have a security clearance. ACME turns down CP, a male, for a job working on the government contract because he does not have a security clearance. However, ACME hires a woman to work on the same government contract who also does not have a security clearance. CP files a discrimination claim against ACME. ACME invokes the national security exception. ACME is not entitled to the national security exception in defending this charge. It is apparent that the CP's lack of a security clearance is not the real reason for ACME's failure to hire him since it hired a female who also lacked the required security clearance. The investigator should investigate to determine whether the employer has a legitimate nondiscriminatory reason for its actions.

## VI. Charge Processing

Section 703(g) only excepts employers from Title VII liability for adverse employment actions taken pursuant to national security requirements imposed by statute or Executive Order. As noted above, § 703(g) provides an affirmative defense to a charge of discrimination. As such it must be raised by the employer. In addition, the employer must *prove* that it is entitled to rely on § 703(g), and that its actions were taken pursuant to § 703(g). Employers cannot use § 703(g) to circumvent the requirements of Title VII by selectively applying national security requirements to individuals who are members of a protected class or to positions that are not subject to national security requirements.

SwRI Johnson 000715

EEOC174 of 597

Charges alleging national origin discrimination where there is a citizenship requirement that is imposed by statute or Executive Order in the interest of national security are CDP. The directions for investigating such charges described in § 622.4(b) in Volume II of the Compliance Manual should be followed. In those instances where an employer raises other national security requirements as a defense to a charge, such as failing to obtain a security clearance, the investigation should determine if the adverse employment action was taken pursuant to national security requirements that are required by statute of the United States or Executive Order of the President.

In addition, the investigation should also determine whether the requirement claimed to be imposed in the interest of national security is required for the position in question. To determine whether the position at issue is subject to national security requirements, the statute or Executive Order which the employer cites as the legal authority for the excluding requirements should be reviewed. Next, the jobs which are subject to the national security provisions should be identified. The investigator should then determine whether the job in question falls within those cited in the national security requirements. For instance, a design engineering position may be subject to national security criteria where the employer is designing a new weapons system for the Defense Department. However, a position in the personnel office may not be subject to national security requirements as that job is not directly related to the fulfillment of the defense contract. Therefore, with respect to that position, § 703(g) will not protect the employer from Title VII liability. Finally, the investigator should determine whether the charging party has failed or has ceased to meet the requirement imposed by statute or Executive Order.

If the investigator determines that the exception was raised pursuant to a statute or Executive Order and that the charging party has failed or has ceased to meet the requirement imposed by the statute or Executive Order, the employer is entitled to rely on the exception. However, if the investigator determines that these two requirements have not been met, the investigator should determine whether the employer's actions were discriminatory.

Approved:     /s/

Date:5/1/89

Clarence Thomas
Chairman

## Footnotes

[1] 29 C.F.R. § 1606.3.

[2] *Department of Navy v. Egan*, ___ U.S. ___, 108 S.Ct. 818, 824 (1988).

[3] Executive Order No. 10450. *See also* 3 C.F.R. 936, 938 (1949-1953 Comp.); 10 C.F.R. § 710.10(a) (Department of Energy); 32 C.F.R. § 156.3(a) (Department of Defense).

[4] *Egan*, 108 S.Ct. at 824.

[5] *Ibid; Molerio v. F.B.I.*, 749 F.2d 815, 823 (D.C. Cir. 1984).

[6] The Court stated that:

> For reasons... too obvious to call for enlarged discussion the protection of classified information must be committed to the broad discretion of the agency responsible, and this must include broad discretion to determine who may have access to it. Certainly, it is not reasonably possible for an outside nonexpert body to review the substance of such a judgment and to decide whether the agency should have been able to make the necessary affirmative prediction with confidence. Nor can such a body determine what constitutes an acceptable margin of error in assessing the potential risk. The Court accordingly has acknowledged that with respect to employees in sensitive positions there is a reasonable basis for the view that an agency head who must bear the responsibility for the protection of classified information committed to his custody should have the final say in deciding whether to repose his trust in an employee who has access to such information. (citations omitted).

