# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| MARY ELLEN JOHNSON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CASE NO. 5:15-CV-00297-RCL |
| | § | |
| SOUTHWEST RESEARCH INSTITUTE, | § | |
| | § | |
| Defendant. | § | |

**DEFENDANT SOUTHWEST RESEARCH INSTITUTE'S MOTION TO ALTER OR AMEND THE JUDGMENT AND, IN THE ALTERNATIVE, MOTION TO STAY INJUNCTIVE RELIEF PENDING APPEAL**

NOW COMES Defendant Southwest Research Institute ("SwRI") and, under Federal Rule of Civil Procedure 59(e), files this Motion to Alter or Amend the Judgment and, in the Alternative, Motion to Stay Injunctive Relief Pending Appeal and would show the Court as follows:

## I. INTRODUCTION

On May 23, 2019, the Court entered an Order & Judgment, Dkt. 148, ordering that "SwRI shall send the text of the letter attached as Exhibit A to this order and judgment to the Defense Security Service Personnel Security Management Office for Industry (DSS PSMO-I), informing DSS PSMO-I the jury found Johnson was terminated in retaliation for her complaints of sex discrimination, rather than for the reasons stated in the incident report submitted August 15, 2012, and requesting DSS PSMO-I withdraw the incident report." *Id.* at 2; *see also* Order & Judgment, Dkt. 148, Exh. A (the "DSS Letter"). The DSS Letter represents compelled speech that violates SwRI's First Amendment rights. Furthermore, the DSS Letter goes far beyond the "retraction" that Plaintiff pleaded for in her Original Complaint. As such, her failure to specifically plead for the DSS Letter and failure to raise the issue of the Letter prior to the

close of the trial results in a waiver of her right to injunctive relief. Moreover, Plaintiff failed to introduce any evidence establishing her right to injunctive relief at trial. The Court's ordering of the DSS Letter in the face of a violation of SwRI's First Amendment rights, as well as Plaintiff's waiver of and failure to present evidence on the injunctive relief, represent manifest errors of law. The Final Judgment must be altered to vacate the injunctive relief.

The DSS Letter also goes to the heart of the prohibition on second-guessing a federal contractor's sensitive and inherently discretionary judgments regarding granting its employees access to classified information that the *Egan* Doctrine establishes. Alternatively, if the Court does not vacate the award of injunctive relief, it should be stayed pending the Court's disposition of post-judgment motions and appeal, if any. Finally, the Court should vacate the award of front pay, based on the jury's finding that Plaintiff failed to mitigate her damages.

## II. ARGUMENTS AND AUTHORITIES

### A. Rule 59(e) Standards

A Rule 59(e) motion "calls into question the correctness" of a decision. *Templet v. HydroChem Inc.*, 367 F.3d 473, 478 (5th Cir. 2004) (citation omitted). Rule 59(e) allows a party to correct manifest errors of law, present newly discovered evidence, or explain an intervening change in the controlling law. *Id.* at 478-79; *see also Schiller v. Physicians Res. Grp. Inc.*, 342 F.3d 563, 567 (5th Cir. 2003).

### B. The DSS Letter is Compelled Speech and Violates SwRI's Free Speech Rights.

The Final Judgment's requirement that SwRI send the DSS Letter is compelled speech that violates SwRI's constitutionally protected speech rights. The DSS Letter compels SwRI to submit a written statement that appears to confess that SwRI's reasons for the termination of Plaintiff's employment, as noted in the incident report, were not the truthful reasons for her termination. It also compels SwRI to request a withdrawal of the incident report. This

compelled judicial speech is unlawful, and the Court should vacate the injunctive relief in its entirety.[1]

The First Amendment protects "both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977).[2] Requiring an individual to present a viewpoint not his own is, in terms of the First Amendment values at stake, the equivalent of forbidding him to say what he wishes to say. *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 256 (1974); *DeBoer v. Vill. of Oak Park*, 267 F.3d 558, 572 (7th Cir. 2001). For example, the government cannot force a speaker to tailor its speech to an opponent's agenda or respond to an opponent's arguments when it might prefer to be silent. *See Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n*, 475 U.S. 1, 10 (1986) (plurality opinion); *DeBoer*, 267 F.3d at 572 (recognizing that plaintiffs "cannot be directed by governmental authorities to format their presentation in a way that the government finds suitable"). "*[A]ll* speech inherently involves choices of what to say and what to leave unsaid ... [c]onsequently, the speaker has the right to tailor the speech; the one who chooses to speak also chooses what to say." *DeBoer*, 267 F.3d at 572 (quoting *Pac. Gas & Elec.*, 475 U.S. at 11) (emphasis and first alteration in original).

---

[1] SwRI objected to the Court's compelling it to send the letter in its Response to Plaintiff's Motion for Judgment, Dkt. 144, at 4 (objecting to Court "using judicial power to order employers to reverse their discretionary determinations"), and in its Sur-Reply, Dkt. 150, at 2 (injunctive relief "would compel SwRI to make a communication that it believes to be wrong"); *id*. at 3 ("SwRI should not be judicially compelled to make statements to a federal agency that it believes are not true, that it disagrees with, and that are not compelled by any finding of the jury").

[2] First Amendment protection extends to corporations. *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 342 (2010). The Final Judgment only explicitly directs the injunction at SwRI, but the First Amendment would also protect individuals indirectly compelled to comply with the injunction (*e.g.*, an employee that must sign and send the letter). SwRI and its employees in Texas are also protected by the Texas Constitution, which protects the "liberty to speak, write or publish … opinions on any subject," which augment the First Amendment's protections. Tex. Const., art. I, sec. 8.

