# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS

| | |
|---|---|
| MARY ELLEN JOHNSON, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>SOUTHWEST RESEARCH INSTITUTE, )<br>)<br>Defendant. )<br>) | Civil Case No. 5:15-297 |

## MEMORANDUM OPINION

Southwest Research Institute fired Mary Ellen Johnson after she complained to the Equal Employment Opportunity Commission (EEOC) about receiving less tuition reimbursement than her male colleagues. So Johnson sued, claiming her termination violated Title VII's protections against sex discrimination and retaliation. A jury agreed, awarding her $550,914.94 in damages (plus interest) and forcing Southwest Research to withdraw an incident report it filed with the Defense Department's Defense Security Service (DSS) reporting her termination and labeling her a security risk.

Now, Southwest Research moves for judgment notwithstanding the verdict, or alternatively to amend the judgment, raising jurisdictional, evidentiary, and constitutional claims. But Southwest Research neither undermines the factual record nor identifies a legal error.

At the same time, Johnson moves for attorneys' fees and costs under 42 U.S.C. § 2000e-5(k). Because she won complete relief, her attorneys can recover their reasonable fees and out-of-pocket expenses. So the Court will deny Southwest Research's motions but grant Johnson's.

## I. Southwest Research's Motion for Judgment as a Matter of Law

Southwest Research's renewed motion for judgment as a matter of law begins by re-attacking the record's sufficiency. It continues by re-challenging the Court's jurisdiction under *Department of Navy v. Egan*, 484 U.S. 518, 529 (1988). And it concludes by re-attempting to invoke Title VII's national-security exception, § 2000e-2(g). These are uphill arguments, steepened by the fact that every judge to consider the issues has already rejected them. *See* ECF Nos. 84, 90, 149. They fail again here: though Southwest Research spends fourteen pages reciting evidentiary conflicts, it never blunts the evidence supporting the jury's verdict and damage award. And its *Egan* and § 2000e-2(g) arguments fall short since the record shows Southwest Research's termination decision focused solely on Johnson's general suitability as an employee, not her specific suitability to hold a security clearance or to comply with national security regulations.

### A

Southwest Research's sufficiency argument is particularly daunting: as long as "there is an[y] evidentiary basis upon which the verdict can be supported, the jury's determinations will be left undisturbed, even where there is substantial contradictory evidence that could have supported an opposite verdict." *Gibraltar Sav. v. LDBrinkman Corp.*, 860 F.2d 1275, 1297 (5th Cir. 1988); *see also West v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 384 (5th Cir. 2003) (noting a court deciding a posttrial motion for judgment as a matter of law "must draw all reasonable inferences in favor of the nonmoving party and not make credibility determinations or weigh the evidence" since both functions fall "within the province of the jury and its decision should be given deference if the record contains any competent evidence to support its findings" (internal

2

quotation marks omitted)). Here, evidence abounds supporting the jury's retaliation verdict, its sex-discrimination verdict, and its damage award.

1

Title VII requires three things to show retaliation: that a claimant "participated in an activity protected by Title VII," that "her employer took an adverse employment action against her," and that "a causal connection exists between the protected activity and the materially adverse action." *Aryain v. Wal-Mart Stores Tex. LP*, 534 F.3d 473, 484 (5th Cir. 2008). Here, both sides agree that Johnson participated in a protected activity by complaining to the EEOC, and that Southwest Research took an adverse employment action against Johnson by firing her. *See also Walker v. Thompson*, 214 F.3d 615, 629 (5th Cir. 2000). So the question is whether the former caused the latter.

Sufficient evidence shows Johnson's EEOC complaint caused her termination. Although Southwest Research claims it fired Johnson for repeatedly violating "timekeeping operating policies and procedures," Def.'s Ex. 66, five pieces of evidence support concluding this explanation was more-than-likely pretextual. *First*, Johnson's supervisor testified other employees made more frequent and more substantial timesheet errors but kept their jobs. *See* 4/3/19 Tr. 35:24–45:21; *see also* 4/2/19 Tr. 123:4-14 (noting employees submitted incorrect timesheets so often Southwest Research developed a form simplifying ex post corrections). *Second*, the same supervisor did not think Johnson's timesheet errors constituted fraud, and neither wanted nor expected executives to fire her. *See* 4/3/19 Tr. 161:9-13, 189:12-23. *Third*, Southwest Research began disciplining Johnson for timekeeping issues only after she complained about receiving less tuition reimbursement than her male colleagues. *See* 4/2/19 Tr. 115:15-17. *Fourth*, Southwest Research offered Johnson an unusual—and generous—severance