*Egan*, 108 S. Ct. at 825.

[7] 110 Cong. Rec. 12723 (1964) (statement of Sen. Humphrey).

[8] *Id.* at 14239.

[9] *Ibid.*

SwRI Johnson 000716

EEOC175 of 597

[10] *Ibid.*

[11] 749 F.2d at 823. Thus, employers that exclude individuals from employment opportunities who have relatives residing in countries whose interests or policies are not hostile to or inconsistent with those of the United States, simply because it may take a long time for the individual to obtain a security clearance, may not be entitled to claim the exception contained in § 703(g).

[12] *Ibid.*

[13] EEOC Decision 71-806 (unpublished).

*This page was last modified on August 23, 2007.*

 Return to Home Page

SwRI Johnson 000717

EEOC176 of 597

# EXHIBIT 52


# DOCUMENT FILED
# UNDER SEAL

# EXHIBIT 53

# DOCUMENT FILED
# UNDER SEAL

# EXHIBIT 54

# DOCUMENT FILED UNDER SEAL

# EXHIBIT 55

| | |
|---|---|
| **Career Step:** | Technical Support (TS-3) |
| **Job Titles:** | Assistant Chef, Lead Computer Operator, Lead Laborer, Machinist B, Senior Craft Technician, Senior Drafter, Senior Graphics Designer, Senior Mechanic, Senior Photographer, Senior Printer, Senior QA Technician, Senior Technician, Senior Telecommunications Technician, Shift Leader, Welder B |
| **FLSA Class:** | Nonexempt |

**GENERAL DESCRIPTION:** Individuals in TS-3 positions are skilled non-exempt technical services staff providing key support to scientific and engineering and/or more senior technical support staff. Most positions require a comprehensive understanding and application of principles, concepts, and standards, and full knowledge of industry practices associated with a technical occupation or trade. Work assignments are less routine and are performed under general supervision. Though having no direct administrative or project development responsibilities, persons have some latitude in carrying out technical instructions in selecting, adapting, and modifying procedures or equipment. Technical adequacy of completed work is reviewed by project leaders or more senior level staff. Continued skill development, practical knowledge, technical understanding, and a degree of creativity and latitude is expected in performing work in laboratories, testing environments, or other service or operating facilities.

**REPRESENTATIVE FUNCTIONS:**

a. As required, performs duties outlined in TS-1 and TS-2 positions.
b. Constructs components, subunits, models, and adaptations of standard equipment.
c. Performs tests following written procedures; reads test results, interprets test data to determine pass/fail criteria; assembles and sorts data for clients and for the preparation of final test reports by engineering staff.
d. Conducts customized tests or experiments that require minor modifications in test set-up or procedures.

e. Selects testing set-up and operates test equipment to record data by hand or ensures automated retrieval of data output.
f. Extracts, compiles, processes, and reduces engineering data using specified formulas and procedures to prepare for tests, or to provide data to project staff.
g. Performs routine analysis to check applicability, accuracy, and reasonableness of data.
h. Observes, monitors, and records instrumentation/results during testing to insure test parameters are maintained within test specifications.
i. Interprets schematics, equipment manuals, blueprints, and drawings to design customized test setups or to set-up complex test procedures.
j. Performs tasks of moderate difficulty in the welding, carpentry, plumbing, and electrical trades.
k. Inspects laboratory to maintain a safe working environment and reports unsafe conditions.
l. Reads daily shift or test schedules to determine specific tests to be conducted and the test equipment to be used during the assigned shift.
m. Uses customized PC software to enter and manipulate data, generate reports, and to monitor testing progress.
n. Computes additional test readings from test measurement data using basic math skills.