Based on these principles, courts have rejected the use of injunctions to compel a party to make forced public retractions or withdrawals of statements, because such injunctions violate that party's right not to speak against its will. Indeed, courts have refused even to compel retractions in cases of *per se* libel.[3] In *Kramer v. Thompson*, 947 F.2d 666 (3d Cir. 1991), the defendant, Thompson, hired Kramer as an attorney to bring a securities claim against a former broker. *Id*. at 666. During the course of the representation, Thompson accused Kramer of deliberately dissuading the F.B.I. from investigating the securities fraud complaint. *Id*. at 667. Thompson subsequently wrote numerous "critical and accusatory letters" about Kramer to private attorneys, judges, F.B.I. agents, prosecutors, and local media outlets. *Id*. In response, Kramer brought a libel action against Thompson and a default judgment was entered against Thompson. *Id.* About two years later, Thompson learned that Kramer was involved in a separate civil matter. Thompson again began writing critical and accusatory letters about Kramer to various people and entities including an attorney involved in the suit, the state Disciplinary Board, the federal judge hearing the case, the Philadelphia Inquirer, and the United States Department of Justice. *Id.* Kramer filed a second libel action against Thompson in federal court based on this continuous conduct. *Id*. The district court determined that Thompson's statements were *per se* libelous and directed a verdict for Kramer. *Id*. at 668. In addition to awarding Kramer compensatory and punitive damages, the court simultaneously entered a permanent injunction, prohibiting Thompson from continuing to make further libelous statements against Kramer and—importantly here—"ordering [Thompson] to write letters of retraction to all persons who had received prior libelous communications." *Id*.

---

[3] The analogy to libel cases in no manner suggests or concedes any libel by SwRI or its employees. Indeed, the truth or falsity of the information in SwRI's August 15, 2012 report was not submitted to the jury, which is a further reason why the Court's injunction is improper.

The Third Circuit reversed the district court's injunction, noting that it "need not tarry very long over those portions of the district court's orders that sought to force Thompson to write letters of retraction to recipients of prior libelous statements and to withdraw libelous court filings" because there was ***no precedent to do so***. *Id.* at 680. The court noted that "[a]lthough the notion of compelled retraction occasionally has been advanced in the literature," it had "not found a single case in which such a remedy has been awarded." *Id.* The court found no statutes in the United States that compel retraction, and "[t]he reasons for the reluctance of state legislatures and courts to provide for mandatory retraction are apparent enough," because voluntary retraction is a defense (e.g., a voluntary decision to retract), "***not an award in the plaintiff's favor***." *Id.* (emphasis added). Citing a variety of authorities, the court expressed doubt "whether compelled retraction could withstand first amendment scrutiny." *Id.*; *see also, e.g.*, *Miami Herald*, 418 U.S. at 256 (Supreme Court "has expressed sensitivity as to whether a retraction or requirement constituted the compulsion exerted by government on a newspaper to print that which it would not otherwise print. The clear implication has been that any such compulsion to publish that which 'reason' tells them should not be published is unconstitutional.") (internal quotations omitted). Finding "no support for the various retractions and withdrawals forced upon [Defendant] by the district court," the *Kramer* court concluded that "those orders ... compelling such retractions and withdrawals ... must be reversed." *Kramer*, 947 F.2d at 682.

Other courts have continued to apply *Kramer*'s rationale in rejecting requests for injunctive relief that compel speech. A federal district court in Texas considered a motion to dismiss that alleged defendants were part of an "extensive, long-lasting conspiracy designed to prevent African-American individuals in Beaumont from gaining power and influence in order to

perpetuate white dominion over Beaumont [Texas] local politics." *Walker v. Beaumont Indep. Sch. Dist.*, No. 1:15-CV-379, 2017 WL 928459, at *1 (E.D. Tex. Mar. 6, 2017), *report and recommendation adopted*, No. 1:15-CV-379, 2017 WL 1166779 (E.D. Tex. Mar. 28, 2017), *appeal filed*, (July 17, 2017). The complaint requested an order that "each member of the [alleged conspiracy] issue an unequivocal retraction, correction, and/or clarification" regarding the plaintiff's relationship with a local school board. *Id.* at *6 n.3. The district court held that such a request "is not a legally permissible form of relief." *Id*. (citing *Kramer*, 947 F.2d at 680); *see also Tackett v. KRIV-TV (Channel 26)*, CIV. A. No. H-93-3699, 1994 WL 591637, at *2 (S.D. Tex. May 5, 1994) (finding that the plaintiff "may not obtain equitable relief from defendants in the form of a retraction, public apology, or permanent injunction. Defendants cannot be compelled to publish or be enjoined from publishing future materials regarding [plaintiff]").

In *Berman v. Kafka*, No. 3:13-CV-1109, 2015 WL 12940184, at *3 (M.D. Fla. July 10, 2015), the plaintiff sought equitable relief in the form of "a letter of retraction and apology" from the defendant. *Id.* at *3. The district court held that "neither is a cognizable form of equitable relief." *Id*. (citing, *inter alia*, *Kramer*, 947 F.2d at 680-82). In *Graboff v. American Association of Orthopaedic Surgeons*, CIV. A. No. 12-5491, 2013 WL 1875819 (E.D. Pa. May 3, 2013), *aff'd*, 559 F. App'x 191 (3d Cir. 2014), a jury in a related case had rendered a verdict that the defendant had engaged in tortious conduct by portraying the plaintiff in a false light in an article published by the defendant in a newsletter and on its website. *Id*. at *1. The plaintiff then sued again based on continued violations and the defendant's refusal to take down the article, seeking an injunction ordering the defendant to remove the article from its website. *Id.* Relying heavily on *Kramer*, the court refused to order the defendant to take down the information, finding that

the plaintiff had been made whole by the damages awarded to him in the prior case based on the jury's verdict. *Id*. at *3-5.