3

package conditioned on her dropping the EEOC complaint. *See* 4/2/19 Tr. 105:17-22; Def.'s Ex. 66 at 2. *Fifth*, and most damningly, Southwest Research executives openly discussed Johnson's EEOC complaint while debating her termination. *See* 4/3/19 Tr. 154:4-19. Since this constituted "adequate evidence to permit a reasonable finding of pretext," the jury reasonably concluded Southwest Research fired Johnson in retaliation for her EEOC complaint. *West*, 330 F.3d at 387-88.

2

A Title VII sex-discrimination plaintiff claiming she was impermissibly denied a benefit must show that her employer denied her a benefit extended to similarly situated male employees because of her sex. *See Nasti v. CIBA Specialty Chems. Corp.*, 492 F.3d 589, 593 (5th Cir. 2007). All agree that employees in Johnson's division could obtain at least some tuition reimbursement, and that Johnson only received partial reimbursement but her male colleagues received full reimbursement. *See, e.g.*, 4/2/19 Tr. 92:10–93:20. The rub, again, is the causal chain.

Although Southwest Research offered several nondiscriminatory explanations for the reimbursement disparity, the jury reasonably saw through each one. At first, Southwest Regional executive Bill Ryan claimed the company's general policy forbade full tuition reimbursement. *See* 4/2/19 Tr. 223:1–225:5. But even so, Ryan couldn't explain why Southwest Research granted exceptions for male employees but not for Johnson. *See id.* at 225:17–228:18. Next, he cast Johnson's tuition as too expensive, but had no answer to why men receiving full reimbursement attended even more expensive schools. *See* 4/2/19 Tr. 216:4-7. His argument that Johnson's school wasn't good enough didn't get much farther, since he acknowledged routinely hiring graduates from that institution. *See id.* at 216:11-13. Finally, although initially claiming Johnson's degree fell too far afield from her career path to add value, Ryan eventually admitted

4

her degree perfectly fit her position. *See id.* at 216:17–217:5. And without any other legitimate explanation, the jury could reasonably infer denying Johnson full tuition reimbursement more than likely amounted to sex discrimination.

3

Finally, Southwest Research questions the evidence underpinning the jury's $260,000 emotional damages award. But "compensatory damages for emotional distress" need only "be supported by competent evidence" establishing the "nature and extent of the harm." *Brady v. Fort Bend Cty.*, 145 F.3d 691, 718 (5th Cir. 1998) (internal quotation marks omitted). Although the evidence must "refer to [a] specific manifestation[] of emotional harm"—"vague[ly]" and "conclusory[il]y" claiming "hurt feelings, anger [or] frustration" will not do—a "plaintiff's testimony alone may be sufficient proof of mental damages" as long as "it speaks to the [harm's] nature, extent, and duration." *Id.* at 718-20 (internal quotation marks omitted).

Johnson cleared that hurdle. Her husband explained the termination "sent her into a deep depression," necessitating antidepressant medication as well as frequent doctor visits, and triggering emotional breakdowns whenever she would run into someone connected to Southwest Research in public. 4/4/19 Tr. 99:21–101:23. He specifically discussed an episode where Johnson began uncontrollably sobbing in a Whataburger, and another where Johnson couldn't bear to stay at a friend's funeral after encountering some former colleagues also in attendance. *Id.* A former colleague further described how Johnson's termination "devastated" her. *See id.* at 91:10-11. This evidence gave the jury an "adequate basis from which to gauge the 'nature and circumstances of the wrong and its effect on the plaintiff.'" *Brady*, 145 F.3d at 719 (quoting *Carey v. Piphus*, 435 U.S. 247, 263-64 (1978)).