**QUALIFICATIONS:** Incumbents should have advanced knowledge of tasks, materials, and tools associated with the occupation or trade. They must have knowledge of safety rules and

SwRI Johnson 000505

procedures; installation methods; operation, maintenance, and repair of specialized equipment; ability to read and follow complex schematics, equipment manuals, blueprints and drawings; and knowledge of custom sample preparation and testing procedures particular to the field of effort. Knowledge of basic standards and regulations and engineering or scientific principles relative to the occupation or trade is needed; and must have ability to design and fabricate testing apparatuses; manipulate testing data; and utilize various PC software applications. Incumbents must practice regular attendance; have ability to work closely with others, work effectively in a group, and/or work alone as necessary. They should also have the ability to supervise subordinate technical support staff effectively in completion of project activities and communicate well with professional staff. Some positions require heavy physical labor; ability to work under adverse conditions such as extreme climates, exposure to heat, temperature extremes, noise, chemicals, and fumes; and the ability to work shifts, overtime and weekends; and drive Institute vehicles. Existing staff should have performed satisfactorily in TS-1 and TS-2 functions for five years or have equivalent experience, knowledge, and ability. New employees should have a high school or equivalent education and generally have a combination of five to ten years of continuing education, or trade school and/or related experience. An Associate's degree is preferred at this level. *Validated tests are given to determine level of knowledge and skill in a particular field.*

SwRI Johnson 000506

**Career Step:** Technical Support (TS-4)

**Job Titles:** Chef, Principal Craft Technician, Principal Drafter, Principal Graphics Designer, Principal Machinist, Principal Mechanic, Principal Photographer, Principal Printer, Principal Technician, Principal Welder, Programmer, QA Inspector

**FLSA Class:** Nonexempt

**GENERAL DESCRIPTION:** Individuals in TS-4 positions are skilled non-exempt technical services staff providing key support to scientific and engineering and/or more senior technical support staff. These positions require expert knowledge of industry standards, concepts, principles, and practices associated with a technical occupation or trade. Work activities consist of a wide variety of non-routine assignments of differing complexities and are performed under limited supervision. Contributions are made to the development of new concepts, techniques, and standards and experience is relied upon to plan and accomplish goals and carry out technical instructions in selecting, adapting, and modifying standards procedures or equipment. These individuals, considered experts in their technical area, may have frequent contact with client vendors, science and engineering professionals and other support groups across the Institute. They may direct the work of others or may be assisted by lower level technical services staff. Advanced skills, knowledge, and technical understanding; and a wide degree of creativity and latitude is expected in performing work in laboratories, testing environments, and other services or operating facilities

**REPRESENTATIVE FUNCTIONS:**

a. As required, performs duties outlined in TS-1 through TS-3, with more freedom of action and decision making authority.
b. Interprets schematics, equipment manuals, blue-prints, and drawings to design customized test set-ups or engineering or scientific components.
c. Responds to complaints of equipment and component malfunctions and troubleshoots to diagnose problems and repairs.
d. Communicates with supervisors, co-workers, and project engineers, as well as with clients, concerning work activities, or test procedures and results.
e. Determines test schedules and monitors test progression to ensure timelines of test completion based on client requirements.
f. Prepares, operates and calibrates carious analytical test systems.
g. Trains and supervises subordinates in completion of job assignments.
h. Verifies technical operations to desired specifications by following written or verbal directions and documents and communicates test results.
i. Performs complex task in welding, carpentry, plumbing, and electrical trades.
j. Makes daily operational job assignments, coordinates routine laboratory functions.
k. Acts as lead on projects to ensure work is coordinated and completed in sequence.
l. Works and consults project team on work in progress to develop final specifications.

**QUALIFICATIONS:** Incumbents should have comprehensive knowledge of tasks, materials, and tools associated with the occupation or trade. They must have knowledge of safety rules and procedures; installation methods; and operation, maintenance, and repair of specialized equipment; ability to read and follow complex schematics, equipment manuals, blueprints and drawings; and knowledge of custom sample preparation and testing procedures particular to