Consistent with these authorities, the Court should vacate the injunctive relief granted in the Final Judgment. As in *Kramer* and subsequent decisions, Plaintiff's request seeks to compel SwRI to make a public retraction. *See* Plaintiff's Original Complaint, Dkt. 1, at 6 (Plaintiff "seeks … retraction of any false incident report Defendant generated against her."). The Court's injunction uses judicial power to compel SwRI to speak and to make statements that it believes are incorrect and that SwRI continues to contest and will contest on appeal in this litigation, if the Court does not vacate the relief. More specific, SwRI vehemently disagrees with the jury's determination that Plaintiff was terminated in retaliation for her complaints of sex discrimination and therefore should not be compelled to make a written statement that interprets the jury verdict to mean that she was terminated due to sex discrimination "rather than for the reasons stated in the incident report submitted on August 15, 2012." *See* Order & Judgment, Dkt. 148, Exh. A. Nor does SwRI believe it is correct to "request[] withdrawal of the August 15, 2012 incident report regarding Ms. Johnson," which carries the implications that there is false or misleading information in the report, or that the information is not relevant to her security clearance. And there was no evidence presented at trial that SwRI even filed such a report to JPAS, yet the Court is compelling SwRI to take ownership of that report, without any factual basis for doing so. Compelling SwRI to make these statements in the DSS Letter, when it believes they are wrong, violates the First Amendment and state law protections of SwRI and any agent or officer of the company that may be asked to send such a Letter.

Furthermore, the injunctive relief is not warranted in equity because Plaintiff has already received monetary damages. *See, e.g.*, *Graboff*, 2013 WL 1875819, at *3-5. The DSS Letter

would require SwRI to note the jury's finding on the retaliation claim and essentially "confess" that gender discrimination was the real reason for Plaintiff's termination. But any alleged harm resulting from the retaliation and/or the incident report has already been compensated by the jury in the form of money damages for retaliation. There are no grounds for the Court additionally to impose extraordinary and unconstitutional equitable relief. As such, the Court's order compelling speech by SwRI in the form of the DSS Letter is a manifest error of law and must be vacated.

**C. Plaintiff Waived Her Right to Injunctive Relief.**

As noted, in her Original Complaint Plaintiff stated, "Plaintiff seeks … retraction of any false incident report Defendant generated against her." *See* Plaintiff's Original Complaint, Dkt. 1, at 6. By her own language, Plaintiff was solely seeking a "retraction" of the incident report. But here, the relief awarded by the Court goes far beyond a "retraction." Plaintiff simply never pleaded for injunctive or equitable relief in the form of the DSS Letter awarded by the Court. There is absolutely no request in the Complaint for a "letter or other communication to JPAS rescinding its adverse information report [incident report], stating that it no longer considers Johnson an insider threat, and notifying JPAS of the jury verdict finding that Johnson would not have been terminated but for her reports of sex discrimination." *See* Plaintiff's Motion for Judgment on the Verdict, Dkt. 143, at 7-8. Under even the most generous reading of Plaintiff's Complaint, a request for a "retraction" of the incident report cannot support the scope of the DSS Letter awarded by the Court.

Further, Plaintiff waived her right to injunctive relief by failing to raise the issue at trial. *See Peterson v. Bell Helicopter Textron, Inc.*, 806 F.3d 335, 339-41 (5th Cir. 2015) (finding that the plaintiff's late request for injunctive relief after trial resulted in waiver and citing *Alexander*

*v. Riga*, 208 F.3d 419, 434 (3d Cir. 2000) for the proposition that "the issue is waived by the failure of counsel to raise the issue of injunctive relief prior to the conclusion of trial"); *Wojcik v. Costco Wholesale Corp.*, No. 3:13-CV-2314-D, 2016 WL 304872, at *5-6 (N.D. Tex. Jan. 26, 2016) (finding that the issue of injunctive relief was waived by the plaintiff's failure to provide notice before or during trial of his intent to seek such relief). Indeed, the Court's Memorandum Opinion recognizes that "Johnson did not present evidence regarding the process for amending or rescinding an incident report during trial." *See* Memorandum Opinion, Dkt. 149, at 8. The simple fact is that the first time Plaintiff requested the relief awarded in the DSS Letter was after trial in her Motion for Judgment. *See* Plaintiff's Motion for Judgment on the Verdict, Dkt. 143, at 7-8. Accordingly, there is no factual record that supports the injunctive relief. In fact, there is no evidence that SwRI even filed an incident report.

In sum, Plaintiff has waived her right to injunctive relief by failing to plead for such relief in the form of a letter to the DSS in her Complaint and by failing to raise the issue of injunctive relief before the end of trial. As a result, the award of injunctive relief is a manifest error of law and must be vacated.

**D. Plaintiff Did Not Satisfy the Requirements for Injunctive Relief.**

As noted above and as the Court acknowledges, Plaintiff failed to present any evidence on injunctive relief at trial and as such, there are no jury findings to establish her entitlement to injunctive relief under the factors set out by the Supreme Court in *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). In order to establish her entitlement to a permanent injunction, Plaintiff was required to satisfy the traditional four-factor test: "(1) that [she] has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff

and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id.*; *see also Yarnall v. The Philadelphia Sch. Dist.*, 180 F. Supp. 3d 366, 370-71 (E.D. Pa. 2016) (applying the *eBay* factors to a request for injunctive relief under Title VII).