5

B

Southwest Research's *Egan* argument fares no better. *Egan* precludes judicial review of the Executive Branch's decision to grant or revoke access to classified information. 484 U.S. at 527-29. The effect is deep but narrow: although *Egan* adjudges any inquiry into security-clearance eligibility determinations "an impermissible intrusion by the Judicial Branch into the authority of the Executive Branch over matters of national security," *Perez v. F.B.I.*, 71 F.3d 513, 514 (5th Cir. 2013), the rule applies only to classified information access, not to adjacent decisions concerning building access or certifications. *See Toy v. Holder*, 714 F.3d 881, 884-85 (5th Cir. 2013). To invoke the rule here, Southwest Research makes two moves: First, it elevates a private contractor's prediction about who can hold a security clearance on equal footing with the Executive's decisions about who can access classified information. Second, it stretches specific predictions about who can hold a security clearance to include general assessments of employee trustworthiness. But even assuming *Egan* extends so far, it would not shield Southwest Research here, since the record shows Southwest Research wasn't deciding whether Johnson could continue accessing classified information, but rather whether she could continue as an employee at all.[1] If Southwest Research had merely revoked Johnson's classified information access while allowing her to continue as an employee, its *Egan* argument would be much stronger. But as Southwest Research conceded during its summary judgment briefing, "this case is not about security clearance eligibility determinations," Def.'s Reply 1, ECF No. 81. Rather,

---

[1] That distinguishes this case from *Perez*, where the Fifth Circuit used *Egan* to block a former Federal Bureau of Investigation (FBI) employee's Title VII retaliation claim alleging the FBI "revok[ed] his top-secret security clearance and fir[ed] him" for participating in a "class action lawsuit against the FBI," since "*any* Title VII challenge to the revocation would of necessity require some judicial scrutiny of the merits of the [security clearance] revocation decision." 71 F.3d at 514 (emphasis added). But here, Johnson's retaliation claim skirted any question concerning access to classified information by focusing on Southwest Research's decision to fire her for a faulty timesheet days after she met with an EEOC counselor.

Southwest Research fired Johnson for reasons that apply with equal force regardless of her access to classified information. *Egan* is inapposite.

### C

So too for Title VII's national security exception. That provision forecloses employment discrimination or retaliation claims if the job "is subject to any requirement imposed in the interest of the national security of the United States under any security program in effect pursuant to or administered under any statute of the United States or any Executive order of the President" and the claimant "has not fulfilled or has ceased to fulfill that requirement." § 2000e-2(g). But as the record makes clear, Southwest Research never said it fired Johnson because she disregarded national security requirements; Southwest Research claimed it fired Johnson because two incorrect timesheets made her too untrustworthy. Indeed, manufacturing a national security concern out of a few fudged timesheets strains the record past its breaking point: one must squint hard at her supervisor's statement that "Johnson ha[d] lost the trust and integrity required to be an effective staff member," Def.'s Ex. 57 at 2; assume a sub silento security-clearance suitability determination lurked behind another supervisor's final explanation that "[t]he reason for [Johnson's] employment termination [wa]s [her] repeated violations of our timekeeping operating policies and procedures, which [] resulted in serious doubts as to [her] trustworthiness," Def.'s Ex. 66; and overlook the fact that no witness mentioned national security concerns on the stand. *Cf.* 4/5/19 Tr. 291:18-20 ("Q: . . . According to the language of this letter, was Miss Johnson terminated because she was a security risk? A: It does not specifically say that."). That doesn't mean Southwest Research's litigation position lacks logical force: it's true that untrustworthiness somewhat coextends with being a bad employee (according to common sense) and with being a national security risk (according to Executive Order 12,968 § 3.1(b)). It's

7

just that the record shows when Southwest Research fired Johnson, it focused solely on the first referent, not the second.[2]

## II. Southwest Research's Motion to Amend the Judgment

"[D]istrict courts have 'not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future.'" *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 364 (1977) (quoting *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418 (1975)). In this case, that meant monetary damages: the Court awarded Johnson $300,000 in compensatory damages plus interest; $150,000 in back pay plus interest; and $45,086.17 in front pay plus interest. *See* Order & J., ECF No. 148. But it also included injunctive relief. After terminating Johnson, Southwest Research lodged an incident report with the Defense Security Service, the agency tasked with processing security clearances for federal contractors, notifying the agency that Johnson

> was terminated for cause . . . due to her falsifying timesheet records and excessive tardiness. Her actions constitute fraud and unreliable behavior and are evidence of the misuse of employer's time and/or resources which call into question her honesty, integrity and trustworthiness. Ms. Johnson has had access to very sensitive classified information. The concern is that as a result of her termination, Ms. Johnson may pose a security risk by becoming an "insider threat."