SwRI Johnson 000507

the field of effort. Incumbents must have knowledge of standards, regulations and engineering or scientific principles relative to the occupation or trade; have the ability to design and fabricate specialized testing apparatuses; manipulate testing data; and be proficient with carious PC software applications. They should remain aware of changes in technology and the application thereof; have ability to communicate effectively verbally and in writing with clients, peers, supervisors, and management. Some positions require heavy physical labor; ability to work under adverse conditions such as extreme climates, exposure to heat, temperature, extremes, noise, chemicals, and fumes; and the ability to work shifts, overtime and weekends; and drive Institute vehicles. Existing staff should have performed satisfactorily in TS-1 and TS-3 functions for ten years or have equivalent experience, knowledge, and ability. New employees should have a high school or equivalent education and generally have a combination of ten to fifteen years of continuing education, or trade school and/or related experience. An Associate's degree is preferred at this level. *Validated test are given to determine level of knowledge and skill in a particular field*

SwRI Johnson 000508

**Career Step:** Technical Support (TS-6)

**Job Titles:** Designer, Engineering Technologist, QA Technologist, Research Technologist

**FLSA Class:** Exempt

**GENERAL DESCRIPTION:** The TS-6 positions provide a means for advancement of exceptional performers at the TS-5 level who demonstrate an adept ability for engineering/scientific work and other project assignments at the professional level. This is also the entry-level exempt career step for individuals with a technology degree. Work at this level is usually in relatively narrow specialties done independently with skills acquired through a prolonged course of study, or from extensive experience and continued education in the field. Individuals at this level consistently exercise technical judgment or discretion in the implementation of program initiatives, have good communication skills, and have the technical expertise needed to adequately contribute to proposals, project management, and supervision.

**REPRESENTATIVE FUNCTIONS:**

a. Manages scientific and engineering research and development projects.
b. Conducts conventional investigations independently.
c. Composes and/or contributes to technical correspondence, reports, and peer-review papers.
d. Develops and promotes (or assists with such activities) proposal efforts for new or follow-on projects.
e. Designs specialized testing apparatus or test equipment to satisfy parameters that have been pre-established.
f. Prepares testing specifications and inspection standards.
g. Develops expertise in organizing project teams and serves as a project manager.
h. Develops concepts for improvements in services provided by group and new program initiatives.
i. Supervises technical support personnel who assist in specific assignments on particular programs.
j. Provides appropriate liaison with clients on project work or serves as a phase manager with reporting responsibilities to a project manager.
k. Uses PC-based systems and applications to satisfy complex program activities and to satisfy reporting, data requirements and analysis of project activities.
l. Recommends improvements to systems to improve program activities.
m. Acts independently to solve problems; promotes new or follow-on projects to clients.

**QUALIFICATIONS:** Incumbents should have knowledge of advanced systems; applications of new technologies in the field of specialization; knowledge of technical performance standards and skills in report generation; ability to manage small projects or tasks in larger or more complex programs; and application of PCs for use in program work. They must have knowledge of advanced mathematic functions; ability to train and supervise subordinate staff in technical area of expertise, conduct technical sessions; effectively communicate with clients concerning project activities; write and present reports or presentations; act independently to solve problems, and promote projects to clients. Existing staff promoted from TS-5 should have performed satisfactorily in TS-1 through TS-5 functions for twenty years with demonstrated abilities to perform in a professional capacity through extensive experience and continued education and development. A newly hired staff member should have a high school or equivalent education and generally have a combination of twenty to twenty-five years of continuing education, or trade school and/or related experience, or a Bachelor's degree from an accredited university with zero to five years experience in the field of specialization.