Plaintiff failed to introduce evidence that her JPAS profile, and specifically the incident report, created irreparable harm. In fact, as noted, Plaintiff failed to introduce evidence other than her own opinions to show that a single prospective employer refused to hire her because of the incident report. *See* Tr. 4, 5:20-6:1, 40:16-23.[4] Further, she failed to introduce evidence that monetary damages were inadequate to compensate her for any alleged harm. The jury's finding that Plaintiff failed to mitigate her damages shows that the jury believed she would be fully compensated by the damages awarded. Further, the balance of hardships weighs against injunctive relief in light of the obligations placed on SwRI by the federal government with regard to the protection of the classified information entrusted to it.

**E. The DSS Letter Violates the *Egan* Doctrine**

In its post-judgment renewed motion for judgment as a matter of law and motion for new trial, which is filed contemporaneously with this motion, SwRI has argued in detail why the *Egan* doctrine applies in this case. SwRI incorporates that argument by reference and will not repeat the same arguments here. In brief, SwRI argues there that (1) the *Egan* doctrine applies to private contractors; (2) the doctrine applies to investigations or suitability determinations like what SwRI performed, regardless of whether a governmental security clearance is involved; and (3) as other courts have held, it is impossible to review Title VII retaliation claims under *Egan*,

[4] The trial transcripts are cited by the day of trial (i.e., Tr. 3 refers to proceedings on April 3, 2019) and are provided for the Court's convenience in Exhibit 1.

because the claims require the court and jury to evaluate whether an employer's predictive judgments about an employee's security risk, in violation of *Egan*.

Here, the Court has ordered injunctive relief based on the jury's verdict. But SwRI's view is that the retaliation claim should never have even gone to the jury in the first place because the Court lacked subject matter jurisdiction over the retaliation claim. The letter clearly pertains to the retaliation claim, and the Court should vacate the injunctive relief under *Egan*.

**F. In The Alternative, The Injunctive Relief Should Be Stayed Pending SwRI's Appeal.**

Rule 62(d) of the Federal Rules of Civil Procedure provides, in relevant part: "While an appeal is pending from an interlocutory order or final judgment that grants, continues, modifies, refuses, dissolves, or refuses to dissolve or modify an injunction, the court may suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights." FED. R. CIV. P. 62(d). Under Federal Rule of Appellate Procedure 8(a), a stay of an injunction should first be sought at the district court level. FED. R. APP. P. 8(a). The decision to grant a stay is "an exercise of judicial discretion, and the propriety of its issue is dependent upon the circumstances of the particular case." *Nken v. Holder*, 556 U.S. 418, 433 (2009) (internal quotation marks and brackets omitted). As the party requesting a stay, SwRI bears the burden of showing that the circumstances justify an exercise of that discretion." *See id.* at 433-34.

The Fifth Circuit has adopted a four factor test for use in weighing whether a stay of injunctive relief pending an appeal is warranted: "(1) whether the stay applicant has made a strong showing that [it] is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Texas v. United States*, 787 F.3d 733, 746-47 (5th Cir. 2015) (quoting *Planned Parenthood of Greater Tex.*

*Surgical Health Servs. v. Abbott*, 734 F.3d 406, 410 (5th Cir. 2013)). However, these four factors are not treated equally and the "[t]he first two factors ... are the most critical." *Nken*, 556 U.S. at 434. Further, the Fifth Circuit has clarified that the first factor "remains a prerequisite in the usual case even if it is not an invariable requirement. Only if the balance of equities (i.e. consideration of the other three factors) is ... heavily tilted in the movant's favor will we issue a stay in its absence, and, even then, the issue must be one with patent substantial merit." *Ruiz v. Estelle*, 666 F.2d 854, 857 (5th Cir. 1982) (internal quotation marks omitted).

In *Reading & Bates Petroleum Co. v. Musslewhite*, 14 F.3d 271 (5th Cir. 1994), the Fifth Circuit considered a contempt order against an attorney that required the attorney to be incarcerated daily and that was based on the attorney's filing of a state court suit for claims that had been raised and disposed of in federal court, with the court enjoining the attorney from prosecuting any action based upon the alleged injury, including the pending state court suit. The Fifth Circuit held that a stay of the contempt order was proper to prevent the underlying dispute from being rendered moot. *Id.* at 272. Further, the court also sought to prevent the irreparable harm of spending "each business day in the custody of the U.S. marshal" should the contempt order ultimately be found to be inappropriately granted. *Id.* In addition, the court stated, "the granting of our stay could not possibly have caused 'substantial harm' [to the plaintiff] ... in light of the fact that the controversy as to the effect of the federal proceeding on the state court proceeding had been going on for more than ten years." *Id.*

Many of the same factors considered by the Fifth Circuit in *Musslewhite* are present here. This case has been going on for many years. SwRI has a substantial case on the merits involving serious legal questions that should be presented to the Fifth Circuit, including violations of SwRI's First Amendment rights against compelled speech caused by the injunction, the scope of

*Egan's* prohibitions as recognized by other courts, the Plaintiff's waiver of her request for injunctive relief, and other issues identified in SwRI's renewed motion for judgment as a matter of law and motion for new trial.