*See* Mem. Op. 7-8, ECF No. 149. That report made it virtually impossible for Johnson to get another job requiring a security clearance, blacklisting her from her chosen career field. So the Court ordered Southwest Research to send a copy of the judgment to the Defense Security Service along with a letter requesting to "withdraw" the incident report and clarifying "Johnson

---

[2] Relatedly, the jury didn't have to determine whether *Egan* barred suit or whether § 2000e-2(g) doomed Johnson's claim: both are legal questions the Court already resolved in its opinion denying Southwest Research's motion for summary judgment. *See* ECF No. 90 (adopting ECF No. 84); *see also Hana Fin., Inc. v. Hana Bank*, 135 S. Ct. 907, 911-12 (2015).

8

was terminated in retaliation for her complaints of sex discrimination, rather than for the reasons stated in the incident report." *See* Order & J. 2-5.

Southwest Research argues that mandatory retraction violates the First Amendment's protection against compelled speech. Accordingly, it moves to vacate the judgment, or at least stay it pending appeal. But because ordering Southwest Research to disavow its incident report violated neither the U.S. nor the Texas Constitution, comported with relief in similar cases across the country, and "make[s] whole the victim[] of discrimination according to what would have been [her] experience in a non-discriminatory work setting," *Claiborne v. Ill. Cent. R.R.*, 583 F.2d 143, 149 (5th Cir. 1978), it was not "a manifest error of law or fact" meriting amending the judgment under Rule 59(e). *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 863 (5th Cir. 2003) (internal quotation marks omitted) (quoting *Simon v. United States*, 891 F.2d 1154, 1159 (5th Cir. 1990)).

Both the federal and Texas state constitutions permit "speech-related injunctions that are not prior restraints, such as ordering the deletion of defamatory statements posted on a website" or "mandatory injunctions calling for the removal of speech that has been adjudicated defamatory." *Kinney v. Barnes*, 443 S.W.3d 87, 99 (Tex. 2014). Indeed, district courts in this circuit and every other routinely employ such relief in Title VII cases "to make persons whole for injuries suffered on account of unlawful employment discrimination." *Albemarle Paper Co.*, 422 U.S. at 418; *e.g.*, *E.E.O.C. v. HBE Corp.*, 135 F.3d 543, 557 (8th Cir. 1998) (affirming an injunction requiring an employer to "expunge its employment records of all reference to the circumstances surrounding the firing of" two racial discrimination victims "and to provide both men with letters of recommendation" since the relief was not "broader than necessary to remedy the underlying wrong"); *Rau v. Apple-Rio Mgmt. Co.*, 85 F. Supp. 2d 1344, 1351 (N.D. Ga.

1999) (enjoining a corporation "from providing a negative evaluation of plaintiff's performance to any prospective employer" since "[w]ithout this relief" she "could be prevented from obtaining a job equivalent to the one she held before her discriminatory demotion, thereby perpetuating its discriminatory effect," but declining to force the corporation to send a recommendation "that misstates historical facts" by suggesting her "job performance was in every respect commendable"); *Martin v. Ansligner, Inc.*, 794 F. Supp. 640, 649 (S.D. Tex. 1992) (enjoining a corporation "from providing negative references" to "prospective employers" about an employee illegally fired for talking to a jobsite safety inspector). The Court follows that trend here, albeit lukewarmly: Southwest Research need not apologize or recharacterize Johnson's activities or trustworthiness; Southwest must only retract the incident report with a one-sentence clarification explaining the jury's conclusion about why Southwest Research fired Johnson. That order poses no constitutional concerns

It follows that the Court will not stay this relief. The Fifth Circuit uses a four-part test to "decid[e] whether to grant a stay pending appeal: (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Texas v. United States*, 787 F.3d 733, 746 (5th Cir. 2015) (internal quotation marks omitted) (quoting *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 410 (5th Cir. 2013)). But Southwest Research cannot pass the first (and most important, *see Ruiz v. Estelle*, 666 F.2d 854, 857 (5th Cir. 1982)) factor. After all, its *Egan* argument has already failed once. And its constitutional argument is exceedingly weak, resting principally on a doubly inapplicable twenty-eight-year-old Third Circuit case vacating an injunction requiring a defamation defendant

10

"to retract or withdraw various previously issued libelous statements and court filings," since the law contemplates retraction as a means for defamation defendants to mitigate damages and the panel was reluctant to foist that relief upon an unwilling defendant without guidance from the Pennsylvania legislature. *Kramer v. Thompson*, 947 F.2d 666, 669, 681-82. What's more, Southwest Research does not come close to showing Johnson would not be substantially injured if the case grinds on for a year (or more) before the Court of Appeals without relief. Southwest Research cannot obtain a stay.[3]

### III. Johnson's Motions for Fees and Costs

As the preceding Parts show, Johnson won; Southwest Research lost. *Cf. Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 603 (2001) (defining a "prevailing party" as a party a court awards "some relief" to). Rule 54(d) generally requires a court to order the losing side to bear the prevailing party's litigation costs. And in Title VII cases, 42 U.S.C. § 2000e-5(k) further allows courts to include a reasonable attorney's fee as part of these costs, including fees for the time spent working on the fee petition. *See Johnson v. State of Mississippi*, 606 F.2d 635, 637-38 (5th Cir. 1979).