SwRI Johnson 000509

# EXHIBIT 56

# DOCUMENT FILED UNDER SEAL

# EXHIBIT 57

# DOCUMENT FILED UNDER SEAL

# EXHIBIT 58

# DOCUMENT FILED
# UNDER SEAL

# EXHIBIT 59

# DOCUMENT FILED UNDER SEAL

# EXHIBIT 60

# DOCUMENT FILED UNDER SEAL

# EXHIBIT 61

# DOCUMENT FILED UNDER SEAL

# EXHIBIT 62

# DOCUMENT FILED UNDER SEAL

# EXHIBIT 63

# DOCUMENT FILED UNDER SEAL

# EXHIBIT 64

# DOCUMENT FILED UNDER SEAL

# EXHIBIT 65

# DOCUMENT FILED
# UNDER SEAL

# EXHIBIT 66

# DOCUMENT FILED
# UNDER SEAL

# EXHIBIT 67

# DOCUMENT FILED UNDER SEAL

# EXHIBIT 68

# DOCUMENT FILED
# UNDER SEAL

# EXHIBIT 69



# Southwest Research Institute®
## Performance Evaluation Summary

ENTERED

AUG 31 2011

___/___

NAME: _____ *Mary Ellen Johnson* _____ DATE: _____ *12 August 2011* _____

JOB TITLE: ____ *Principal Technician* _____ EMP. NO.: ____ *11838* _____

CC: ____ *Division 11 – Applied Power* _____ REVIEW PERIOD: From ___ *August 2010* ___ To ___ *August 2011* ___

*Strongest Areas of Job Performance:* _____ Ms. Johnson has proven to be an exceptional electronics technician. Ms. Johnson can successfully see board development through the entire life cycle. Her board layout skills continue to grow and she is becoming a leading person inside and outside Division 11. Ms. Johnson is to be commended for establishing relationships with other divisions on her own. She has continued to grow Division 11's reputation.

*Opportunities to Improve Job Performance:* _____ Ms. Johnson needs to improve her communication with peers and senior staff. She needs to follow-up with her tasking managers on specific tasking, and she needs to make sure her tasking managers are aware of any schedule conflicts she may have.

*Overall Job Performance Summary:* ____ ME

*Overall Employee Satisfaction with Job and Work Relationships:* ____ Relatively satisfied. My job has been challenging and fulfilling all year long. I am thankful for the opportunity my new position provides to start leading in our areas of work. My peers and co-workers are generally friendly and enjoyable to work with.

*Short and Long Term Career Goals:* _____ Short-term goals – Graduate with my B.S., which happens in March. Long-term goals- Study hard and take the P.E.

*Developmental Recommendations:* _____ Mary Ellen needs to continue her coursework towards her degree. I would also like to see Mary Ellen become more involved in Division 11 programs and further become a leader / mentor in the division. She has outstanding qualities and workmanship that, as a senior member of the technical staff, she should instill on younger staff.

_____ K. Nova Cooper _____ _____ 12893
       *Prepared by*            *Emp. No.*

_____               _____
     *Reviewed by (optional)*                    *Cost Center Head*

--------------------------------------------------------------------------------

I have reviewed and discussed this evaluation with my immediate supervisor; I may or may not agree with this evaluation. Any additional comments I have are on the reverse side. see attached comments

_____ Mary Ellen Johnson _____
                              *Employee*

Form E-15 (Rev. 2/96)

SwRI Johnson 000127

## Overall Performance Summary

I disagree with my rating of Meets Expectations. The definition on the back of the review explains the different ratings. Nowhere in the definition does it require the OPP job description of Principal Technician to be compared to the work actually assigned and then subtracted from performance. My supervisor and I see this area differently. He sees that I am not completing my job definition as stated in the OPP. I see it as, how well did I perform on the work I was afforded. Very recently being promoted, how can I exceed on a job I had no opportunity to complete? In our technical environment, most supervisory rolls are not extended to senior or principal technicians.

To clarify, the jobs that were performed outside the division, these project managers called me for availability. My capabilities and skill set extend beyond the confines of this division. This is an example of going above and beyond what my supervisor expected of me. Laying out a complicated 12 layer board and rigging up a stem cell research setup; these are not in my normal duties assigned by my supervisor.

Excelling at these extra duties is reason further that the 'Meets Expectations' is not an acceptable rating. Exceeds Expectations is defined as continually produces results that are better than expected; consistently exceeds the normal expectations for her position. With the phrase 'produces results' the connotation is that you were given something to provide results for. Whether well done or not the quality of the job you are given is what you are being rated on, your performance.

# 2011 Work Definitions

(Not in chronological order)

Kevin/Chris

Speed sensors: ordered parts, coordinated between purchasing, ACE and Sigmatronix, Assembled/tested initial 18 units for proof of concept. The effort was repeated for the next order of 72 boards. I performed a final inspection of Sigmatronix work on the boards and inserted them in the housings.