Requiring SwRI to send the DSS Letter now would essentially moot the injunctive controversy, at great prejudice to SwRI, which would not have an opportunity for appellate review of relief that was entered for the first time in the Final Judgment. Moreover, as the case has been pending for over four years, with Plaintiff's employment being terminated nearly seven years ago, a stay of the injunctive relief is unlikely to cause Plaintiff substantial harm at this time. In fact, Plaintiff presented no evidence that she is currently seeking employment in a field where the incident report would impair her ability to be hired. As such, in light of the circumstances of this particular case and the injunctive relief sought, a stay does nothing more than preserve the status quo pending a determination by the Fifth Circuit of the important legal questions presented to it. The public interest is also served by allowing the process of an appeal to continue without becoming moot, when the constitutional issues raised by the Court's Final Judgment should be evaluated.

### G. The Court Should Vacate The Award of Front Pay.

The Court should not have exercised its discretion to award front pay. The jury found that Plaintiff failed to mitigate her damages, a failure that may reduce or eliminate entirely an award of front pay. *See, e.g.*, *Bogan v. MTD Consumer Group Inc.*, 919 F.3d 332, 336 (5th Cir. 2019) (holding that there was no clear error in the district court's refusal to award a plaintiff front pay where there was evidence to support the court's finding that she had failed to "use

reasonable diligence to obtain 'substantially equivalent employment'") (citation omitted).[5] Here, the jury not only found that Plaintiff failed to mitigate her damages but also found that her back wages should be reduced by an amount that exceeds the amount of front pay that Plaintiff now seeks. In such a circumstance, an award of front pay, in any amount, is clearly improper. *See Bogan*, 919 F.3d at 337 (noting that there may be cases in which "no prospective relief is appropriate for a victim of discrimination"). In awarding front pay, the Court reasoned as follows:

> Johnson has had difficulty obtaining substantially equivalent employment since SwRI terminated her. This is likely not only due to her failure to exercise reasonable diligence in seeking, obtaining, and maintaining substantially equivalent employment after the date of her termination but also because prospective employers learned she was fired. And as her length of unemployment grew over time, prospective employers likely became [warier] about hiring her. Johnson's lack of reasonable diligence only accounts for some of her present failure to obtain substantially equivalent employment.

Memorandum Opinion, Dkt. 149, at 7. However, the evidence at trial contradicts this conclusion. Plaintiff testified that she voluntarily chose to leave Pets Alive after working there for less than three months. Tr. 3, 229:9-11; Tr. 4, 76:12-22. In addition, she was terminated from Veterans Evaluations Services after working there just over three weeks due to her inability to successfully complete the required training. Tr. 4, 14:19-15:15. The evidence at trial further establishes that Plaintiff was out of work for almost five (5) years and that, during this time, she did not apply for employment to a number of local security contractors, including the MITRE Corporation and SAIC. *See* Tr. 4, 29:3-13. She also admitted that, to the extent that she was seeking employment, she was applying for engineering positions for which she was not

[5] *See also Sellers v. Delgado College*, 902 F.2d 1189, 1196 (5th Cir. 1990) (affirming the denial of front pay where the trial court found that the plaintiff did not exercise reasonable diligence to obtain substantially equivalent employment during the back pay period); *Hansard v. Pepsi-Cola Metro. Bottling Co.*, 865 F.2d 1461, 1470 (5th Cir. 1989) (recognizing that the district court "must consider [the plaintiff's] failure to mitigate his damages in determining the extent to which, if at all, front pay is appropriate").

qualified. Tr. 4, 75:23-76:11. Thus the evidence did not establish that it was "likely" that potential employers did not hire her because they learned she was fired. There is also no evidence that prospective employers grew wearier over time about hiring her, but that weariness was likely caused by Plaintiff's own lack of diligence, rather than any actions by SwRI.

WHEREFORE, Defendant Southwest Research Institute respectfully requests that this Court reconsider its award of equitable and injunctive relief to Plaintiff Mary Ellen Johnson in the form of the DSS Letter, enter an order vacating such relief, or in the alternative, issue a stay of the injunctive relief pending appeal. SwRI also requests that the Court vacate the award of front pay, and grant SwRI such other and further relief, both at law and in equity, both general and specific to which SwRI may show itself justly entitled.

Respectfully submitted,

NORTON ROSE FULBRIGHT US LLP

By: *\/s/ Mario A. Barrera*
Mario A. Barrera
State Bar No. 01805915
mario.barrera@nortonrosefulbright.com
Stephen J. Romero
State Bar No. 24046756
stephen.romero@nortonrosefulbright.com
300 Convent Street, Suite 2100
San Antonio, Texas 78205
Telephone: (210) 224-5575
Telecopier: (210) 270-7205

Counsel for Defendant
Southwest Research Institute

**CERTIFICATE OF CONFERENCE**

I hereby certify that on June 20, 2019, counsel for Defendant Southwest Research Institute conferred with counsel for Plaintiff regarding the substance of this Motion. Plaintiff opposes the relief sought herein.