"[T]he attorneys' fees calculus is a fact-intensive one and its character varies from case to case." *Hopwood v. Texas*, 236 F.3d 256, 281 (5th Cir. 2000). Both sides agree the calculus begins with the lodestar approach: multiplying the total hours contributing to a successful outcome with an hourly rate reasonable in the relevant community. *See Blum v. Stenson*, 465 U.S. 886, 895 (1984); *Hensley v. Eckerhart*, 461 U.S. 424, 433-34 (1983). And both sides agree

---

[3] The Court already considered Southwest Research's remaining contentions—whether Johnson waived her right to seek injunctive relief, whether Johnson satisfied the four-part test for injunctive relief, whether *Egan* precludes injunctive relief, and whether Johnson deserves front pay—in deciding Johnson's motion for judgment on the verdict. *See* Mem. Op. 6-11. The Court rejects these rehashed arguments for the reasons explained there.

that in the Fifth Circuit, once the Court calculates the lodestar, it must then contemplate adjusting the figure upwards or downwards according to factors explained in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974). Those factors include "[t]he time and labor required"; "[t]he skill requisite to perform the legal service properly" (including the attorney's "work product, his preparation, and general ability before the court"); "[t]he preclusion of other employment by the attorney due to acceptance of the case"; "[t]he amount involved and the results obtained"; and the attorney's "experience, reputation, and ability." *Id.* at 718–19.

A

Johnson's five-person legal team spent 1178.4 hours securing Johnson's complete relief. *See* Consol. Time R. & Summs., ECF No. 152-2. That figure includes the week-long trial as well as all the time spent successfully opposing Southwest Research's dispositive motions (before both the magistrate and the Court), *see* ECF Nos. 11, 30, 68, 86; successfully opposing Southwest Research's motion for interlocutory appeal, *see* ECF Nos. 91; successfully moving to compel on three different occasions, *see* ECF Nos. 31, 37, 57; successfully moving—over Southwest Research's opposition—for judgment on the jury's unanimous verdict, *see* ECF No. 148, and litigating fees, *see* ECF No. 152. And it represents sound billing judgment by Johnson's lead attorney Colin Walsh, who reduced two more junior colleagues' totals where they struck him as excessive, generally accounted for only one participant's time during inter-office conferences, omitted 50% of idle travel time, excised time spent drafting motions he ultimately forewent filing, wrote-off time conducing background research, and forfeited any recovery for four associate attorneys' time. *See* Decl. Colin W. Walsh ¶¶ 27–28, ECF No. 152-1; *see also Saizan v. Delta Concrete Prods. Co., Inc.*, 448 F.3d 795, 799 (5th Cir. 2006) (requiring "plaintiffs seeking attorney's fees" so "prov[e] that they exercised billing judgment" by

"document[ing ] the hours charged and [] the hours written off as unproductive, excessive, or redundant"). Walsh further eliminated hours the team spent on dismissed claims. *See id.* ¶ 29. And attempting to accommodate Southwest Research's objections, he abandons several more hours in his reply brief. *See* ex. 1, ECF No. 170. In total, these deductions decline reimbursement for 131.5 hours—roughly 10% of the team's total time. *See* Consol. Time R. & Summs.; Decl. Colin W. Walsh ¶ 29; Pl.'s Reply ex. 1. And that reduction is particularly striking given the team's already-measured litigation strategy: they spent just one day deposing Southwest Research's two corporate representatives and another day deposing a third witness, and complied with all Southwest Research's discovery demands. *See* Decl. Colin W. Walsh ¶ 20.