Chuck/John A.

For the reverse engineer work John Ashmore is doing, loading all handwritten schematics to Cadence.

Mark

Various; cables made, A/D boards assembled and tested.

Terry

Assembled units and tested. Perfected the inside wiring process with a small circuit board I designed.

Dr. Cheng/Lauren Cornell

Ribbon bonded test initial set up for proof of concept. The test went well; Stem cells grow in the scaffolding pattern desired. They returned for further boards – fashioned setup from glass slide/5min epoxy/old 94 GHz boards. Those tests went well, returned for final board assembly. Designed wafer 'carrier' so that boards could be bonded, power applied and then removed easily to integrate into the growing medium.

Merle Converse

Merle is researching a part from the University of California/San Diego gathering data on a near zero voltage turn-on rectifier. The chips are RAW SOS (Silicon on Sapphire) CMOS chips. Initially I was to wire bond to the chip and bring out leads he could attach voltage and an o-scope to. After initial inspection I realized our AEL equipment was not sufficient. I organized time from Div 15 and had the chips ball bonded, mounting them to a daughter card that could be bread boarded easily.

Sean Broderick

Block diagrams for Scuno.

Taylor/Hutch/Jeremy J.

Worked with 4th floor learning systems, and clean up of all labs.

SwRI Johnson 000129

Cleaned up and rerouted cabinet cables.

Tom Untermeyer

Working closely with Innoflight (client) we ironed out defects in their schematics. Created parts for their parts, laid out and routed a 12 layer board in Cadence. There were several issues with the cadence license and getting the program to run properly. Recently I had the opportunity to meet the client and view the board. The final assembly worked as designed.

Joe Herring

Along with Andrew, I helped modify filter boxes for Mopac and Scuno.

I. Overall Employee Satisfaction
   a. Relatively satisfied. My job has been challenging and fulfilling all year long. I am thankful for the opportunity my new position provides to start leading in some of our work areas. My peers and co-workers are generally friendly and enjoyable to work with.
II. Short and Long term goals
   a. Short term goals,
      i. Graduate with my B.S. in Electronics and Communications Engineering Technologies, which happens in March.
   b. Long term goals,
      i. Study hard and take the P.E.

# EXHIBIT 70

# DOCUMENT FILED UNDER SEAL

# EXHIBIT 71

# DOCUMENT FILED UNDER SEAL

# EXHIBIT 72

# DOCUMENT FILED UNDER SEAL

# EXHIBIT 73

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| MARY ELLEN JOHNSON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CASE NO. 5:15-CV-00297-FB-HJB |
| | § | |
| SOUTHWEST RESEARCH INSTITUTE, | § | |
| | § | |
| Defendant. | § | |

## DECLARATION OF ANTHONY MAGARO

I, Anthony Magaro, do hereby swear and affirm as follows:

1.    "I am of sound mind, over 21 years of age, and capable of making this declaration. The facts herein stated are true and correct based on my personal knowledge gained in my position as Executive Director, Human Resources for Southwest Research Institute ("SwRI"). In this capacity, I am a custodian of records for SwRI.

2.    Attached as Exhibits 1, 6-12, 15, 17-28, 30-37, 39-50, and 52-72 to SwRI's Motion for Summary Judgment are various pages of records from SwRI. The pages attached as Exhibits 1, 6-12, 15, 17-28, 30-37, 39-50, and 52-72 to SwRI's Motion for Summary Judgment are records kept by SwRI in the regular course of business, and it was the regular course of business of SwRI for an employee or representative of SwRI with knowledge of the acts, events, or conditions recorded in the records to make the records or to transmit the information to be included in such records, and the records were made at or near, or reasonably soon after, the time of the acts, events, or conditions recorded. The sources of information of, and the method and circumstances of the preparation of, the attached records were in all respects trustworthy. The records attached are exact duplicates of the originals.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____ March 30, 2017 .

_____
Anthony Magaro