*/s/ Mario A. Barrera*
Mario A. Barrera

**CERTIFICATE OF SERVICE**

I hereby certify that on this 20th day of June, 2019, I electronically filed the foregoing instrument with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following counsel of record:

Colin Walsh
Jairo Castellanos
Wiley Walsh, P.C.
1011 San Jacinto Blvd., Suite 401
Austin, TX 78701

Kalandra Wheeler
Rob Wiley, P.C.
1651 Richmond Ave.
Houston, TX 77006

Robert E. McKnight , Jr.
Law Office of Robert E. McKnight, Jr.
203 N. Liberty Street
Victoria, TX 77901

*/s/ Mario A. Barrera*
Mario A. Barrera

# EXHIBIT 1

Tr. 3

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| MARY ELLEN JOHNSON, Plaintiff, | § | CIVIL NO. 5:15-297-RCL |
| | § | |
| v. | § | April 3, 2019 |
| | § | |
| SOUTHWEST RESEARCH INSTITUTE, DEFENDANT. | § | |
| | § | |

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE ROYCE C. LAMBERTH
DISTRICT COURT JUDGE, and a jury

APPEARANCES:

For the Plaintiff:

Colin Walsh
Jairo Nikov Castellanos
Wiley Walsh, P.C.
1011 San Jacinto Blvd., Suite 401
Austin, TX 78701

Kalandra Nicole Wheeler
Rob Wiley, P.C.
1651 Richmond Avenue
Houston, TX 77006

For the Defendant:

Mario Alberto Barrera
Stephen J. Romero
Norton Rose Fulbright US LLP
300 Convent Street
Suite 2100
San Antonio, TX 78205

Produced by mechanical stenography; computer-aided transcription

Tr. 3

INDEX

PAGE

WILLIAM RYAN

Direct Examination by Mr. Walsh..........................3

Cross-Examination by Mr. Barrera........................60

Redirect Examination by Mr. Walsh......................145

Recross-Examination by Mr. Barrera.....................164

STEPHEN PADILLA

Direct Examination by Ms. Wheeler......................171

Cross-Examination by Mr. Barrera.......................179

Redirect Examination by Ms. Wheeler....................191

Recross-Examination by Mr. Barrera.....................198

MARY ELLEN JOHNSON

Direct Examination by Mr. Walsh........................199

EXHIBITS

Defendant's Exhibit 1 admitted..........................82

D62 admitted...........................................136

Alive. They were opening a new adoption center, so they made me an assistant to the director until we got that up and running, which was about -- I don't remember, maybe six months, maybe. Four months. I don't remember how long it took.

Q. And, I'm sorry, was that a paid position or did you say that was a volunteer position?

A. That was a paid position.

Q. Why did you end up leaving San Antonio Pets Alive?

A. They did away with that position. They offered me to be an adoption counselor but I declined that.

Q. And did you make $6,134.58 at San Antonio Pets Alive?

A. I believe so.

Q. And where else have you worked since your termination by Southwest Research?

A. Recently, October time frame I was, I worked for Veterans Evaluation Services for just a short time, maybe three weeks.

Q. What did you do there?

A. Oh, well, the first week we were in training. I had to go to Houston and be part of a training course to learn how to use the computer, to learn how to use their software. And then kind of get a feel what the work was. And then came back here to San Antonio and set up. They gave you a laptop and a monitor, two monitors. And started another -- started

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

MARY ELLEN JOHNSON, PLAINTIFF,

vs.

SOUTHWEST RESEARCH INSTITUTE, DEFENDANT.

DOCKET NO. SA:15-CV-297-RCL

TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE ROYCE C. LAMBERTH
UNITED STATES DISTRICT JUDGE
APRIL 4, 2019

APPEARANCES:

FOR THE PLAINTIFF:

COLIN WALSH, ESQUIRE
JAIRO NIKOV CASTELLANOS, ESQUIRE
WILEY WALSH, P.C.
1011 SAN JACINTO BOULEVARD
SUITE 401
AUSTIN TX 78701

KALANDRA NICOLE WHEELER, ESQUIRE
ROB WILEY, P.C.
1651 RICHMOND AVENUE
HOUSTON TX 77006

FOR THE DEFENDANT:

MARIO ALBERTO BARRERA, ESQUIRE
STEPHEN J. ROMERO, ESQUIRE
NORTON ROSE FULBRIGHT US LLP
300 CONVENT STREET
SUITE 2100
SAN ANTONIO TX 78205

REPORTED BY:

GIGI SIMCOX, RMR, CRR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
SAN ANTONIO, TEXAS

# INDEX


| | Page |
|---|---|
| MARY ELLEN JOHNSON | |
| Direct Examination By Mr. Walsh | 3 |
| Cross-Examination By Mr. Barrera | 8 |
| Redirect Examination By Mr. Walsh | 77 |
| Recross-Examination By Mr. Barrera | 81 |
| Further Redirect Examination By Mr. Walsh | 85 |
| Further Recross-Examination By Mr. Barrera | 85 |
| DAVID KING | |
| Direct Examination By Mr. Castellanos | 86 |
| Cross-Examination By Mr. Romero | 91 |
| JAMES JOHNSON | |
| Direct Examination By Mr. Walsh | 97 |
| Cross-Examination By Mr. Romero | 102 |
| NICK HAWKINS | |
| Direct Examination By Mr. Romero | 113 |
| Cross-Examination By Mr. Walsh | 141 |
| Redirect Examination By Mr. Romero | 177 |
| Recross-Examination By Mr. Walsh | 181 |
| DEBBIE LANGE | |
| Direct Examination By Mr. Barrera | 190 |
| Cross-Examination By Mr. Walsh | 205 |
| Redirect Examination By Mr. Barrera | 206 |
| MARY MASSEY | |
| Direct Examination By Mr. Barrera | 208 |
| Cross-Examination By Mr. Walsh | 222 |

THE COURT: Sustained.

BY MR. WALSH:

Q. What was the reason that Southwest Research provided to the Texas Workforce Commission, if you know?

A. That I had accepted the offer.

Q. What offer?

A. The offer of the severance agreement.

Q. And was that true, had you accepted the severance agreement?

A. No.

Q. So was it after that, that you then received unemployment benefits?

A. Yes.

Q. Now, even if you had accepted that severance package, would you have been able to get a job after being fired by Southwest Research?