Southwest Research attacks this total on three fronts. *First*, it argues Walsh's ninety-eight-page billing record is too vague, and accordingly asks to slash the claimed hours 25%. *Second*, it complains Walsh did not write-off enough costs, and tries to wring another 50% off the total. *Third*, since Johnson succeeded only on her retaliation and unequal-tuition-reimbursement claims—she dropped her unequal-pay claim and the Court granted summary judgment to Southwest Research on her failure-to-promote claim—Southwest Research wants to slice the total hours 75%.

None succeed. *First*, Johnson's attorneys were "not required to record in great detail how each minute of [their] time was expended," and certainly not to track section-by-section progress when drafting a motion or brief. *Hensley*, 461 U.S. at 437 n.12. They need only "identify the general subject matter of [their] time expenditures" with enough specificity to facilitate judicial review. *Id.* Here, the Court could adequately ascertain each expenditure's reasonableness. *Id.* That's true even for the entries "grouping [related] tasks" into a single entry. *Hollowell v. Orleans Reg'l Hosp. LLC*, 217 F.3d 379, 392-93 (5th Cir. 2000). *Second*, the Court will not

13

entertain conclusory assertions about how long Southwest Research thinks Walsh should have spent on certain tasks; the Court personally reviewed Walsh's billing records and found none excessive or duplicative.[4] *Third*, the Supreme Court has expressly rejected "a mathematical approach comparing the total number of issues in the case with those actually prevailed upon":

> Where a plaintiff has obtained excellent results, h[er] attorney should recover a fully compensatory fee. . . . [T]he fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit. Litigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee. The result is what matters.

*Hensley*, 461 U.S. at 435. What's more, since Walsh's total request already deducts time spent exclusively on Johnson's unsuccessful claims, further reducing his recovery would "be an abuse of discretion." *Black v. SettlePou, P.C.*, 732 F.3d 492, 502-03 (5th Cir. 2013). At bottom, Johnson received an excellent result, and her attorneys deserve compensation for the time spent obtaining it.

**B**

For these efforts, Johnson's attorneys charge rates from $125 to $585 depending on the particular lawyer's experience, reputation, and ability; the weighted average hourly rate is roughly $445. *See* Pl.'s Reply 2. To support these rates' reasonableness, Walsh provides an

---

[4] That includes Johnson's claim for 80.25 hours spent using focus groups to refine and prepare his trial strategy. Southwest Research's single-sentence footnote objecting to these hours identified no case from any jurisdiction categorically excluding this time, *cf. Energy Intelligence Grp., Inc. v. Kayne Anderson Capital Advisors, LP*, 326 F.R.D. 453, 461 (S.D. Tex. 2018) (refusing to reimburse an "expenditure of over $235,000.00 for four different jury consulting companies" since it "was unreasonable and excessive"); *O'Sullivan v. City of Chicago*, 484 F. Supp. 2d 829, 837 (N.D. Ill. 2007) (deeming "the compensability of expenditures for a focus group . . . a matter for the court's discretionary judgment"); Johnson identifies several allowing it, *see* Pl.'s Reply 3 n.2 (collecting cases); and the Court thinks the time reasonably spent. *See generally Rozell v. Ross-Holst*, 576 F. Supp. 2d 527, 540 (S.D.N.Y. 2008) ("It is entirely proper . . . to bill a client for a mock trial exercise devoted to the case at hand. Just as preparation for oral argument frequently involves a moot court, so may preparation for an evidentiary presentation appropriately include a mock trial. Indeed, this technique has the added benefit of previewing a case for a mock jury, and the jury's reaction may influence a party's willingness to settle." (citations omitted)).

affidavit from a disinterested fee-paying San Antonio client acknowledging he currently pays Walsh $585 hourly to litigate federal employment matters in San Antonio. *See* Decl. Dr. Melvin G. Perry, Jr. ¶ 4, ECF No. 152-8; *see also La. Power & Light Co. v. Kellstrom*, 50 F.3d 319, 328 (5th Cir. 1995) ("To determine reasonable rates, a court considers the attorneys' regular rates . . . ."). Walsh also includes affidavits from three different San Antonio lawyers attesting to the rates' reasonableness. *See* Decl. Glen D. Mangum 3, ECF No. 152-5; Decl. Christopher McKinney ¶¶ 10–11, ECF No. 152-6; Decl. John W. Griffin, Jr. ¶ 11, ECF No. 152-8; *see also Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984) (noting once a "fee applicant [] produce[s] satisfactory evidence . . . that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation," the rate "is normally deemed to be reasonable").