A. I don't believe so.

Q. Why not?

A. Because of the incident report.

Q. And how would that have affected your ability to get a job?

A. Once you are labeled as untrustworthy, you're done. You're not -- no one is going to hire you. It says untrustworthy in my dismissal letter. It says untrustworthy in my incident report. So it's everywhere. So you're not

going to avoid it.

Q. Despite that incident report and Southwest Research labeling you as untrustworthy, did you attempt to find work after you were terminated?

A. I did.

Q. What did you do to find work?

A. San Antonio isn't quite the technological town, so I checked out at Lackland. I interviewed with a company called TASC. They do sort of the same thing. During the interview I explained what happened. They asked why I left Southwest Research and I explained the whole situation and never heard back from them.

I had some friends who had graduated -- that I graduated with, they tried to get me -- I guess it was maybe a year later, he tried to get me in with the security company that he was working for. When I interviewed they asked why I left Southwest. And Southwest Research is a really good company to work for, so people are usually curious, why did you leave. So when they asked, I'm not going to lie, I'm going to tell them what happened.

Q. And what was the result when you would tell these companies what had happened?

A. I would never hear anything back.

Q. Now, during jury selection we heard about a competitor of Southwest Research called, I think it was, Intertek?

is your mitigation efforts. And since this is my sheet I think I can add some information to it. We've talked about the unemployment benefits, which is the 11,076 that you received; correct?
A. Yes, sir.
Q. All right. And that would have been received sometime in the 2012 time frame shortly after your termination?
A. 2012/2013 I think.
Q. So why don't we just do that. All right. San Antonio Pets Alive!, according to what you told me when we met a little over two years ago, was you actually had started volunteering with them and then accepted a position with them in the fall of 2013, I think you told me sometime in the September to December 2013 time frame; is that correct?
A. Yes.
Q. All right. Miss Johnson, I'm going to have --
Miss Marr, I guess we're going to have to switch for a little bit and then come back to this. D70, please.
And, for the record, Miss Johnson, I'm showing you D70, and it's also found in that big notebook, but as long as it took me to get to it, it's probably easier for you just to look at the screen. We've taken the liberty of redacting your social security number, but it has your pertinent information, and you actually see the number that Mr. Walsh wrote up there, which is the $6,134.58. Do you see that?

A. I see it.

Q. All right. Now, we have an entry for something called --

And then if I could come back to this.

-- Veterans Evaluation Services; correct?

A. Yes.

Q. And you weren't there very long; were you?

A. No.

Q. All right. And I'm going to take this out right now so I'm not flipping through this book as much as I've been doing. I do want to come back. And, according to the records I have, it shows that you were hired on October 22nd, 2018; does that sound familiar?

A. Yes.

Q. All right. And then you separated November 13 of 2018?

A. That sounds right.

MR. BARRERA: Your Honor, may we approach?

THE COURT: Yes.

(At the bench.)

MR. BARRERA: Excuse me, your Honor. Exhibit 71 -- sorry -- Exhibit 78 are her employment records from Veterans Evaluation Services. Mr. Walsh has raised an objection to them because he says that they are not relevant. She was terminated for performance reasons after only about five weeks. I think that it's relevant to show that she did not properly mitigate her damages. It was very a straightforward

Q. All right. But right now we are talking about at least a list of companies that you have been able to identify, and so my questions right now are as to these companies and then we'll get to any applications that you've made. I just want to be clear. Since 2013 have you been specifically looking at the Intertek website or anything where Intertek might be posting openings?
A. No. Well, you said posting openings. If they are posting on Indeed or ClearanceJobs, they will pop up.
Q. That's what I was wanting to ask you. So outside of Indeed, where else are you looking for for positions?
A. There is a website called Clearance.
Q. Clearance?
A. Clearance Network. It's for jobs for -- that have security clearances. There is also USAJobs, which lists all the jobs for Lackland and the surrounding air force bases.
Q. Okay. But Intertek may not be posting necessarily on those websites; would they?
A. I don't know.
Q. Okay. And if they have postings or openings for work that doesn't involve classified information and security clearance, have you even been looking for those jobs?
A. I'm sorry? I don't understand.
Q. Yes. If there are positions that are available that do not involve classified information that require a security

clearance, have you been looking for those jobs?

A. Yes. The Argyle Security didn't require security.

Q. So where else have you applied? That's what I'm looking for, because it sounds like you haven't really been looking specifically since 2013 at Intertek, Rackspace, NSA, MITRE, SAISC, or any of these local entities. Where else have you applied for a job since 2013, other than Pets Alive! and Veterans Evaluation Services?

A. I might have applied at our new Honda dealership, but I didn't think that mattered because it wasn't an electronics job, and they also turned me down. So it's very discouraging to have to keep writing on applications why I left Southwest Research.

Q. All right. So you applied at a Honda dealership, and when did you do that?

A. There is a brand new Honda dealership right near our house, so they must have opened in 2018.

Q. So before or after Veterans Evaluations Services?

A. Before.

Q. Okay. And did they call you in for an interview?

A. I believe so.

Q. But they didn't hire you?

A. No.

Q. Okay. So would you agree with me, Miss Johnson, that a security clearance is not a right, it's a privilege?

Q. All right. And you could always reapply for a top secret in your SCI or any other security clearances that you may need for a particular job; can you not?

A. It's more like a reinstatement. They -- it's not -- you don't have to start all the way over. You already have an account in the government, so they pull up your information. It's not like you are starting brand new.