Southwest Research argues those rates are too high, citing the Texas state bar's four-year-old survey listing a $258 median hourly rate for San Antonio employment lawyers and a $250 median hourly rate for small San Antonio law firms, and noting only 5.1% of attorneys bill over $500 hourly. *See* Dep't of Research & Analysis, State Bar of Tex., *2015 Hourly Fact Sheet* 1, 10, 13 (2016), https://www.texasbar.com/AM/Template.cfm?Section=Arcives&Template=/CM/ContentDisplay.cfm&ContentID=34182. Whatever probative value this survey has, it does not erode the evidence supporting the rates' reasonableness, particularly since other judges in this district have approved much higher hourly rates for less complicated cases. *See MidCap Media Fin., LLC v. Pathway Data, Inc.*, No. 15-60, 2018 WL 7890668, at *2 (W.D. Tex. Dec. 19, 2018) (approving a $755 hourly rate in a breach-of-contract case); *Xpel Techs. Corp. v. Carlas Int'l Auto. Accessory, Ltd.*, No. 16-1308, 2017 WL 9362801, at *9 (W.D. Tex. Nov. 27, 2017) (approving a $545 hourly rate for attorneys at a large law firm who obtained a default

judgment in a trademark infringement case); *see also City of San Antonio v. Hotels.com, L.P.*, No. 6-381, 2017 WL 1382553, at *11 (W.D. Tex. Apr. 17, 2017) (awarding attorneys with ten to twenty years experience $475 hourly, and attorneys with five to nine years experience $350 hourly in a class action under the Texas Tax Code); *Sierra Club v. Energy Future Holdings Corp.*, No. 12-108, 2014 WL 12690022, at *6 (W.D. Tex. Aug. 29, 2014) (awarding out-of-district counsel in a Clean Air Act case $925 per hour after finding that rate reasonable given their home market).

And even if this hourly rate did exceed the market, the *Johnson* factors would adequately justify any increase. "The most critical factor in determining an attorney's fee award is the 'degree of success obtained.'" *Romaguera v. Gegenheimer*, 162 F.3d 893, 896 (5th Cir. 1998) (quoting *Hensley*, 461 at 436). Here, Johnson's attorneys won their client over half-a-million dollars and all the equitable relief she sought with a remarkably sophisticated and professional presentation leading jurors to a unanimous verdict after just a few hours of deliberation.

## C

Johnson further accounts for $11,566.97 in "reasonable out-of-pocket expenses incurred by [her] attorney[s] . . . in the course of providing legal services." *Mennor v. Fort Hood Nat'l Bank*, 829 F.2d 553, 557 (5th Cir. 1987) (internal quotation marks omitted) (quoting *Laffey v. Nw. Airlines, Inc.*, 746 F.2d 4, 30 (1984)). These costs include travel expenses; filing, witness, and transcription fees; service and copying costs; and electronic research charges. *See* Summ. Costs, ECF No. 152-3. Southwest Research concedes $6,166.86 in travel expenses, filing fees, postage, and transcription costs, but baldly claims Johnson should not be able to claim attorney meals, copying costs, electronic research expenses, or focus group and consultant fees. That's just wrong: "Reimbursement for . . . meals, . . . photocopying, . . . computer legal research, . . .

[and] document scanning . . . are the types of litigation expenses that are recoverable . . . as part of an attorneys' fee award." *Alex v. KHG of San Antonio, LLC*, 125 F. Supp. 3d 619, 630 (W.D. Tex. 2015) (internal quotation marks omitted) (quoting *Hilton v. Exec. Self Storage Assocs., Inc.*, No. 6-2744, 2009 WL 1750121, at *16 (S.D. Tex. June 18, 2009)); *see also Hensley*, 461 U.S. at 433 n.7. And as already discussed, the Court thinks Johnson's lawyers advantageously leveraged focus groups and an expert consultant. *See supra* note 1. Southwest Research owes Johnson $11,566.97 in costs.

### D

Finally, Southwest Research owes Johnson interest running from the underlying merits judgment. *See La. Power & Light Co.*, 50 F.3d at 331-332. She requests 2.324% per annum, which Southwest Research does not contest.

\* \* \*

To review: Southwest Research must pay Johnson $535,609.47 in fees and costs, plus 2.324% interest beginning on May 23, 2019 and compounded annually.

### IV. Conclusion

For these reasons, the Court will deny Southwest Research's motions but grant Johnson's. A separate order follows.

August 23, 2019

Royce C. Lamberth
United States District Judge