Q. And you could work at an employer that is willing to then sponsor you and then go through that readmission/reapplication process?

A. They would have to pay for an investigation and the refreshing, if you will.

Q. But have you had any employer, prospective employer, tell you they are unwilling to do that?

A. Tell me -- oh, no.

Q. Okay. And, again, either Argyle, or TASC, or the Arrow Science and Technology Company, have any of those ever told you, did they ever tell you in 2012/2013 that the reason they were not hiring you is because Southwest Research had reported your specific reason for termination to them?

A. I never hear back from them. When I apply, you expect to hear a letter back, a refusal letter. I just get no information. There is no follow-up. There is no --

Q. So the answer is there is no evidence that Southwest Research has provided your reasons for separation to any of

these three entities?

A. I'm sorry?

Q. There is no evidence that you can show this jury that anyone from Southwest Research provided the reason for your separation to either Arrow Science and Technology, Argyle Security, or TASC?

A. I do not have evidence, no.

Q. Or any other employer that you have applied for?

A. No, I do not have evidence.

Q. Okay. Now, what I was saying earlier about the seriousness of the work that you were doing, when we were talking about your termination meeting, I asked you who was present at that termination meeting; do you remember that question?

A. At the deposition?

Q. Yeah. During your deposition.

A. Yes.

Q. All right. And you told me Mary Massey, who we have yet to hear but the jury will get a chance to hear from her tomorrow, you told me there was a representative from the human resources department; correct?

A. Yes.

Q. You mentioned Alfredo Ramos and Mike McGoffin?

A. Yes.

Q. Who are both facility security officers?

evidence?

A. I didn't have time. I came in directly and filled it out as quick as I could.

Q. No. You are misunderstanding my question. Is there any document in the evidence from Mr. Cooper rushing you saying, you're in the office now, hurry, get that time sheet in, or else; anything that you've seen?

A. No.

Q. Okay. Anything from Mr. Hawkins?

A. No.

Q. D31. B, background.

You knew what was expected of you, Miss Johnson, especially given the type of work that you did at Division 11 and the security clearances that you were privileged to receive, you knew the standards that you were being held to; did you not?

A. Yes.

Q. And 22 days earlier you had been instructed, you had been reminded of that same obligation and told that you needed to change two earlier time entries; correct?

A. Yes.

Q. Miss Johnson, I told you I would come back to this and I'm here and wrapping up. When you told the ladies and gentlemen of the jury in response to my questions, and it was written down as you were looking for an electric or electronic

engineer position from some of these federal contractors; do you remember that?
A. Yes.
Q. You don't have an engineering degree; do you?
A. No.
Q. You have an electronic technologist or technology degree?
A. Right.
Q. So if you are applying for engineering positions, you are not qualified, you don't meet the criteria of an engineer; do you?
A. No.
Q. And if we sort of go through this time period and you even help correct me, you said three months at San Antonio Pets Alive!, which if I'm doing again, my math, four weeks per month, that's 12 weeks, and we count three more weeks for the time that you worked at Veterans Evaluation Services, 12 plus 3 is 15; would you agree with me on that math?
A. Yes.
Q. So out of the 346 weeks that are at issue in this case, you've only been able to find employment for 15 of those weeks?
A. Yes.
Q. And you were terminated from that last job?
A. Yes.
MR. BARRERA: Pass the witness.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| MARY ELLEN JOHNSON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CASE NO. 5:15-CV-00297-RCL |
| | § | |
| SOUTHWEST RESEARCH INSTITUTE, | § | |
| | § | |
| Defendant. | § | |

**ORDER GRANTING DEFENDANT SOUTHWEST RESEARCH INSTITUTE'S MOTION TO ALTER OR AMEND THE JUDGMENT**

ON THIS DAY came on to be considered Defendant's Motion to Alter or Amend the Judgment and, in the Alternative, Motion to Stay Injunctive Relief Pending Appeal. Based on the pleadings of record, it is hereby

**ORDERED** that the Court's Order & Judgment entered on May 23, 2019, is vacated to the extent it ordered Defendant Southwest Research Institute to send a letter to the Defense Security Service Personnel Security Management Office for Industry indicating that Plaintiff Mary Ellen Johnson had been terminated in retaliation for complaining about sex discrimination.

SIGNED this _______ day of _________________________, 2019.

_________________________________
ROYCE C. LAMBERTH
U.S. DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| MARY ELLEN JOHNSON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CASE NO. 5:15-CV-00297-RCL |
| | § | |
| SOUTHWEST RESEARCH INSTITUTE, | § | |
| | § | |
| Defendant. | § | |

**ORDER GRANTING DEFENDANT SOUTHWEST RESEARCH INSTITUTE'S ALTERNATIVE MOTION TO STAY INJUNCTIVE RELIEF PENDING APPEAL**

ON THIS DAY came on to be considered Defendant's Motion to Alter or Amend the Judgment and, in the Alternative, Motion to Stay Injunctive Relief Pending Appeal. Based on the pleadings of record, it is hereby

**ORDERED** that the Court's Order & Judgment entered on May 23, 2019, is stayed, pending Southwest Research Institute's appeal to the Fifth Circuit Court of Appeals, to the extent the Judgment ordered Defendant Southwest Research Institute to send a letter to the Defense Security Service Personnel Security Management Office for Industry indicating that Plaintiff Mary Ellen Johnson had been terminated in retaliation for complaining about sex discrimination.

SIGNED this _______ day of _________________________, 2019.

______________________________________
ROYCE C. LAMBERTH
U.S. DISTRICT JUDGE